UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Platypus Holdings, LLC,<br>405 North Highland Avenue<br>Merion Station, PA  19096 | : <br> : <br> : <br> : | Case Number: |
| Plaintiff, | : <br> : | |
| vs. | : <br> : | |
| Jeffrey B. Russell, M.D.  and<br>Rosemary Russell,<br>14 Wood Road<br>Wilmington, DE  19806 | : <br> : <br> : <br> : <br> : | |
| Defendant. | : | |

## COMPLAINT

Plaintiff Platypus Holdings, LLC, ("Platypus") brings forth the following causes of action and alleges the following against Defendants Jeffrey B. Russell, M.D. and Rosemary Russell (collectively the "Russells"):

### THE PARTIES

1. Platypus is a Pennsylvania Limited Liability Company with a mailing address at 405 North Highland Avenue, Merion Station, Pennsylvania 19066.

2. The Russells are individuals residing at 14 Wood Road, Wilmington, Delaware 19806.

### JURISDICTION AND VENUE

3. This Court has jurisdiction to hear this dispute pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

4.     Venue is proper in this District because the Platypus Operating Agreement (the "Operating Agreement") has a venue selection clause requiring that any action "relating to this Agreement shall be brought exclusively in the Federal District Court for the Eastern District of Pennsylvania…" Operating Agreement, attached hereto as Exhibit A, at Annex C, § GP15.)

5.     Venue is further proper in this District pursuant to 28 U.S.C. § 1391 (a) because Platypus's principal place of business is in this District, and the events giving rise to this Complaint occurred in this District.

## STATEMENT OF RELEVANT FACTS

6.     On or about January 31, 2012, the Russells purchased a membership interest in Platypus by executing a Subscription Agreement, attached hereto as Exhibit B, and the Operating Agreement. The Russells also made an initial capital contribution of $1.2 million in order to purchase 300 shares of Class B membership interest in Platypus.

7.     The Russells' 300 shares of Class B membership represented a 30% ownership interest in Platypus.

8.     Pursuant to Section 4(j) of the Subscription Agreement, the Russells' Class B membership has no voting rights and no rights to participate in the management of Platypus. By executing the Subscription Agreement, the Russells agreed that they were "willing to entrust all aspect of management of the Company to the Manager." (Exhibit B at § 4(j).)

9.     Likewise, the Operating Agreement expressly provides that the Russells will have no right participate in the management of Platypus. (Exhibit A at § 2.2.)

10.    In executing the Subscription Agreement, the Russells acknowledged their sophisticated and accredited status by, among other things, agreeing to the following:

3(a). The Subscriber (i) has received the information on Annex B to the Operating Agreement with regard to the Existing Portfolio but has not been furnished with any other property information, market data, business plan, financial forecast, offering literature or prospectus and has not received any representations or warranties from the Company or any representative of the Company other than as set forth in this Agreement, (ii) has received a copy of the Operating Agreement, (iii) has had full and complete access to all information requested by him and his advisors, and (iv) with his advisors has had an opportunity to ask questions of, and receive and review answers from, the Company and to conduct such investigation concerning the Company, its Members, managers, personnel, business, assets and prospects and concerning the Shares as the Subscriber and his advisors have desired;

3(b). The Subscriber has received all information and documentation which he might reasonably deem material to his decision to purchase the Shares and enter into this Agreement, has had an opportunity to consult with counsel and other advisors as he has considered appropriate in connection with evaluation of the purchase of the Shares, has relied solely upon this Agreement and independent investigations made by the Subscriber or his advisors in making a decision to subscribe for and purchase the Shares, and neither the Company nor any of its Members, managers or other representatives has made any representation or warranty, express or implied, except as expressly set forth herein;

3(c). Any valuations, projections, estimates of value or revenue or anticipated costs provided to or reviewed with Subscriber, including as set forth on Annex B to the Operating Agreement, constitute or contain forward-looking statements that are not historical facts, but rather are based on the Company's current expectations, estimates and projections about the real estate market. Examples, pro formas, uses of funds and words or concepts that indicate the Company's estimates, projections, expectations, intentions or plans are intended to identify and be forward-looking statements. These statements are not guarantees of future performance and are subject to some risks, uncertainties and other factors, many of which are beyond the control of the Company, are difficult to predict and could cause actual results to differ materially from those expressed or forecasted in the forward-looking statements. These risks and uncertainties include, among others, the "Risk Factors" below. The Subscriber has independently evaluated the Existing Portfolio and real estate market, has negotiated the valuations set forth on Annex B to the Operating Agreement and does not place undue reliance on any forward-looking statements.

3(d). An investment in the Shares involves certain risks, and the Shares must be considered a speculative investment which involves a high degree of risk with no assurance of any income therefrom and the substantial possibility of loss of the Subscriber's entire investment, and the Subscriber has taken full cognizance of and understands all of the risk factors relating to the purchase thereof. . . .; and

3(f). The Subscriber has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the proposed investment in the Shares.

11. The Russells were cognizant of the risks associated with their investment in Platypus, which were set forth at length in Section 4 of the Subscription Agreement:

4(a). Limited Operating History. Since its formation in March, 2010, the Company has acquired, or is completing the acquisition of, the Existing Portfolio but has not sold any of its properties and has generated only minimal, fluctuating revenue from its activities. Accordingly, the Company has only a limited operating history upon which the Subscriber may base an evaluation of its potential future performance. There can be no assurance that the Company will be able to develop its assets as revenue sources or to develop additional revenue sources, or that its operations will become profitable even if it is able to commercialize those sources.

4(b). Portfolio Valuation. The value of real property cannot be assured. The Company faces the risks inherent in the ownership, disposition and commercialization of real property, such as fluctuations in property values, construction costs, occupancy rates and operating expenses, an illiquid and uncertain market for the properties (whether for sale or rental), as well as risks of personal injury, property damage, environmental hazards and zoning, permitting or other regulatory matters. There is no assurance that the Existing Portfolio or any property therein has or will have the various values estimated on Annex B to the Operating Agreement or that the Company will be able to derive any of the revenues estimated on Annex B. Actual property values, disposition values or revenues may not be sufficient to return the Subscriber's capital or to generally realize profits to generate returns to the Subscriber. The Company may actually suffer loss and incur unwieldy liabilities.

4(c). Unidentified Investments. The Company's acquisition, disposition and revenue strategy is speculative and entails

> substantial risk. There is no assurance that the Company will achieve its objective, and results may vary substantially over time. The Manager will have broad discretion in identifying, locating, selecting, structuring and negotiating desirable investments for the Company, as well as the disposition or other use of those investments once made. Subscriber will not have the opportunity to evaluate personally the relevant economic, financial and other information which will be utilized by the Manager in his selection, evaluation and negotiation of any investments. The Company will not have fixed guidelines for investment, diversification or concentration, and the Company is likely to be concentrated in relatively few property types and geographic markets and possibly in a limited number of transactions. The Subscriber, therefore, will be relying on the ability of the Manager and Class A Members to identify suitable investments.

12. The Russells were also aware that they could not withdraw or resign their membership, or demand a return of capital contributions. (Operating Agreement, attached hereto as Exhibit A, at Annex C, GP1.4.)

13. The Russells were likewise cognizant of the ongoing and potentially unlimited need for additional capital that Platypus could acquire through capital calls from its members, including the Russells, as set forth in Section 4(d) of the Subscription Agreement:

> 4(d). Unlimited Capital Calls. Manager may call for capital for new investments up until dissolution of the company and for expenses up to one year thereafter to fund Company Expenses and Working Capital. The Manager also determines when to dissolve the Company, in the absence of which the term of existence of the Company will be perpetual. Accordingly, the Subscriber's commitment to contribute capital when a capital call is made could be perpetual and unlimited in amount.

14. The General Provisions in Annex C of the Operating Agreement defines "Company Expenses" broadly to include the following:

> "Company Expenses" include (a) expenses incurred in connection with obtaining third-party financing, and principal, interest, fees, expenses and any other deficiencies under or arising out of borrowings made by the Company to the extent not paid out of revenues from Portfolio Investments or otherwise related to

borrower defaults under any Portfolio Investments, (b) organizational, liquidation and indemnification expenses, obligations and liabilities of the Manager and the Company, (c) administrative expenses of the Company, including the cost of the preparation of financial statements, reports to Members, the annual audit (if any), financial and tax returns and tax reports required for Members or the Company, cash management expenses, escrow fees and expenses and routine legal and accounting expenses, (d) transactional and operating expenses of the Company, including travel, meals and entertainment expenses of the Manager or, if approved by the Manager, the Members, broker commissions, carrying costs, foreclosure costs and property management costs, to the extent not treated as Working Capital of the Manager, and (e) registration expenses and any taxes, fees or other charges of any Governmental Entity levied or assessed against the Company, and all expenses incurred in connection with any tax audit, investigation, settlement or review of the Company.

15. The General Provisions in Annex C of the Operating Agreement defines "Working Capital" broadly to include the following:

"Working Capital" means costs of sourcing deals, meals, entertainment and travel (including any of the Manager or, if approved by the Manager, the Members), salaries, benefits and other compensation of support staff, consultants, analysts, appraisers, underwriters, portfolio managers, attorneys and other professionals, insurance, office space and other overhead and operating expenses of the Company and/or the Manager, as reasonably determined by the Company.

16. In executing the Subscription Agreement, the Russells acknowledged that failure to pay capital calls when made would have substantial penalties by virtue of Section 4(e) of the Subscription Agreement:

4(e). Substantial Penalties for Default. Subscriber, as a Member, will be required to commit and fund additional capital proportionate to his Shares. A Member who fails to make capital contributions in a timely manner may suffer substantial penalties with respect to his Shares, including a total forfeiture of such Shares. Upon an event of default, such defaulting Member may, in the sole discretion of the Manger, be assessed a reduction in his capital account up to 50% of the aggregate amount of his previous capital contributions (which reduction will be credited to the

LEGAL\18226844\2

capital accounts of the other Members, including the Manager in his capacity as a Member), with appropriate adjustments made to the Shares held by such defaulting Member. In addition, the Company may take any or all of the actions set forth in the Operating Agreement.

17. Section 4.3 of the Operating Agreement likewise stresses the importance of timely paying capital calls and the substantial penalties in the event of default:

> 4.3. Default. Each Member agrees that time is of the essence in respect to the payment of such Person's Capital Contribution when due under this Section 4, that any failure of a Member to make all or a portion of any Capital Contribution on the applicable due date (a "Defaulting Member") would cause injury to the Company and to the other Members, and that the amount of damages caused by any such injury would be extremely difficult to calculate. Accordingly, each Member agrees that upon any such failure by a Defaulting Member (unless a cure opportunity is made available by the Company and such failure is cured in accordance with such opportunity), the Company, in its sole discretion, may take, without limitation, the following actions:
>
>> 4.3(a). The Company may cause the Capital Account of such Defaulting Member to be reduced by an amount (the "Default Deduction") up to 50% of the aggregate amount of such Defaulting Member's Capital Contributions made on or prior to the date of such default and make appropriate adjustments to the Shares and Percentage Interest held by such Defaulting Member, and the amount of such reduction shall be credited to the Capital Accounts of all non-defaulting Members in proportion to their respective Capital Accounts after giving effect to the other adjustments under this Section 4.3.
>
>> 4.3(b). The Company may redeem any of all Shares of the Defaulting Member upon payment to such Defaulting Member of an amount (the "Default Redemption Amount") equal to 50% of the fair market value of such Defaulting Member's Shares (calculated by the Company in its sole discretion) after taking into account the Default Deduction. In connection with any such redemption, the Company shall notify the Defaulting Member of the Default Redemption Amount and such notice shall be final

absent of manifest error. The excess of the fair market value of any Shares redeemed under this Section 4.3(b) over the Default Redemption Amount shall be credited to the Capital Accounts of all non-defaulting Members in proportion to their respective Capital Accounts after giving effect to the other adjustments under this Section 4.3 (with a corresponding debit to the capital account of the Defaulting Member).

4.3(c). The Company may, upon default, at its discretion, arrange for the sale of all or a portion of the Shares held by Defaulting Member, and such Defaulting Member hereby agrees to sell all or such portion of its Shares, to the Company, the other Members or another Person designated by the Company (including, without limitation, an existing Member or any affiliate of a Member) at such price and on such other terms as the Company deems appropriate. For any sale of the Defaulting Member's Shares pursuant to this Section 4.3(c), the purchase price paid for the Defaulting Member's Shares shall be applied in the following order: (i) To the payment of the expenses of the sale, including any selling commission, and the expenses of the Company resulting from the default, including reasonable attorneys' fees and costs (collectively, the "Default Expenses"); (ii) Thereafter, to the payment of all amounts then due and payable from the Defaulting Member to the Company as a Capital Contribution including any such unpaid amounts that contributed to the occurrence of the default; (iii) Thereafter, up to the amount of the purchase price remaining (if any), to the Defaulting Member, an amount not to exceed the amount of the Defaulting Member's Capital Account at the time of the default (prior to any reduction thereof pursuant to the forfeiture provisions of Section 4.3(a) above); and (iv) Thereafter, any remainder to the Company.

4.3(d). The Company may seek or obtain commitments or investments of capital from additional investors in amounts and on such terms as the Company determines in its sole discretion.

8

4.3(e). The rights and remedies referred to in this Section 4.3 shall be in addition to, and not in limitation of, any other rights available to the Members or the Company under this Agreement or at law or in equity. A Defaulting Member's default under this Section 4 shall not relieve any other Member of such Person's obligation to make its Capital Commitment. In addition, unless the Shares of any such Defaulting Member are redeemed pursuant to Section 4.3(b) or sold pursuant to Section 4.3(c), any such default shall not relieve such Defaulting Member of the obligation to make any required Capital Commitment subsequent to such default. The Company may proceed to collect from the Defaulting Member any amount due from such Member as and when due, as well as all costs and expenses of collection incurred by the Company (including reasonable fees and disbursements of counsel).

18. Section 4.2 of the Operating Agreement outlines the procedure for making capital calls and the three business day window within which the recipient of the capital call must make the required payment so as not to be declared in default:

> 4.2 Capital Call Procedure. The Capital Contribution of each Member shall be such Member's proportionate share of the total Capital Contribution based on their respective Shares, . . . . The Company shall give the Members at least three (3) Business Days' prior written notice of each Capital Contribution to be made in accordance with this Section 4, and each Member shall make such Capital Contribution, except as provided below, by wire transfer of immediately available funds in the amount and to the account specified in such notice within such period.

19. Beginning immediately after the execution of the agreement, Platypus periodically made capital calls and, for a time, the Russells timely paid their proportionate share within the allowed three business days.

9

### The Russells' First Event of Default

20. On August 3, 2013, Platypus invoiced the Russells for capital calls for May 2013, June 2013, and July 2013 (the "August 2013 Capital Call"). True and correct copies of the invoices are attached hereto as Exhibits C, D and E, respectively.

21. The Russells' share of the August 2013 Capital Call was $140,701.55.

22. Payment of the August 2013 Capital Call was due in full on August 7, 2013.

23. The Russells failed to make the required payment on August 7, 2013, and were therefore in default (the "First Default").

24. On August 8, 2013, Platypus issued a "Notice of Default Pursuant to Section 4.3 of Platypus Holdings, LLC's Operating Agreement" to the Russells. A true and correct copy of the August 8, 2013 email is attached hereto as Exhibit F.

25. Platypus expressly reserved, but did not then exercise, its rights to exercise its remedies pursuant to Section 4.3 of the Operating Agreement, including its remedy under Section 4.3(a) of the Operating Agreement to reduce the Russells' capital account by 50% and to reduce their ownership interest in Platypus by 50%, so that the Russells would only own 15% of the company.

26. Over time, the Russells eventually paid the amounts due pursuant to the August 2013 Capital Call, although the payments were not timely and the late payment did not cure the First Default.

### The Russells' Second Event of Default

27. On December 17, 2013, Platypus invoiced the Russells for capital calls for August 2013, September 2013, October 2013 and November 2013 (the "December 2013 Capital

Call"). True and correct copies of the invoices are attached hereto as Exhibits G, H, I and J, respectively.

28. The Russells' share of the December 2013 Capital Call was $202,225.10, which was reduced to $67,225.10 due to a prepayment that had been made by the Russells.

29. Payment of the December 2013 Capital Call was due in full on December 20, 2013.

30. On December 20, 2013, the Russells made a partial payment of $50,000, leaving a balance due on the December 2013 Capital Call of $17,225.10.

31. The Russells' failure to make the entire payment due on December 20, 2013 was a default under the Operating Agreement (the "Second Default").

32. To date, the Russells have not paid the $17,225.10 still owing on the December 2013 Capital Call.

33. Platypus reserved, but did not then exercise, its rights to pursue the remedies set forth in Section 4.3 of the Operating Agreement with respect to the Second Default, including its right to further reduce by 50% the Russells' capital account and ownership share, so that the Russells would only own 7.5% of Platypus by virtue of the Second Default, and would only have 25% of the capital account.

### The Russells' Third Event of Default

34. On January 7, 2014, Platypus invoiced the Russells for capital calls for December 2013, and for deferred and current taxes (the "January 2014 Capital Call"). True and correct copies of the invoices are attached hereto as Exhibits K and L respectively.

35. The Russells' share of the January 2014 Capital Call was $60,895.05.

36. Payment of the January 2014 Capital Call was due in full on January 10, 2014.

37. The Russells failed to pay the January 2014 Capital Call.

38. Failure to pay the January 2014 Capital Call constituted the Russells' third event of default pursuant and subject to Section 4.3 of the Operating Agreement (the "Third Default").

39. Platypus reserved, but did not then exercise, its rights to pursue the remedies set forth in Section 4.3 of the Operating Agreement with respect to the Third Default, including its right to further reduce by 50% the Russells' capital account and ownership share, so that the Russells would only own 3.75% of Platypus by virtue of the Third Default, and would only have 12.5% of the capital account.

**The Russells' Fourth Event of Default**

40. On February 1, 2014, Platypus invoiced the Russells for capital calls for January 2014 (the "February 1, 2014 Capital Call"). A true and correct copy of the invoice is attached hereto as Exhibit M.

41. The Russells' share of the February 1, 2014 Capital Call was $41,365.64.

42. Payment of the February 1, 2014 Capital Call was due in full on February 5, 2014.

43. The Russells failed to pay the February 1, 2014 Capital Call.

44. Failure to pay February 1, 2014 Capital Call constituted the Russells' fourth event of default pursuant and subject to Section 4.3 of the Operating Agreement (the "Fourth Default").

45. Platypus reserved, but did not then exercise, its rights to pursue the remedies set forth in Section 4.3 of the Operating Agreement with respect to the Fourth Default, including its right to further reduce by 50% the Russells' capital account and ownership share, so that the Russells would only own 1.875% of Platypus by virtue of the Fourth Default, and would only have 6.25% of the capital account.

### The Russells' Fifth Event of Default

46. On February 5, 2014 Platypus invoiced the Russells for an interim capital call to cover the company's shortfall due to the Russells' First, Second, Third and Fourth defaults and continued refusal to pay the $119,485.70 in total still owing (the "February 5, 2014 Capital Call"). A true and correct copy of the February 5, 2014 invoice is attached hereto as Exhibit N.

47. The proportionate amount the Russells owed pursuant to the February 5, 2014 Capital Call was $30,000. The Russells also still owed the unpaid monies relating to the Second, Third and Fourth Defaults, totaling $119,485.79.

48. Payment of the February 5, 2014 Capital Call was due in full on February 10, 2014.

49. The Russells failed to pay the February 5, 2014 Capital Call.

50. Failure to pay February 5, 2014 Capital Call constituted the Russells' fifth event of default pursuant and subject to Section 4.3 of the Operating Agreement (the "Fifth Default").

51. Platypus reserved, but did not then exercise, its rights to pursue the remedies set forth in Section 4.3 of the Operating Agreement with respect to the Fifth Default, including its right to further reduce by 50% the Russells' capital account and ownership share, so

that the Russells would only own 0.9375% of Platypus by virtue of the Fifth Default, and would only have 3.125% of the capital account.

### Platypus Exercised its Remedies Under Section 4.3(a) of the Operating Agreement

52. In the face of the repeated failure by the Russells to comply with their contractual obligations to meet capital calls and after being unable to reach an amicable resolution of this dispute, on February, 16, 2014, Platypus exercised its previously reserved remedies under Section 4.3(a) as they pertained cumulatively to all five events of the Russells' defaults. The Russells were advised of this action by letter from Platypus's counsel. A true and correct copy of the February 16, 2014 letter is attached hereto as Exhibit O.

53. By simultaneously exercising its previously unwaived remedies as they pertained cumulatively to all five events of the Russells' defaults, Platypus contractually reduced the Russells' capital account balance to 3.125% of its value as of February 16, 2014, and reduced the Russells' percentage ownership to 0.9375%.

54. Furthermore, the Russells remain obligated to Platypus for all unpaid capital calls, and for payment of future capital calls.

55. On February 16, 2014, Platypus issued a new invoice in the amount of $30,000 for interim working capital. The Russells' share of this invoice, following the exercise of Platypus' rights under Section 4.3 of the Operating Agreement and the corresponding reductions to the capital account and ownership interest, is $281.25. A true and correct copy of the February 16, 2014 invoice is attached hereto as Exhibit P.

## COUNT I
## Breach of Contract

56. Platypus incorporates by reference the allegations of paragraphs 6 through 55 as if fully set forth herein.

57. The Subscription Agreement and Operating Agreement are valid and enforceable contracts.

58. Pursuant to the Subscription Agreement and Operating Agreement, the Russells have an obligation to pay timely any and all capital calls.

59. The Russells have not paid the capital calls made as set forth herein.

60. The Russells' failure to comply with the payment obligations pursuant to the capital calls is a breach of the Subscription Agreement and the Operating Agreement.

61. Platypus has been damaged by the Russells' breach of the Subscription Agreement and the Operating Agreement in an amount in excess of the Court's jurisdictional limits, including the amount of the unpaid capital calls, the costs of collection, and lost business opportunities.

WHEREFORE, Platypus demands judgment against the Russells in an amount to be determined, but in excess of $75,000, together with attorneys' fees, costs and such other relief as the Court deems just and proper.

## COUNT II
## Declaratory Judgment

62. Platypus incorporates by reference the allegations of paragraphs 6 through 61 as if fully set forth herein.

63. Based on the facts described herein, the Russells have repeatedly and deliberately breached the terms of the Operating Agreement and the Subscription Agreement

resulting each time in an event of default. Specifically, the Russells have not timely paid capital calls on five distinct occasions, with each event creating a default that triggered the default provisions in Section 4.3 of the Operating Agreement.

64. On February 16, 2014, after forbearing for some time while attempting to come to an amicable resolution of the dispute between them, Platypus exercised its previously unwaived remedies under Section 4.3(a) as they pertained cumulatively to all five events of the Russells' defaults contractually reducing the Russells' capital account balance to 3.125% of its value as of February 16, 2014, and reducing the Russells' percentage ownership to 0.9375%.

65. There is an actual, substantial and immediate dispute between Platypus and the Russells with respect to Platypus's right to enforce section 4.3(a) of the Operating Agreement and with respect to the effect of such enforcement. By reason of this dispute, the Russells deny that their capital account is now worth only 3.125% of their attributable capital account balance and that their equity ownership has been reduced to 0.9375%. The Russells have further insisted that they have a right to the return of their unadjusted capital account and that they may resign their membership, all in contravention of the plain terms of the Operating Agreement and the Subscription Agreement.

WHEREFORE, Platypus respectfully requests a Declaratory Judgment establishing that the Russells' capital account is now 3.125% of its value as of February 16, 2014, and the Russells' percentage of ownership in Platypus is now 0.9375%, and that they will continue to be reduced by 50% with each additional missed capital call. Platypus further respectfully requests an order of the court awarding Platypus damages, attorneys' fees, costs and such other relief as the Court deems just and proper.

LEGAL\18226844\2

Respectfully Submitted,

COZEN O'CONNOR

By: *[signature]*

Sarah E. Davies (PA ID No. 62873)
1900 Market Street
Philadelphia, PA 19103
(215) 665-2768 Phone
(215) 701-2468 Fax
sdavies@cozen.com

February 19, 2014