## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PLATYPUS HOLDINGS, LLC, | ) |
| | ) |
|     Plaintiff and Counterclaim Defendant, | ) |
| | ) |
|     v. | ) C.A. No. 14-cv-00999-NIQA |
| | ) |
| JEFFREY B. RUSSELL and | ) |
| ROSEMARY RUSSELL, | ) <u>Jury Trial Demanded</u> |
| | ) |
|     Defendants and Counterclaim Plaintiffs | ) |

## FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM OF JEFFREY B. RUSSELL AND ROSEMARY RUSSELL

Jeffrey B. Russell ("Jeffrey") and Rosemary Russell ("Rosemary," and collectively with Jeffrey, the "Russells"), hereby answer Plaintiff's Amended Complaint (the "Complaint"), and state as follows:

## ANSWER TO COMPLAINT

1.     The Russells admit the averments of paragraph 1 of the Complaint, upon information and belief.

2.     Paragraph 2 of the Complaint is admitted as to Rosemary.  Jeffrey resides at 24 Brandywine Falls Road, Wilmington, Delaware.

3.     The averments of paragraph 3 of the Complaint set forth legal conclusions, to which no response is required.

4.     The averments of paragraph 4 of the Complaint set forth legal conclusions, to which no response is required.  The Russells further state that the Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.

5.     The averments of paragraph 5 of the Complaint set forth legal conclusions, to which no response is required.

6.     The Russells admit that they executed the Subscription Agreement and the Operating Agreement on or about January 31, 2012.  The Russells further state that the Subscription Agreement and the Operating Agreement are writings that speak for themselves. The Russells refer to the Subscription Agreement and the Operating Agreement for their true and correct contents and deny any inaccurate characterizations or interpretations of the Subscription Agreement and the Operating Agreement when read in context and in their entirety.  The Russells admit the averments of the second sentence of paragraph 6 of the Complaint, except to the extent that the Russells rolled over the proceeds of a $200,000 loan to Mr. Taffet before they executed the Subscription Agreement and Operating Agreement.

7.     The Russells admit the averments of paragraph 7 of the Complaint.

8.     The Subscription Agreement is a writing that speaks for itself.  The Russells refer to the Subscription Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Subscription Agreement when read in context and in its entirety.

9.     The Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.

10.     The Subscription Agreement is a writing that speaks for itself.  The Russells refer to the Subscription Agreement for its true and correct contents and deny any inaccurate

characterization or interpretation of the Subscription Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 10 of the Complaint.

11.    The Subscription Agreement is a writing that speaks for itself.  The Russells refer to the Subscription Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Subscription Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 11 of the Complaint.

12.    The Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 12 of the Complaint.

13.    The Subscription Agreement is a writing that speaks for itself.  The Russells refer to the Subscription Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Subscription Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 13 of the Complaint.

14.    The Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 14 of the Complaint.

15.    The Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 15 of the Complaint.

16.    The Subscription Agreement is a writing that speaks for itself.  The Russells refer to the Subscription Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Subscription Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 16 of the Complaint.

17.    The Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 17 of the Complaint.

18.    The Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 18 of the Complaint.

19.    Denied as stated.  The Russells admit that Platypus purported to make capital calls, but deny that the capital calls were necessary, appropriate or proper.  The Russells admit that they frequently contributed additional capital to Platypus and even prepaid capital amounts when requested.  The Russells deny all the remaining averments of paragraph 19 of the Complaint.

20.    Denied as stated.  The Russells admit that Platypus purported to make a capital call on August 3, 2013, but deny that the capital call was necessary, appropriate or proper.  The purported August 2013 Capital Call is a writing that speaks for itself.  The Russells refer to the purported August 2013 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported August 2013 Capital Call when read in context and in its entirety.

-4-

21.     The purported August 2013 Capital Call is a writing that speaks for itself.  The Russells refer to the purported August 2013 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported August 2013 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 21 of the Complaint.

22.     The purported August 2013 Capital Call is a writing that speaks for itself.  The Russells refer to the purported August 2013 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported August 2013 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 22 of the Complaint.

23.     Denied as stated.  The Russells admit that they did not make the demanded payment by August 7, 2013, but deny that not making the payment constituted a default under the Operating Agreement or in any other manner.  The Russells deny all the remaining averments of paragraph 23 of the Complaint.

24.     The August 8, 2013 email is attached to the Complaint as Exhibit F and is a writing that speaks for itself.  The Russells refer to the August 8, 2013 email for its true and correct contents and deny any inaccurate characterization or interpretation of the August 8, 2013 email when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 24 of the Complaint.

25.     The August 8, 2013 email is attached to the Complaint as Exhibit F and is a writing that speaks for itself.  The Russells refer to the August 8, 2013 email for its true and correct contents and deny any inaccurate characterization or interpretation of the August 8, 2013

#28986789 v1

email when read in context and in its entirety. The Russells deny all the remaining averments of paragraph 25 of the Complaint.

26.     The Russells deny that they did not pay the amounts demanded in the purported August 2013 Capital Call. The Russells deny all the remaining averments of paragraph 26 of the Complaint.

27.     Denied as stated. The Russells admit that Platypus purported to make a capital call on December 17, 2013, but deny that the purported capital call was necessary, appropriate or proper. The purported December 2013 Capital Call is a writing that speaks for itself. The Russells refer to the purported December 2013 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported December 2013 Capital Call when read in context and in its entirety.

28.     The purported December 2013 Capital Call is a writing that speaks for itself. The Russells refer to the purported December 2013 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported December 2013 Capital Call when read in context and in its entirety. The Russells admit that they had previously paid Platypus $135,000 as an advance. The Russells deny all the remaining averments of paragraph 28 of the Complaint.

29.     The purported December 2013 Capital Call is a writing that speaks for itself. The Russells refer to the purported December 2013 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported December 2013 Capital Call when read in context and in its entirety. The Russells deny all the remaining averments of paragraph 29 of the Complaint.

#28986789 v1

30.     The Russells admit that they made a $50,000 capital contribution to Platypus on December 20, 2013.  The Russells deny all the remaining averments of paragraph 30 of the Complaint.

31.     The averments of paragraph 31 of the Complaint set forth legal conclusions, to which no response is required.  The Russells deny all the averments of paragraph 31 of the Complaint.

32.     Denied as stated.  The Russells admit that Platypus purported to make a capital call on December 17, 2013, but deny that the capital call was necessary, appropriate or proper. The purported December 2013 Capital Call is a writing that speaks for itself.  The Russells refer to the purported December 2013 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported December 2013 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 32 of the Complaint.

33.     The December 17, 2013 email is attached to the Complaint as Exhibits G, H, I and J and is a writing that speaks for itself.  The Russells refer to the December 17, 2013 email for its true and correct contents and deny any inaccurate characterization or interpretation of the December 17, 2013 email when read in context and in its entirety.  The Russells deny all the remaining averments of Paragraph 33 of the Complaint.

34.     Denied as stated.  The Russells admit that Platypus purported to make a capital call on January 7, 2014, but deny that the purported capital call was necessary, appropriate or proper.  The purported January 2014 Capital Call is a writing that speaks for itself.  The Russells refer to the purported January 2014 Capital Call for its true and correct contents and deny any

inaccurate characterization or interpretation of the purported January 2014 Capital Call when read in context and in its entirety.

35.     The purported January 2014 Capital Call is a writing that speaks for itself.  The Russells refer to the purported January 2014 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported January 2014 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 35 of the Complaint.

36.     The purported January 2014 Capital Call is a writing that speaks for itself.  The Russells refer to the purported January 2014 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported January 2014 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 36 of the Complaint.

37.     The Russells admit that they did not pay the amounts demanded in the purported January 2014 Capital Call, and deny that the purported capital call was necessary, appropriate or proper.  The Russells deny all the remaining averments of paragraph 37 of the Complaint.

38.     The averments of paragraph 38 of the Complaint set forth legal conclusions to which no response is required.  The Russells deny all the averments of paragraph 38 of the Complaint.

39.     The January 2014 email is attached to the Complaint as Exhibits K and L, and is a writing that speaks for itself.  The Russells refer to the January 2014 email for its true and correct contents and deny any inaccurate characterization or interpretation of the January 2014 email when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 39 of the Complaint.

40.     Denied as stated.  The Russells admit that Platypus purported to make a capital call on February 1, 2014, but deny that the purported capital call was necessary, appropriate or proper.  The purported February 1, 2014 Capital Call is a writing that speaks for itself.  The Russells refer to the purported February 1, 2014 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported February 1, 2014 Capital Call when read in context and in its entirety.

41.     The purported February 1, 2014 Capital Call is a writing that speaks for itself. The Russells refer to the purported February 1, 2014 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported February 1, 2014 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 41 of the Complaint.

42.     The purported February 1, 2014 Capital Call is a writing that speaks for itself. The Russells refer to the purported February 1, 2014 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported February 1, 2014 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 42 of the Complaint.

43.     The Russells admit that they did not pay the amounts demanded in the February 1, 2014 Capital Call, and deny that the purported capital call was necessary, appropriate or proper. The Russells deny all the remaining averments of paragraph 43 of the Complaint.

44.     The averments of paragraph 44 of the Complaint set forth legal conclusions, to which no response is required.  The Russells deny all the averments of paragraph 44 of the Complaint.

#28986789 v1

45.     The February 1, 2014 email is attached to the Complaint as Exhibit M and is a writing that speaks for itself.  The Russells refer to the February 1, 2014 email for its true and correct contents and deny any inaccurate characterization or interpretation of the February 1, 2014 email when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 45 of the Complaint.

46.     Denied as stated.  The Russells admit that Platypus purported to make a capital call on February 5, 2014, but deny that the capital call was necessary, appropriate or proper.  The purported February 5, 2014 Capital Call is a writing that speaks for itself.  The Russells refer to the purported February 5, 2014 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported February 5, 2014 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 46 of the Complaint.

47.     The purported February 5, 2014 Capital Call is a writing that speaks for itself. The Russells refer to the purported February 5, 2014 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported February 5, 2014 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 47 of the Complaint.

48.     The purported February 5, 2014 Capital Call is a writing that speaks for itself. The Russells refer to the purported February 5, 2014 Capital Call for its true and correct contents and deny any inaccurate characterization or interpretation of the purported February 5, 2014 Capital Call when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 48 of the Complaint.

49.     The Russells admit that they did not pay the amounts demanded in the purported February 5, 2014 Capital Call, and deny that the purported capital call was necessary, appropriate or proper.  The Russells deny all the remaining averments of paragraph 49 of the Complaint.

50.     The averments of paragraph 50 of the Complaint set forth legal conclusions, to which no response is required.  The Russells deny all the averments of paragraph 50 of the Complaint.

51.     The February 5, 2014 email is attached to the Complaint as Exhibit F and it's a writing that speaks for itself.  The Russells refer to the February 5, 2014 email for its true and correct contents and deny any inaccurate characterization or interpretation of the February 5, 2014 email when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 51 of the Complaint.

52.     Denied as stated.  The Russells admit that Platypus emailed the Russells on February 16, 2014, purporting to exercise remedies under Section 4.3(a) of the Operating Agreement, but deny that the letter and the purported exercise of remedies were necessary, appropriate or proper.  The February 16, 2014 letter is a writing that speaks for itself.  The Russells refer to the February 16, 2014 letter for its true and correct contents and deny any inaccurate characterization or interpretation of the February 16, 2014 letter when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 52 of the Complaint.

53.     The averments of this paragraph of the Complaint set forth legal conclusions to which no response is required.  The February 16, 2014 letter and the Operating Agreement are writings that speak for themselves.  The Russells refer to the February 16, 2014 letter and the

Operating Agreement for their true and correct contents and deny any inaccurate characterization or interpretation of the February 16, 2014 letter or the Operating Agreement when read in context and in their entirety.  The Russells deny all the remaining averments of paragraph 53 of the Complaint.

54.     The averments of this paragraph of the Complaint set forth legal conclusions to which no response is required.  The Russells deny all the averments of paragraph 54 of the Complaint.

55.     Denied as stated.  The Russells admit that Platypus purported to issue an invoice on February 16, 2014, but deny that the purported invoice was necessary, appropriate or proper.  The purported February 16, 2014 invoice and the Operating Agreement are writings that speak for themselves.  The Russells refer to the purported February 16, 2014 invoice and the Operating Agreement for their true and correct contents and deny any inaccurate characterization or interpretation of the purported February 16, 2014 invoice or the Operating Agreement when read in context and in their entirety.  The Russells deny all the remaining averments of paragraph 55 of the Complaint.

56.     The Russells deny the averments of paragraph 56 of the Complaint.

57.     The Russells deny the averments of the first sentence of paragraph 57 of the Complaint.  The June 16, 2014 email, attached to the Complaint as Exhibit Q, is neither official nor proper nor effective for any purpose.  The June 16, 2014 email is a writing that speaks for itself.  The Russells refer to the June 16, 2014 email for its true and correct contents and deny any inaccurate characterization or interpretation of the June 16, 2014 email when read in context and in its entirety.

-12-

58.     The June 16, 2014 email is a writing that speaks for itself.  The Russells refer to the June 16, 2014 email for its true and correct contents and deny any inaccurate characterization or interpretation of the June 16, 2014 email when read in context and in its entirety.

59.     The June 16, 2014 email is a writing that speaks for itself.  The Russells refer to the June 16, 2014 email for its true and correct contents and deny any inaccurate characterization or interpretation of the June 16, 2014 email when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 59 of the Complaint.

60.     The Russells admit the averments of paragraph 60 of the Complaint, upon information and belief.

61.     The Construction and Sale Agreement attached as Exhibit R is a writing that speaks for itself.  The Russells refer to the Construction and Sale Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Construction and Sale Agreement when read in context and in its entirety.

62.     The Construction and Sale Agreement is a writing that speaks for itself.  The Russells refer to the Construction and Sale Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Construction and Sale Agreement when read in context and in its entirety.

63.     The Construction and Sale Agreement is a writing that speaks for itself.  The Russells refer to the Construction and Sale Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Construction and Sale Agreement when read in context and in its entirety.

64.     The Russells admit that they approved Management's assignment of the Construction and Sale Agreement to Platypus.  The Russells further state that the Construction

-13-

and Sale Agreement is a writing that speaks for itself.  The Russells refer to the Construction and Sale Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Construction and Sale Agreement when read in context and in its entirety. The Russells deny all the remaining averments of paragraph 64 of the Complaint.

65.     The Russells admit that they paid substantial amounts to Platypus in connection with 50 Fairview.  The Russells deny all the remaining averments of paragraph 65 of the Complaint.

66.     The Russells are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 66 of the Complaint.

67.     The Russells admit that they paid for and purchased 50 Fairview in their own names.  The Russells further state that Construction and Sale Agreement is a writing that speaks for itself.  The Russells refer to the Construction and Sale Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Construction and Sale Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 67 of the Complaint.

68.     The Russells are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 68 of the Complaint.

69.     The Russells admit that they had the financial ability to purchase 50 Fairview, and that they did purchase 50 Fairview by obtaining a line of credit.  The Russells deny all the remaining averments of paragraph 69 of the Complaint, particularly that they "agreed to purchase 50 Fairview on behalf of Platypus."

#28986789 v1

70.    The Russells admit that prior to their purchase of 50 Fairview, they communicated with Platypus about the property.  The Russells deny all the remaining averments of paragraph 70 of the Complaint.

71.    The Russells admit that they purchased 50 Fairview in their own names.  The Russells deny all the remaining averments of paragraph 71 of the Complaint.

72.    The emails referred to in paragraph 72 of the Complaint are writings that speaks for themselves.  The Russells refer to the emails for their true and correct contents and deny any inaccurate characterization or interpretation of the emails when read in context and in their entirety.  The Russells deny all the remaining averments of paragraph 72 of the Complaint.

73.    The Russells deny all the averments of paragraph 73 of the Complaint.

74.    The Russells admit that Rosemary Russell attended the closing of 50 Fairview on November 12, 2012.  The Russells admit that Mr. Taffet attended the closing of 50 Fairview, but did so at his own insistence and not at Rosemary's invitation.  The Russells deny all the remaining averments of paragraph 74 of the Complaint.

75.    The Russells admit that they purchased 50 Fairview in their own names using a personal line of credit.  The Russells deny all the remaining averments of paragraph 75 of the Complaint.

76.    The text message referred to in paragraph 76 of the Complaint is a writing that speaks for itself.  The Russells refer to the text message for its true and correct contents and deny any inaccurate characterization or interpretation of the text message when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 76 of the Complaint.

-15-

77.     The Russells admit that they are the sole owners of 50 Fairview both in title and in deed, and that Platypus has no interest in the property.  The Russells deny all the remaining averments of paragraph 77 of the Complaint.

78.     The Russells admit that they are the sole owners of 50 Fairview, that Platypus has no interest in the property.  The Russells deny that they purchased 50 Fairview for the benefit of Platypus.

79.     The Russells admit that they are the sole owners of 50 Fairview and that Platypus has no interest in the property, and that Platypus has no right to use 50 Fairview for collateral or for any other purpose.  The Russells deny all the remaining averments of paragraph 79 of the Complaint.

80.     The Russells admit that they are the sole owners of 50 Fairview, and that Platypus has no interest in the property.  The Russells deny all the remaining averments of paragraph 80 of the Complaint.

81.     The averments of paragraph 81 of the Complaint set forth legal conclusions, to which no response is required.

82.     The Russells incorporate their responses to paragraphs 1-81 of the Complaint as if fully set forth herein.

83.     The averments of paragraph 83 of the Complaint set forth legal conclusions, to which no response is required.  The Russells further state that the Subscription Agreement and the Operating Agreement are writings that speak for themselves.  The Russells refer to the Subscription Agreement and the Operating Agreement for their true and correct contents and deny any inaccurate characterization or interpretation of the Subscription Agreement and the Operating Agreement when read in context and in their entirety.

84.     The averments of this paragraph of the Complaint set forth legal conclusions, to which no response is required.  The Russells further state that the Subscription Agreement and the Operating Agreement are writings that speak for themselves.  The purported capital calls referenced in the Complaint were not necessary, appropriate or proper.  The Russells refer to the Subscription Agreement and the Operating Agreement for their true and correct contents and deny any inaccurate characterization or interpretation of the Subscription Agreement and the Operating Agreement when read in context and in their entirety.

85.     Denied as stated.  The Russells admit that Platypus purported to make capital calls, but deny that the capital calls were necessary, appropriate or proper.  The Russells admit that they frequently contributed capital to Platypus.

86.     The averments of paragraph 86 of the Complaint set forth legal conclusions, to which no response is required.

87.     The averments of paragraph 87 of the Complaint set forth legal conclusions, to which no response is required.

88.     The Russells incorporate their responses to paragraphs 1-87 of the Complaint as if fully set forth herein.

89.     The averments of the first sentence of paragraph 89 of the Complaint set forth legal conclusions, to which no response is required.  The Subscription Agreement and the Operating Agreement are writings that speak for themselves.  The purported capital calls referenced in the Complaint were not necessary, appropriate or proper.  The Russells refer to the Subscription Agreement and the Operating Agreement for their true and correct contents and deny any inaccurate characterization or interpretation of the Subscription Agreement and the

-17-

Operating Agreement when read in context and in their entirety.  The Russells deny all the remaining averments of the second sentence of paragraph 89 of the Complaint.

90.     Denied as stated.  The Russells admit that John M. Gerber, Esquire emailed the Russells on February 16, 2014, purporting to exercise remedies under Section 4.3(a) of the Operating Agreement, but deny that the letter was necessary, appropriate or proper.  The February 16, 2014 letter is a writing that speaks for itself.  The Russells refer to the February 16, 2014 letter for its true and correct contents and deny any inaccurate characterization or interpretation of the February 16, 2014 letter when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 90 of the Complaint.

91.     The averments of the first sentence of paragraph 91 of the Complaint set forth legal conclusions, to which no response is required.  The Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.  The Russells admit the averments of the second sentence of paragraph 91 of the Complaint.  The Russells deny all the remaining averments of paragraph 91 of the Complaint.

92.     The Russells incorporate their responses to paragraphs 1-91 of the Complaint as if fully set forth herein.

93.     The Russells deny the averments of paragraph 93 of the Complaint.  The averments of this paragraph of the Complaint set forth legal conclusions, to which no response is required.  The purported capital calls referenced in the Complaint were not necessary, appropriate or proper.  The Russells deny all the remaining averments of paragraph 93 of the Complaint.

-18-

94.     Denied as stated.  The Russells admit that John M. Gerber, Esquire emailed the Russells on February 16, 2014, purporting to exercise remedies under Section 4.3(a) of the Operating Agreement, but deny that the letter and the remedies were necessary, appropriate or proper.  The Russells further state that the February 16, 2014 letter is a writing that speaks for itself.  The Russells refer to the February 16, 2014 letter for its true and correct contents and deny any inaccurate characterization or interpretation of the February 16, 2014 letter when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 94 of the Complaint.

95.     The Operating Agreement is a writing that speaks for itself.  The averments of this paragraph of the Complaint set forth legal conclusions, to which no response is required.  The Russells refer to the Operating Agreement for their true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.

96.     The June 16, 2014 email and the Operating Agreement are writings that speak for themselves.  The purported capital calls referenced in the Complaint were not necessary, appropriate or proper.  The Russells refer to the June 16, 2014 email and the Operating Agreement for their true and correct contents and deny any inaccurate characterization or interpretation of the June 16, 2014 email and the Operating Agreement when read in context and in their entirety.  The Russells deny all the remaining averments of paragraph 96 of the Complaint.

97.     The averments of the first sentence of paragraph 97 of the Complaint set forth legal conclusions, to which no response is required.  The Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents

-19-

and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.  The Russells admit the averments of the second sentence of paragraph 97 of the Complaint.  The Russells deny all the remaining averments of paragraph 97 of the Complaint.

98.     The averments of the first sentence of paragraph 98 of the Complaint set forth legal conclusions, to which no response is required.  The Operating Agreement is a writing that speaks for itself.  The Russells refer to the Operating Agreement for its true and correct contents and deny any inaccurate characterization or interpretation of the Operating Agreement when read in context and in its entirety.  The Russells deny all the remaining averments of paragraph 98 of the Complaint.

99.     The Russells incorporate their responses to paragraphs 1-98 of the Complaint as if fully set forth herein.

100.     The averments of paragraph 100 of the Complaint set forth legal conclusions, to which no response is required.

101.     The Russells deny all the averments of paragraph 101 of the Complaint.

102.     The Russells admit the averments of paragraph 102 of the Complaint.

103.     The Russells deny that they are obligated to compensate Platypus for any expenses.

104.     The Russells deny all the averments of paragraph 104 of the Complaint, but admit they will not allow Platypus to leverage 50 Fairview.

105.     The Russells admit the averments of paragraph 105 of the Complaint.

106.     The averments of paragraph 106 of the Complaint set forth legal conclusions, to which no response is required.

107.    The averments of paragraph 107 of the Complaint set forth legal conclusions, to which no response is required.

108.    The Russells incorporate their responses to paragraphs 1-107 of the Complaint as if fully set forth herein.

109.    The averments of paragraph 109 of the Complaint set forth legal conclusions, to which no response is required.

110.    The averments of paragraph 110 of the Complaint set forth legal conclusions, to which no response is required.  The Russells deny all the remaining averments of paragraph 110 of the Complaint.

111.    The averments of paragraph 111 of the Complaint set forth legal conclusions, to which no response is required.  The Russells deny all the remaining averments of paragraph 111 of the Complaint.

112.    The Russells incorporate their responses to paragraphs 1-111 of the Complaint as if fully set forth herein.

113.    The averments of paragraph 113 of the Complaint set forth legal conclusions, to which no response is required.

114.    The averments of paragraph 114 of the Complaint set forth legal conclusions, to which no response is required.

115.    The Russells admit that they are the sole owners of 50 Fairview, and that Platypus has no interest in the property.  The remaining averments of paragraph 115 of the Complaint set forth legal conclusions, to which no response is required.  The Russells deny all the remaining averments of paragraph 115 of the Complaint.

#28986789 v1

116.    The averments of paragraph 116 of the Complaint set forth legal conclusions, to which no response is required.

FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails, in whole or in part, to state a claim on which relief can be granted.

SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract are barred, in whole or in part, by Plaintiff's failure to mitigate.

THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract are barred, in whole or in part, by Plaintiff's breaches of the same contracts.

FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands.

FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because any damages allegedly sustained by Plaintiff were caused, in whole or in part, by Plaintiff's own acts and/or omissions.

SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of waiver and laches.

SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of accord and satisfaction, ratification, consent or release.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because of fraud committed by Plaintiff or third parties acting on Plaintiff's behalf, in inducing the Russells to invest in Plaintiff and in operating Platypus to their own advantage and to the Russells' detriment.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the terms of the applicable agreements.

## TENTH AFFIRMATIVE DEFENSE

To the extent either of the Russells is liable to Plaintiff in any amount, which they deny, they are entitled to offset any damages caused by Plaintiff as a result of its bad faith and/or tortious conduct in connection with the matters at issue in this action.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by its breaches of the implied covenant of good faith and fair dealing contained in each of the agreements at issue in this action, including, without limitation, the Operating Agreement, the Subscription Agreement, and the agreements relating to the sale of 50 Fairview.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff has suffered no damages.

## RESERVATION OF DEFENSES

Defendants reserve the right to assert any and all additional defenses, both factual and legal, as may be justified by information subsequently obtained.

#28986789 v1

WHEREFORE, the Russells demand judgment in their favor and against Platypus Holdings, LLC on all Counts of the Complaint and the following Counterclaims, as well as such other and further relief as this Court deems just and proper.

## COUNTERCLAIMS OF JEFFREY B. RUSSELL AND ROSEMARY RUSSELL AGAINST PLATYPUS HOLDINGS, LLC

Counterclaim Plaintiffs Jeffrey B. Russell ("Jeffrey") and Rosemary Russell ("Rosemary," and collectively with Jeffrey, the "Russells"), assert counterclaims against Plaintiff/Counterclaim Defendant Platypus Holdings, LLC ("Platypus"), and state as follows:

### NATURE OF THE ACTION

1.      Platypus and its Class A members fraudulently induced Jeffrey and Rosemary Russell to invest in Platypus.  The Class A members also served as the manager, Managing Partner and construction manager of Platypus.  The Class A members ran Platypus as their own personal treasury, used the Russells' investments as their own, and engaged in far-reaching self-dealing in conscious disregard for the Russells' membership and investment in Platypus.  The Class A members operated Platypus as a sham enterprise and fraudulently conducted business in the name of Platypus to benefit themselves, to the detriment of the Russells.  This Counterclaim expresses how Platypus, its Class A members, manager, Managing Partner and construction manager defrauded the Russells through misrepresentations, self-dealings, lies, misstatements, fraudulent activities and conducted other notorious actions in a willful, bad faith and reckless manner that caused the Russells to lose the benefit of their entire $3.4 million investment in Platypus.  The Russells seek recovery of their losses.

### THE PARTIES

2.      Counterclaim Plaintiffs are Jeffrey B. Russell and Rosemary Russell.

3.      Counterclaim Defendant is Platypus.

-24-

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the Russells' claims against Platypus pursuant to

28 U.S.C. § 1367.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because

Platypus's principal place of business is within this District, and many of the events giving rise

to this Counterclaim occurred within this District.

## BACKGROUND

*Development of the Relationship Between the Russells and the Taffets*

6.      These Counterclaims are the unfortunate but (in hindsight) inevitable conclusion

of a scheme devised by David M. M. Taffet, Esquire ("Mr. Taffet") to take advantage of a

relationship of friendship and trust that began some 20 years ago.

7.      Tracy R. Williams ("Ms. Williams") joined the scheme sometime in 2011.

8.      Rosemary met Mr. Taffet's wife Sharon Taffet ("Sharon") in the early 1990s

through a play group for mothers and children at Pennsylvania Hospital in Philadelphia.

9.      The wives of two busy professionals with first-born infant sons, Rosemary and

Sharon became fast friends.  Their children, who were each around the same age, also became

close.  Soon, the friendship expanded to include Jeffrey and Mr. Taffet.

10.     Over time, the friendship between the Russells and the Taffets grew, and the

families began to spend a lot of time together.  They became the closest of friends, spending the

Jewish High Holidays together, celebrating birthdays and Bar and Bat Mitzvahs and becoming

close with each other's extended families.

11.     Rosemary would socialize with Sharon during the week, keeping one another

company while they watched and cared for their children.  On weekend mornings, when Jeffrey

worked and Sharon enjoyed some time to herself, Mr. Taffet and Rosemary would take their children out to breakfast.

12.     Rosemary and Mr. Taffet became very close friends.

13.     As their wives got closer, Jeffrey and Mr. Taffet also forged a friendship, and shared confidences about their respective businesses, hopes and dreams.

14.     When Jeffrey and Mr. Taffet first met, Mr. Taffet worked as a young associate with the law firm Blank Rome LLP.  Mr. Taffet said he was a transactional lawyer, negotiating and brokering financings and other transactions.  Jeffrey was a young doctor working hard to establish a practice.

15.     As they developed their professional practices, Mr. Taffet looked to Jeffrey for advice, particularly as he charted his career path.  Jeffrey was Mr. Taffet's senior by ten years, and more professionally established in his field, having been through some of the same growing pains that Mr. Taffet would experience.

16.     Around 1995, Jeffrey and Mr. Taffet had dinner at Ruth's Chris Steak House in Philadelphia, and Mr. Taffet confided that he was considering leaving his law practice.  Mr. Taffet explained to Jeffrey that he would prefer brokering his own deals to working on those brokered by his clients.  Mr. Taffet sought Jeffrey's advice.

17.     Jeffrey encouraged Mr. Taffet to follow his dreams, as Jeffrey had done in becoming a doctor, and pursue his passion.  Not long after this dinner, Mr. Taffet left his law practice, and became a venture capitalist and deal broker.

*The Couples' Relationship Evolves*

18.     Over the ensuing years, The Russells believed that the couples' relationship deepened and strengthened.  Despite each moving out of the Philadelphia – the Taffets to the

-26-

Philadelphia Main Line and the Russells to Wilmington – they remained close friends, and continued to share holidays, family celebrations and other special occasions.

19.     The changes in location amplified some of the differences between the couples. The Taffets, particularly as Mr. Taffet's business ventures grew, began to live much more extravagantly, especially compared to the Russells, who preferred a low-key lifestyle.

20.     Mr. Taffet boasted to the Russells of the success he enjoyed in his business, and regularly regaled Jeffrey and Rosemary with his latest successes and triumphs, the substantial money he made and how he made it.  Over the years, Mr. Taffet represented that his business shifted its focus away from brokering deals to operating businesses for his own account.

21.     Mr. Taffet purchased a company called Lippincott that operated a cash-for-gold website called [www.goldkit.com](www.goldkit.com).  Mr. Taffet told the Russells that in 2007 alone, Lippincott generated such substantial revenues and profits for Mr. Taffet, that he repaid  the multi-million dollar loan he had taken out to purchase the business much faster than he anticipated.

22.     Mr. Taffet also said he began renovating and selling residential properties for profit, including the first house on Kent Road in Lower Merion that the Taffets purchased after moving from Philadelphia.  Mr. Taffet frequently told the Russells of his great successes buying homes at reduced prices, renovating them, and selling them at a considerable profit.

23.     Sharon participated in these ventures by sorting jewelry for Lippincott, identifying valuable items and separating gems, and decorating the houses that the Taffets renovated.  Once, when Jeffrey and Rosemary visited the Taffets' home, Sharon produced a tray of diamonds, spread them out on her bed, and said "this is what $75,000 of precious stones and pave diamonds look like."

24.     Although Sharon always had preferred higher-end amenities, she jumped into her new lifestyle with gusto, spending hundreds of thousands of dollars on haute couture stylings, plastic surgery, throwing fancy parties and hosting elaborate events and fundraisers.

25.     Despite their differences, and being separated by 35 miles, the Russells believed that the couples shared a friendship that remained strong, flourished and grew.

*The Taffet and Russell Families Vacation Together in Asia*

26.     Over the years, the Taffets told the Russells of their exotic vacations to Europe, Asia, and the Caribbean (among others), traveling first class, staying in the finest hotels, and eating in the finest restaurants.  The Taffets bragged that by the time their daughter Lily celebrated her Bat Mitzvah, she had visited 30 countries.

27.     The Taffets invited the Russells to join in their vacations, but the Russells did not want to spend the kind of money on vacations that the Taffets did.  However, in 2010, the Russells decided to accept the Taffets' invitation to join them and their two children on a tour of southeast Asia (the "Asia Trip").

28.     The families spent over a year planning the trip together.  In December 2011, the families (each couple joined by their two children) embarked on an 11-day tour of Hong Kong, Cambodia and Thailand.

29.     During the Asia Trip, one subject dominated the conversation between Jeffrey and Mr. Taffet:  Mr. Taffet's latest investment project Platypus.

*Mr. Taffet Solicits Jeffrey to Invest in Platypus*

30.     Jeffrey had previously invested with Mr. Taffet.  In October 2011, Mr. Taffet asked Jeffrey for a short-term loan of $200,000, promising an outsized return -- 10% interest payable in 120 days.  The interest and return of Jeffrey's principal would be due at the end of

January 2012, less than a month after the Russells and Taffets would return from their Asia Trip, during which Mr. Taffet would begin to inveigle the Russells to invest with him in Platypus. Jeffrey agreed and wired $200,000 to Mr. Taffet on October 4, 2011.

31.     As the Russells came to learn later, Mr. Taffet's presentations, inducements and promises had all the hallmarks of a classic Ponzi scheme.  Mr. Taffet wanted to lay the foundation of positive returns on relatively smaller investments to whet the Russells' appetite for larger investments.

32.     During the Asia Trip, Mr. Taffet constantly discussed his trips to New Orleans and his recent real estate acquisitions.  Mr. Taffet described the philosophy of his real estate company, Platypus, and explained that the key to the business was to purchase foreclosed and distressed properties at low prices.  Because the purchase prices were so low, Mr. Taffet informed Jeffrey that the Company and its investors were guaranteed to reap considerable profits on the sale of those properties.

33.     Mr. Taffet described Platypus's portfolio of 15 New Orleans properties which Platypus purportedly had acquired for approximately $927,000 and the assumption of approximately $500,000 in loans on two of the properties.  Mr. Taffet claimed that Platypus was able to acquire the properties for "pennies on the dollar."  He further stated that since Platypus purchased them, the properties' values already had appreciated substantially, and that he was willing to share his profits with the Russells, if they agreed to purchase a 30% interest in the Company for $1.2 million.

34.     To substantiate the appreciated valuations, Mr. Taffet explained the backgrounds of the neighborhoods in which the properties were located, and his plan for each of the properties.  Mr. Taffet said that Platypus had acquired a prime piece of real estate (901 Piety

Street) in the New Orleans "Bywater" area that Mr. Taffet described as a "rapidly appreciating and highly desirable neighborhood." Mr. Taffet represented that, upon completion, the 901 Piety Street property would house a retail store that would generate $10,000 to $21,000 a month in rental revenue, with condominium units above the store which Platypus would sell for prices between $2 million and $2.2 million. Mr. Taffet later memorialized this representation in a December 7, 2013 "Schedule of Real Estate Owned," a true and correct copy of which is attached hereto as Exhibit "1."

35.     Mr. Taffet stated that Platypus intended to invest approximately $1.9 million to complete renovations of the New Orleans properties within 2-8 months. The renovations would continue to increase the properties' and the neighborhood's values substantially and enable Platypus either to sell them quickly for a substantial profit, or rent them to generate an income stream for Platypus and its members. Mr. Taffet represented that Platypus's residential and commercial rental properties would generate approximately $90,000-$120,000 in monthly revenue.

36.     Mr. Taffet explained how Platypus operated, how the Russells' investment would work, and outlined the costs, anticipated profits and anticipated revenue streams associated with each New Orleans property. Mr. Taffet presented himself as an experienced businessman with years of success purchasing, renovating, and selling real estate for profit. Mr. Taffet described his experience with confidence, and stated that he had served as the general contractor on his previous projects, a role which he represented allowed Platypus to keep costs down. Mr. Taffet touted his appraisal and property evaluation abilities.

37.     Jeffrey asked many questions about the properties, the finances, and how any investment would work. Mr. Taffet always provided polished answers that sounded good. Mr.

Taffet explained that the quality of Platypus's renovation and construction work would add value to the properties and surrounding neighborhoods, ensuring that the Russells' investment would prove profitable.  In response to Jeffrey's questions about Mr. Taffet's prior experience appraising these kinds of properties, Mr. Taffet stated,  "that their actual values increased in comparison with his initial appraisals," that his appraisals had been accurate and his  property values were right on target.

38.     Jeffrey believed what his trusted friend Mr. Taffet, told him, *i.e.* that he was an experienced real estate developer with several completed projects, including a recent sale and several ongoing projects, at the time he approached the Russells about investing in Platypus.  Mr. Taffet's explanations, coupled with the trust and goodwill accumulated over the course of their 20-year friendship, sold Jeffrey on considering the investment further, once they returned from Asia.

*Investment Discussions Heat Up Post-Asia*

39.     Upon returning from Asia in January 2012, Mr. Taffet continued to press the Russells to invest in Platypus.

40.     In Asia, Mr. Taffet stated that he was working with Ms. Williams, whose experience he talked up frequently and advertised as having real estate skills superior even to his. He extolled her ability to keep costs low by purchasing materials at discount prices and prepaying subcontractors to lock in labor and construction costs.

41.     Not long after they returned from Asia in early January 2012, Mr. Taffet arranged a lunch meeting among himself, Ms. Williams, Jeffrey and Rosemary.

42.     At the lunch meeting and at subsequent meetings, Mr. Taffet presented Ms. Williams (and she presented herself) as a sophisticated developer, general contractor and

businesswoman, with substantial real estate success as the principal in several multi-million dollar projects.

43.     Ms. Williams also claimed prior successful careers in banking and government service, and said that she had made a substantial amount of money buying and selling real estate since she was 17 years old.  Ms. Williams told the Russells that she owned approximately 100 properties.

44.     Ms. Williams presented herself as having overcome great adversity in her life to achieve her current success.  She told Jeffrey and Rosemary that she was from Chicago, and described her background and family experiences in great detail.

45.     In an effort to entice the Russells to invest with her, Mr. Taffet and Platypus, Ms. Williams constantly told the Russells about the rich and famous people with whom she did business.  Ms. Williams claimed to be very well-connected, counting Oprah Winfrey and Mike Tyson among her friends.  She said that she served on a prestigious committee in Chicago with Michelle Obama, and that she shortly would travel to Israel with Nation of Islam leader Louis Farrakhan.  She also claimed that she owned a home in Jamaica, showed the Russells a picture of the purported home, and said that Jamie Foxx had rented her Jamaica home for which she collected $20,000 weekly.

46.     Ms. Williams touted herself as an expert contractor, with experience as a developer, a banker, and a financier.  She claimed to have owned a wide variety of businesses over the years, from which she always enjoyed great success, including multi-million dollar domestic and international real estate development projects.

47.     At a second meeting in January 2012 at the Hotel DuPont in Wilmington, Mr. Taffet described the Platypus strategy in greater detail.  Mr. Taffet provided the Russells with

written descriptions, pictures and a spreadsheet of the Platypus properties, reported how much Platypus had paid to acquire the properties, the amounts Platypus already had invested for renovations, the future funding requirements, dates of completion and post-renovation rents, revenues and sale prices ("Annex B").  A true and correct copy of Annex B which Mr. Taffet provided to the Russells to induce them to invest with him in Platypus, is attached hereto as Exhibit "2."  Mr. Taffet said that Platypus would renovate and sell or rent its existing properties within 2-8 months in order to begin generating revenue quickly.  He explained Platypus's long-term plan to own entire blocks of New Orleans, renovate them, and rent them for a profit.  Mr. Taffet explained that once Platypus completed the renovations the existing Platypus properties would generate monthly cash flow of approximately $30,000 for the Russells if they invested.

48.    Mr. Taffet explained that the residential properties represented just the beginning. Mr. Taffet and Ms. Williams also planned to renovate, open and operate several commercial properties through Platypus.  Mr. Taffet explained his plan to develop a steakhouse, a rib joint, a coffee shop, a retail warehouse, and a nightclub, tentatively named Silhouette, among other businesses.

49.    Mr. Taffet presented a very clear and deliberate plan for renovating the Platypus portfolio properties.  He presented a great opportunity with "no worries," and stated that the Russells would be fools not to invest with Mr. Taffet in Platypus.  When Rosemary noted that the New Orleans properties appeared to occupy a floodplain and inquired about the potential loss in the event of another catastrophic weather event, Ms. Williams responded that the Federal Emergency Management Agency ("FEMA") would guaranty the properties' values and ensure that neither Platypus nor its members would suffer any loss.

50.     Mr. Taffet and Ms. Williams said that Ms. Williams, with her extensive experience as a developer and general contractor, would serve as the general contractor for the renovation of the properties, obtain all necessary permits and licenses and be responsible for all aspects of property management.

*The Russells Take the Bait and Invest in Platypus*

51.     Over the course of January 2012, Mr. Taffet and Ms. Williams, through telephone calls, emails, text messages, and meetings, continued to push the Russells to invest in Platypus. They promised the Russells that they had negotiated excellent purchase prices on the properties, partially due to the devastation caused by Hurricane Katrina, and that the Russells would enjoy great returns on their investment and the financial security to realize their retirement plans and goals.

52.     Mr. Taffet and Ms. Williams stated that the Russells would recoup 70% of their contemplated initial $1.2 million investment upon the sale of 901 Piety Street alone.

53.     By late January, Mr. Taffet and Ms. Williams had sold the Russells on their scheme.  The Russells told Mr. Taffet that they would invest in Platypus, Mr. Taffet, Ms. Williams, and the promises they had made.

54.     Mr. Taffet told the Russells that he would roll over the unpaid $200,000 principal and $20,000 interest from Jeffrey's October 2011 short-term loan to Mr. Taffet into their Platypus capital contribution, but the Russells objected.  Jeffrey objected to rolling over his $200,000 without first receiving his outstanding interest payment, while Rosemary wanted the prior principal and returned interest paid before the Russells committed any capital to Platypus. Mr. Taffet ultimately persuaded Jeffrey to agree to accept only the $20,000 interest payment.  Mr. Taffet was happy to oblige Jeffrey by paying this relatively small amount, a

#28986789 v1

necessity to grease the wheels and keep the Russells satisfied until they signed the Platypus paperwork.  However, he persisted on rolling the unpaid $200,000 principal into Platypus. Rosemary eventually capitulated.

55.     Once the Russells had committed to invest in Platypus and agreed to roll over the unpaid $200,000, Mr. Taffet no longer had a need to slow roll them.  Instead, he kicked his scheme into overdrive.  Within days of the Russells' expression of interest, Mr. Taffet's lawyer John Gerber, Esquire, transmitted organizational documents for the limited liability company, as well as a subscription agreement for the Russells' investment in Platypus, on January 26, 2012.

56.     Once Mr. Gerber provided the documents, Mr. Taffet made everything a rush. Just four days after Mr. Gerber provided the documents, Mr. Taffet pressured the Russells to sign them and wire the remaining $1 million of their investment as soon as possible.

57.     While reviewing the Platypus documents, Jeffrey became concerned about some of the repercussions in the agreements, particularly in the event the Russells failed to meet a capital call if, and when, one was made.  The draft operating agreement that Attorney Gerber had sent initially indicated that if the Russells missed a single capital call, Platypus could reduce the value of their entire investment substantially, not by just the amount of the missed call.

58.     Jeffrey objected to this provision, and told Messrs. Gerber and Taffet that the language was not acceptable.  Jeffrey reasoned that the non-payment of a single capital call should not diminish the value of the Russells' entire investment, but only reduce their investment by the amount of the missed call, and further that a missed call should impact only their interest in the properties to which the proceeds of the missed call would apply.  Mr. Taffet told Jeffrey not to worry, that he agreed with Jeffrey's concern, and said that he would have Attorney Gerber make the necessary changes and provide a revised draft.  Shortly thereafter, Attorney Gerber

emailed Jeffrey that he had made the requested changes, and provided a revised draft.  Mr. Taffet

assured the Russells that the revised language resolved Jeffrey's concern, and pressed the

Russells to sign the documents and wire the additional $1 million quickly.

59.     Mr. Taffet wired Jeffrey the $20,000 interest payment on January 31, 2012.

60.     Later that day, based on Mr. Taffet's representation and trusting their friend of 20

years, the Russells signed the revised documents and wired an additional $1 million to Platypus,

as Mr. Taffet directed.

*Platypus's Structure and Obligations*

61.     Mr. Taffet structured his enterprise, Platypus, as a limited liability company.

Platypus purports that an Operating Agreement (the "Operating Agreement") governs the

Company and the rights and obligations of its members.  A copy of the Platypus Operating

Agreement is attached to the Complaint as Exhibit "A."

62.     Membership interest in Platypus is divided into two classes, Class A and Class B.

(Compl. Ex. A, § 1.1)  Mr. Taffet, Sharon and Ms. Williams are Class A members.  (*Id.*)  The

Russells are Class B members.  (*Id.*)  All of the members and Platypus executed the Operating

Agreement.  (*Id.* at 9)

63.     Mr. Taffet and Sharon jointly own half of the Class A membership shares, and

35% of the total equity in Platypus.  (*Id.* at 1)  Ms. Williams owns half of the Class A

membership shares, and 35% of the total equity in Platypus.  (*Id.*)  The Russells own 100% of

the Class B membership shares (300 shares), and 30% of the total equity in Platypus.  (*Id.*)

64.     Platypus purports to be a manager-managed limited liability company.  (*Id.* § 2.1)

The Operating Agreement identifies Mr. Taffet as Platypus's manager.  (*Id.*)  According to Ms.

#28986789 v1

Williams' LinkedIn profile, she claims to be the Managing Partner of Platypus.  A true and correct copy of Ms. Williams' LinkedIn profile is attached hereto as Exhibit "3."

65.    As manager, Mr. Taffet claims to wield absolute control over Platypus and its management, operations and affairs.  The members are afforded no role in the Company beyond being financiers, except as the manager determines.

66.    The Operating Agreement provides that the manager shall be liable to the Company and its members if he breaches or fails to perform an obligation due to them, and such breach constitutes willful misconduct or recklessness.  (Compl. Ex. A, § 2.3, GP3.3)

67.    Annex C to the Operating Agreement contains several General Provisions (collectively "GPs", individually "GP"), which are incorporated into the Operating Agreement in Section 13.  (*Id.* at 17)  GP3.3 provides that the manager shall be liable to the Company and its members if "(a) the Manager or other Person breached or failed to perform its or his duties and (b) such breach or failure constituted improper self-dealing in breach of this Agreement, willful misconduct or bad faith."  (*Id.* at 26)

68.    The manager has the authority to make capital calls, and to obligate all members to contribute funds in proportion to their overall equity ownership interest in Platypus, to finance the operation of the Company and to cover its expenses.  The Operating Agreement does not contain any provision establishing when capital calls should be made, or what standards govern the necessity, frequency or dollar amount of capital calls.

69.    Section 4.2 of the Operating Agreement describes the procedure by which capital calls are to be made:

> Section 4.2   Capital Call Procedure.  The Capital Contribution of each Member shall be such Member's proportionate share of the total Capital Contribution based on their respective Shares . . . .  The Company shall give the Members at least three (3) Business Days' prior written notice of each Capital Contribution to

#28986789 v1

be made in accordance with this Section 4, and each Member shall make such Capital Contribution, except as provided below, by wire transfer of immediately available funds in the amount and to the account specified in such notice within such period. . . . In the event any Class B Member elects in accordance with the foregoing not to make any such Capital Contribution more than twice, then, unless otherwise determined by the Manager, the Company shall be dissolved.

70.     Section 4.3 of the Operating Agreement governs default of the members of their

capital contribution obligations.  Section 4.3 provides, in relevant part:

4.3   Default.  Each Member agrees that time is of the essence in respect to the payment of such Person's Capital Contribution when due under this Section 4, that any failure of a Member to make all or a portion of any Capital Contribution on the applicable due date (a "Defaulting Member") would cause injury to the Company and to the other Members, and that the amount of damages caused by any such injury would be extremely difficult to calculate.  Accordingly, each Member agrees that upon any such failure by a Defaulting Member (unless a cure opportunity is made available by the Company and such failure is cured in accordance with such opportunity), the Company, in its sole discretion, may take, without limitation, the following actions:

(a)     The Company may cause the Capital Account of such Defaulting Member to be reduced by an amount (the "Default Deduction") up to 50% of the aggregate amount of (i), with respect to default in making any Capital Contribution for the purpose of funding Company Expenses and Working Capital, all of such Defaulting Member's Capital Contributions made on or prior to the date of such default, and (ii) with respect to all other defaults in making any Capital Contribution, such Defaulting Member's Capital Contributions made on or prior to the date of such default that relate to Portfolio Investments, including any set forth on Annex B, that are not "Fully Invested".  The Company may make appropriate adjustments to the Shares and Percentage Interest held by such Defaulting Member, and the amount of such reduction shall be credited to the Capital Accounts of all non-defaulting Members in proportion to their respective Capital Accounts after giving effect to the other adjustments under this Section 4.3. "Fully Invested" means, as determined by the Manager in its reasonable discretion, Portfolio Investments that produce stable revenue streams or are completed and marketable for sale.

(b)  The Company may redeem any or all Shares of the Defaulting Member upon payment to such Defaulting Member of an amount (the "Default Redemption Amount") equal to 50% of the fair market value of such Defaulting Member's Shares (calculated by the Company in its sole discretion) after taking into account the

Default Deduction. In connection with any such redemption, the Company shall notify the Defaulting Member of the Default Redemption Amount and such notice shall be final absent of manifest error. The excess of the fair market value of any Shares redeemed under this Section 4.3(b) over the Default Redemption Amount shall be credited to the Capital Accounts of all non-defaulting Members in proportion to their respective Capital Accounts after giving effect to the other adjustments under this Section 4.3 (with a corresponding debit to the capital account of the Defaulting Member).

Section 4.2(a) is referred to hereinafter as the "Capital Forfeiture Provision."

Section 4.3(b) is referred to hereinafter as the "Redemption Provision."

71.     Mr. Taffet, a lawyer, crafted the Capital Forfeiture Provision to have the precise effect about which Jeffrey previously objected and expressed concern to Messrs. Taffet and Gerber, prior to executing the Operating Agreement. Thus, Mr. Taffet did precisely what he told Jeffrey he would not do.

72.     GP10 to Annex C sets forth the requirements for how Platypus must give notice to members:

GP10.  Notices and other Communications.  Any notice, consent, demand, offer, acceptance or other communication required or permitted under this Agreement shall be made in writing and shall be deemed to have been duly given if (a) sent by personal delivery (and shall be deemed given upon confirmation of receipt), (b) mailed by first class registered or certified mail, return receipt requested, postage prepaid (and shall be deemed delivered three (3) days after the date received for delivery by the United States Postal Service, whether or not accepted by the addressee) or (c) sent by nationally recognized next-day delivery courier that guaranties delivery within twenty-four (24) hours, charges prepaid (and shall be deemed delivered one business day after delivery to said courier), addressed to a Member at his/her/its respective addresses on record with the Company from time to time. Each Member shall bear responsibility for informing the Company of any change of address, and any such change shall be recorded by the Company and effective ten (10) days after written notice of such change is supplied to the Company.

GP10 specifically describes and limits the manner by which Platypus may give any notice that the Operating Agreement requires, including capital calls, to be effective. The

Operating Agreement does not authorize email as an effective manner of communicating notice.

*Mr. Taffet and Ms. Williams Draw the Russells in Further*

73.     After the January 2012 meetings, Ms. Williams spent more and more time in Philadelphia.

74.     Once the Russells had invested in Platypus, they, Mr. Taffet and Ms. Williams began to spend increasing amounts of time together.  Mr. Taffet, Ms. Williams and the Russells became dinner and activity companions, and despite the Russells' protests, Mr. Taffet insisted on paying for everything, charging their meals and other excursions on his Platypus corporate American Express card.  When socializing with the Russells, Mr. Taffet frequently stated that anything the Russells wanted to purchase, whether related to Platypus or not, could be purchased on the Platypus corporate American Express card.  Mr. Taffet's personal and other dining, travel and entertainment expenses, and those of Sharon, Ms. Williams and unknown other persons, were borne by Platypus, and the Russells as members of Platypus.

75.     Mr. Taffet purchased a 2012 Porsche Panamera Turbo for Ms. Williams, at a cost of $135,000.  Upon information and belief, this expense was borne by Platypus, and the Russells as members of Platypus.

76.     Mr. Taffet and Ms. Williams bought a French Bulldog named Bourbon.  Upon information and belief, when Mr. Taffet and Ms. Williams traveled with Bourbon, Platypus paid (directly or indirectly) for an additional airplane ticket so Bourbon could ride in the airplane cabin with Ms. Williams and Mr. Taffet.

*Platypus Issues Quick and Frequent Capital Calls*

77.     While Mr. Taffet and Ms. Williams were living the high life together, the Russells financed Mr. Taffet's and Ms. Williams' lifestyles.

78.     After the Russells' initial $1.2 million investment in January 2012, Mr. Taffet emailed them monthly statements from Platypus, purporting to report the expenses allegedly incurred over the preceding month, and allocating the expenses among the members.

79.     Beginning in February 2012 and extending through February 2014, Mr. Taffet emailed the Russells correspondences purporting to present capital calls from Platypus.  The Russells' share of these purported capital calls ranged from $30,000 to more than $200,000.  Mr. Taffet emailed each of the purported capital calls issued to the Russells.  All told, the Russells paid more than $2 million in capital calls in addition to their $1.2 million initial investment. True and correct copies of the purported capital calls are attached hereto as Exhibit "4."

80.     At first, the invoices that accompanied the capital calls described the expenses for which Mr. Taffet and Platypus required the Russells to pay only by broad category, but they did not identify the property on which the monies were expended, or the nature of the expense.

81.     For example, from July-December 2012 alone, Platypus claimed over $1.2 million in materials costs, over $968,000 in labor costs, and nearly $60,000 in categories described as "Professional Services" and "Travel and Entertainment."  (Ex. 4, at 7-12)

82.     The Russells honored their purported obligations to Platypus, as Mr. Taffet and Ms. Williams had promised them that Platypus would be a fruitful investment for them, and that their construction completion dates were intact and property valuations were rising.

83.     Mr. Taffet and Platypus frequently solicited, and exerted pressure on, the Russells to prepay future expenses, referred to as "advances of capitalized costs" for future months.

Although they had no contractual obligation to pay such advances, the Russells trusted Mr. Taffet, relied on Mr. Taffet's and Ms. Williams' claimed need for the advanced funds and prepaid future costs when they asked, as Mr. Taffet and Ms. Williams assured them the prepayments would lock in prices and control costs.

84.     In an April 4, 2012 email, Mr. Taffet solicited the Russells to invest in a second portfolio of properties, consisting of three additional properties in New Orleans and four properties in Chicago (the "Second Portfolio Letter").  A true and correct copy of the Second Portfolio Letter is attached hereto as Exhibit "5."  The Second Portfolio Letter identified the properties, their acquisition costs, the funds required to complete renovation of the properties, the anticipated completion dates, and the anticipated values upon completion of the renovations. The Second Portfolio Letter stated that the cost to acquire the seven additional properties was $963,119.20, and that the Russells' required contribution to those purchases was $288,935.76. Relying on Mr. Taffet's representations, the Russells invested in the second portfolio of properties.

85.     In response to Jeffrey's requests, on May 6, 2012, Mr. Taffet, as manager of Platypus, promised that Platypus would distribute monthly financial reports and statements, prepared in accordance with GAAP, beginning at the end of May 2012.  Mr. Taffet represented that Platypus's accountant John Sullivan would prepare these reports and statements.  A true and correct copy of Mr. Taffet's May 6, 2012 email is attached hereto as Exhibit "6."

86.     Mr. Taffet's May 6, 2012 email also promised that Mr. Sullivan would distribute, by the end of June 2012, a forward-looking financial projection, rent roll, and updated photographs of Platypus properties.  (Ex. 6).

-42-

87.     Despite Mr. Taffet's representations, Platypus only provided financial statements to the Russells on two occasions, and only after Jeffrey repeatedly pursued Mr. Taffet for information.  Mr. Sullivan never provided the Russells with the forward-looking financial projection, rent roll or photographs.

*321 Old Gulph Road*

88.     After their initial $1.2 million Platypus investment, the Russells were still in the "honeymoon phase" with Mr. Taffet and Ms. Williams.  They held high hopes, and believed that Platypus would prove a beneficial long-term investment for them, as Mr. Taffet and Ms. Williams had promised.

89.     In July 2012, Mr. Taffet approached Rosemary and proposed an additional investment opportunity in a property located at 321 Old Gulph Road in Wynnewood, Pennsylvania (the "Old Gulph Property").

90.     Mr. Taffet described the Old Gulph Property to Rosemary as a renovation project that he was working on, separate from Platypus.  He promised her that he would pay her 20% annual interest on her investment, and that he would return her principal upon his sale of the property.

91.     Mr. Taffet explained that he already had purchased the Old Gulph Property for $500,000, planned to invest another $500,000-$600,000 in renovations and then sell the property for approximately $2 million.  He asked Rosemary to extend him a $200,000 loan to help pay for the renovation costs.

92.     Based upon Mr. Taffet's representations and their long friendship, Rosemary invested $200,000 in Mr. Taffet for the Old Gulph Property.  She wired her $200,000 investment money on July 23, 2012, even before receiving the promissory note from Mr. Taffet

memorializing the loan.  Ultimately, Rosemary received and executed a promissory note memorializing her loan to Mr. Taffet (the "Old Gulph Note").  A true and correct copy of the Old Gulph Note is attached hereto as Exhibit "7."

93.    For many months, Mr. Taffet provided Rosemary with interest payments, as he promised.  Mr. Taffet led Rosemary to feel confident that she would receive the agreed-upon interest payments as promised on the first day of every month, and that Mr. Taffet would return her principal upon the sale of the Old Gulph Property.

94.    However, after June 2013, Mr. Taffet stopped paying Rosemary the contractually-agreed-upon interest.

95.    Since Rosemary loaned Mr. Taffet $200,000, Mr. Taffet has received offers from two separate bona fide purchasers to buy the Old Gulph Property.  Upon information and belief, Mr. Taffet refused both offers as insufficient.

96.    Mr. Taffet has not returned Rosemary's $200,000 principal investment, despite Rosemary's repeated requests.

97.    Additionally, Mr. Taffet has not paid Rosemary any interest payments since June 2013, as the Old Gulph Note required.  (Ex. 7, at 1)

98.    Mr. Taffet currently resides in the Old Gulph Property.  Upon information and belief, Ms. Williams also spends substantial time at, or resides in, the Old Gulph Property.

*50 Fairview Road*

99.    In September 2012, Mr. Taffet approached the Russells with another investment opportunity outside of Platypus's portfolio.

100.    Mr. Taffet informed the Russells that the owners of a property located at 50 Fairview Road, in Penn Valley, Pennsylvania ("50 Fairview") were in financial distress and

needed to sell the property to avoid imminent bankruptcy.  Mr. Taffet confirmed payment of $200,000 to the owners to move out and the assumption of payments on the property's approximate $1 million mortgage.  Mr. Taffet stated that neither he nor Ms. Williams could buy the property or participate in the purchase, and strongly advised the Russells to buy 50 Fairview.

101.    Mr. Taffet arranged for the Russells to meet with Mr. Taffet's real estate agent. Mr. Taffet and the agent valued the property between $1.8 million and $2.2 million.

102.    Mr. Taffet stated that Jeffrey and Rosemary could reduce the interest payments and carrying costs for 50 Fairview by at least $3,000 per month if they purchased it outright using a low-interest line of credit.

103.    Mr. Taffet provided statements purporting to show that renovations began on 50 Fairview between August and September 2012.  Mr. Taffet stated that contractors who had worked on 50 Fairview were about to obtain liens against the property, and that the Russells could avoid the liens by buying the property.  Mr. Taffet represented that if the Russells purchased 50 Fairview, Mr. Taffet personally would supervise the renovations, and would use his construction company, American Made Renovations, to renovate the property within six months so that it could be marketed and sold quickly.  He said that if the Russells invested $1.2 million ($1 million to purchase the property and an additional $200,000 to prepay the costs to complete the renovations), the Class A Platypus members would pay the remaining renovation expenses.  After construction began and his vision for the property began to take shape, Mr. Taffet stated, with the purported imprimatur of his real estate agent, that the property could be marketed at a higher price, and sold for between $2 million and $2.6 million.

104.    Mr. Taffet promised if they prepaid $200,000 for renovation expenses, the Russells would not need to contribute any further capital toward the 50 Fairview renovations.

Again believing Mr. Taffet's representations, the Russells agreed to purchase 50 Fairview, executed an Agreement of Sale**,** and wired $1.2 million to Platypus's Penn Liberty bank account on November 10, 2012.  A true and correct copy of the Agreement of Sale is attached hereto as Exhibit "8."

105.    The 50 Fairview Deed identifies the Russells as the sole owners.  A copy of the 50 Fairview Deed is attached hereto as Exhibit "9."

106.    Again, Mr. Taffet, Ms. Williams and Platypus failed to follow through on their representations.  Although they commenced work on 50 Fairview, they stopped, and the renovations remain far from complete, even now 20 months later.  Indeed, Mr. Taffet directed the contractors to stop work on 50 Fairview in spring 2013 leaving the Russells' investment at a complete standstill while the Russells continued to pay the carrying costs.

107.    Contractors who worked on 50 Fairview now claim that Platypus owes them over $100,000, and have threatened to place liens against the property if they are not paid.  Mr. Taffet has refused to pay the contractors, and has demanded that the Russells pay him $150,000 to release claims he maintains that he, Sharon, Ms. Williams or Platypus may present against 50 Fairview.

108.    The Russells own 50 Fairview.

109.    Indeed, in a January 20, 2014 email to Jeffrey and Rosemary, Mr. Taffet acknowledged that "the two of you own the property outright."  A true and correct copy of Mr. Taffet's January 20, 2014 email is attached hereto as Exhibit "10."

110.    The Russells recently paid approximately $26,000 in 2013 property taxes for 50 Fairview, including penalties incurred because Platypus had failed to pay the taxes timely prior to the Russells' purchase.  Despite recently claiming an ownership interest in 50 Fairview,

#28986789 v1

neither Platypus nor Mr. Taffet nor Ms. Williams has ever paid, nor offered to pay, 50 Fairview's

taxes or the monthly carrying costs on the Russells' line of credit.

111.     50 Fairview remains vacant, partially finished, and unsalable.  Mr. Taffet uses 50

Fairview as a storage facility and workshop for his other construction projects.

### *4847 South Woodlawn Avenue*

112.     In June 2012, Ms. Williams solicited the Russells to invest with her in property

located at 4847 South Woodlawn Avenue in Chicago, Illinois ("Woodlawn").

113.     Ms. Williams promised the Russells that a portion of any investment in

Woodlawn would earn a 20% return "in a year and a day" and another portion could earn a huge

possible return in a little over 6 months.  In a June 22, 2012 email, Ms. Williams stated:

> David and I had a wonderful night hanging and connecting with
> you even with oaxaca food life happens Iand [sic] I loved my
> time…  I am glad that David is beginning to see and understand
> what I knew right at the beginning—you are a REAL people hes
> [sic] more excited about his friendship with you which will allow
> for us tp [sic] all live in the now.
>
> Ok let's talk about your and my favorite subject, MONEY.
>
> . . . .
>
> It's time for us and the Woodlawn property.Its going to make you
> and me some good money and give us what David calls a
> leveraged return.  I want you to wire $250,000 to the investment
> account I set up at Penn Liberty.  I'll get you the instructions later
> today to read over $200,000 of this will earn a 20% return in a year
> and a day. $50,000 will be equity where you will get your
> percentage of the profits with your percentage determined by the
> total amount of the investment that you, I and the other two
> investors contribute.  In 6+ months, you and I will work to
> leverage( re fi between 1.7&2.7 HUGE POSSIBLE RETURN) the
> property, return our capital and give us extra money to invest
> elsewhere.  I have already set the closing for early next week, so I
> will need this early next week…. over view/ bottom line you
> would be putting out less than expected in P calls but earning a
> nice return.. welcome to Flawless (emphasis supplied)

#28986789 v1

A true and correct copy of Ms. Williams' June 22, 2012 email is attached hereto as Exhibit "11."

114.    Shortly thereafter, in the fall of 2012, Mr. Taffet solicited Rosemary directly to participate in Woodlawn.

115.    Mr. Taffet praised Woodlawn as an excellent opportunity, located just a few blocks from President Obama's Chicago residence.  Mr. Taffet said that Woodlawn held unique value because of its location.  Mr. Taffet stated that Elijah Muhammad, the late leader of the Nation of Islam, formerly owned Woodlawn.

116.    Mr. Taffet represented that the other participants in Woodlawn were members of Mr. Taffet's immediate and extended family and his close friends.  Mr. Taffet promised that the Woodlawn investors would realize a large profit on the sale.

117.    Mr. Taffet also said that Rosemary would receive the return of her investment and profit after the sale.

118.    Based upon Mr. Taffet's representations, Rosemary told Mr. Taffet that she would invest $160,000 in Woodlawn.  As Mr. Taffet directed, she wired the funds to Platypus Management Inc.'s bank account at Penn Liberty Bank on September 4, 2012.  Rosemary repeatedly requested the Woodlawn documentation from Mr. Taffet.  Mr. Taffet did not provide Rosemary with the paperwork to memorialize the Woodlawn investment until March 2013, over six months after she wired her funds to Platypus Management.

119.    Much like Ms. Williams' and Mr. Taffet's other promises, Woodlawn failed to deliver.

120.    After Mr. Taffet and Platypus Management took Rosemary's $160,000, the property was sold to Jerald Labovitz, a longtime friend and affiliate of Mr. Taffet.  Mr. Labovitz purchased the property on or about October 16, 2013 for $1,750,000.

#28986789 v1

121.    When Rosemary asked for the return of her $160,000 plus profit from the sale of Woodlawn to Mr. Labovitz, Mr. Taffet and then Ms. Williams rebuffed and ignored her requests.

122.    After the October 2013 sale of Woodlawn to Mr. Labovitz, Mr. Taffet first asked the Russells to roll over Rosemary's $160,000 investment plus her profit in Woodlawn as a capital contribution to Platypus.  Rosemary wanted the return of her Woodlawn investment plus the profit derived thereon and declined Mr. Taffet's request that she roll over the investment into Platypus.

123.    Mr. Taffet then tried to convince Rosemary to leave her funds in the Woodlawn investment.  In an October 27, 2013 email, Mr. Taffet informed her that Ms. Williams planned to roll the property over into a potential sale to Mr. Farrakhan, which would provide an even greater profit:

> Rosemary
>
> Building on the fact that my life is NEVER boring, I offer the following explanation (which should not be confused for an excuse) for the lack of a wire of your proceeds and for my failure to communicate the details before now:
>
> (1) Immediately after the close, Farrakhan, the next door neighbor to Elijah Mohammad's home, the property Tracy sold, burst a vessel (for real – he is actually in the hospital) when he learned that we sold it to a multi-generational, Alabama Jew that was one of the four original backers of the Alabama Chabad House, which is based in Birmingham.  Directly and through his money men, Farrakhan implored Tracy to freeze the transaction with an eye to unwinding it within 30 days and then selling the property to him (AKA The Nation of Islam) for $1 million more than she had just sold it.  Thus, she is obligated (READ: THRILLED) to hold the proceeds as we work to a close for what would amount to a bit more than twice the profit she already reaped.
>
> (2) My failure to communicate this development stems from the fact that immediately after the close Jordan took quite ill with a major Crohn's flair up.  Tracy and I drove him from college at William & Mary to the hospital here in Philadelphia where he has been and is still admitted.  We anticipate his being discharged this

afternoon and, assuming that is the case, we will drive him back to
school and spend a few days with him until he is adjusted back to
college life.

Lots of drama and trauma.  Par for the course.

We will wire the funds as soon as the transaction with Farrakhan is
either consummated or voided.

David M. M. Taffet
(610) 529-9785

A true and correct copy of Mr. Taffet's October 27, 2013 email is attached hereto as Exhibit

"12."

124.    When Rosemary insisted upon the return of her $160,000 plus the profit, Mr.

Taffet presented other excuses why she could not get her money back, and why she should roll

her investment into the potential sale to Mr. Farrakhan.

125.    After considering all that Mr. Taffet said, Rosemary decided that she could not

afford to roll over her investment.  On November 5, 2013, she again asked Mr. Taffet for her

money back, insisting that she was not interested in rolling her money into any potential sale to

Mr. Farrakhan.  She expressly wrote:  "after great consideration i've [sic] decided not to roll over

any part of my investment. . . . if you could send me a cashiers [sic] check, as before, to 14 wood

road i [sic] would be most appreciative."  In a response the same day, Mr. Taffet unequivocally

responded "Understood.  No problem."  A true and correct copy of the November 5, 2013 email

chain between Rosemary and Mr. Taffet is attached hereto as Exhibit "13."

126.    Faced with Rosemary's refusal to transfer her Woodlawn investment into

Platypus, Mr. Taffet, without Rosemary's knowledge or approval, then approached Jeffrey and

asked him to authorize the rollover of the $160,000 plus profit into the Russells' Platypus

account.  Jeffrey refused, informing Mr. Taffet that it was Rosemary's investment, and that it

was Rosemary's decision whether to roll the money into Platypus or have it returned to her.

-50-

127.     Despite soliciting her investment, making representations to Rosemary about Woodlawn, attempting to coerce Jeffrey to override Rosemary's wishes about rolling the investment into Platypus, and assuring Rosemary that her investment would be returned via cashier's check on November 5, 2013, when Rosemary again asked Mr. Taffet to return her $160,000 investment, Mr. Taffet disclaimed any responsibility, and sang a different tune.  In a January 22, 2014 email, he told Rosemary that Woodlawn was Ms. Williams' project, and that any decision on when to return the investors' money lay exclusively with Ms. Williams:

> As everyone copied is aware, I have had and continue to have no role – equity, management or otherwise – in Woodlawn.  As such, I have no influence to exercise or position to articulate.

A true and correct copy of the January 22, 2014 email chain among Rosemary, Mr. Taffet and Ms. Williams is attached hereto as Exhibit "14."

128.     Rosemary then approached Ms. Williams seeking the return of her $160,000 investment and the profit thereon.  Ms. Williams also refused.  In a January 22, 2014 email Ms. Williams derided Rosemary as a "damsel in distress," and told Rosemary that she alone had sole discretion to determine when to return Rosemary's money, and declined to do so, stating:

> I just now realized that you copied John Gerber so GREAT THAT'S BE REAL FUCKING CLEAR!  Making it legal escalates the issue and reveals your intentions and lack of good intentions. Not a good move.  Don't get it twisted.  I am not David and I don't have any sympathy or tolerance for a women [sic] that operates like a damsel in distress…
>
> . . . .
>
> This communication is more than you are entitled [sic] and all that you are going to get from me.
>
> . . . .
>
> I PRAY YOU HAVE READ THIS WITH CLEAR UNDERSTANDING FROM ME AND [sic] I HAVE ALREADY DONE "better than you and in good faith."  In my world

-51-

> BULLSHIT and you're a Hypocrite.  You invested to show up
> Jeffrey, now please sit back and allow the participating investors to
> make this a successful one for us all . . . GOODNIGHT.

A true and correct copy of Ms. Williams' January 22, 2014 email is attached hereto as Exhibit "15."

129.    In April 2014, Ms. Williams provided Rosemary with an IRS Form K-1 for 2013 reflecting that she was owed $195,000 for her investment in Woodlawn.  A partially redacted copy of the K-1 is attached hereto as Exhibit "16."  Nonetheless, Mr. Taffet, Ms. Williams and Platypus Management have refused to return Rosemary's $160,000 investment or the $35,000 profit she is owed from the October 2013 sale of Woodlawn to Mr. Labovitz.

130.    Mr. Taffet induced Rosemary to invest in Woodlawn, and then abandoned her when she requested the return of her investment.  To this date, Rosemary has not recovered a single penny of the Woodlawn investment that Mr. Taffet inveigled her to make.  Also to date, Mr. Farrakhan has not purchased Woodlawn, despite the representations Mr. Taffet and Ms. Williams made in their January 2014 emails and in discussions with the Russells and others.

131.    Despite the representations provided by Mr. Taffet and Ms. Williams, they designed the Woodlawn investment to make money for themselves and to extract money from Rosemary.

### Mr. Taffet's, Ms. Williams' and Platypus's Self-Dealing and Bad Faith Management of Platypus

132.    After investing in Platypus, the Russells spent more time with Mr. Taffet and Ms. Williams.  They began to learn how Platypus really operated, and specifically observed how Ms. Williams' supervised the renovations.

133.    Ms. Williams informed the Russells that her preferred approach to securing labor was to hire recovering drug addicts and alcoholics (which she described as "giving back to the

community"), then paying them in cash "under the table" to avoid any paper trail and to permit the workers to avoid declaring their income and conceal the income from their creditors and child support obligations.  Mr. Taffet was aware of, and authorized, Ms. Williams' hiring and payment practices, despite purporting to be the manager of Platypus and owing duties to Platypus and its members.

134.    After investing in Platypus, the Russells also learned that, as part of her labor management efforts, Ms. Williams would move workers from one job site to another, even across state lines among New Orleans, Chicago, and Philadelphia, to allow the workers she hired to evade their legal troubles.  One recurring theme among Ms. Williams' workforce, the Russells later learned, was workers being pursued for child support and other overdue payments.  Ms. Williams and Platypus frequently shuttled workers between cities when it appeared that they would be called into court to face criminal charges or child support obligations.

135.    Ms. Williams also explained that she purchased materials in bulk, and then transported smaller amounts to the job sites where they were needed.  She boasted that she frequently purchased millions of dollars of materials at a time, despite not having a pressing need for them or anywhere to store the excess.  She said that she would store excess materials in certain of the properties, work around the stored materials, or not work on the properties that served as storage space, until she used the materials in other projects.

136.    Because Ms. Williams claimed to own numerous other properties in New Orleans, the Russells wanted to ensure that Platypus paid only for materials that it used in its properties, not materials Ms. Williams used on her other properties.  When Jeffrey asked Ms. Williams to itemize her materials purchases and allocate expenses to each of the individual properties, she

declined and responded that "it was not worth her time" to track the material expenses as the Russells requested.

137.    Tenants in one of Ms. Williams' New Orleans properties claimed title to the property, and refused to vacate or pay rent, requiring Ms. Williams to pursue legal action against those individuals.  Upon information and belief, Platypus paid some or all of those legal fees for this property which Platypus did not own.

138.    The Platypus statements that Mr. Taffet provided to the Russells during the first several months of their membership in Platypus provided no itemization, either by location, type of material or work allegedly performed.  The statements merely classified expenses as "Building and Materials," "Labor," or other vague categories.

139.    The invoices that Mr. Taffet provided for the period from February through October 2012, for example, asserted that Platypus had incurred the following expenses:

|  | Feb. 2012 | Mar. 2012 | Apr. 2012 | May 2012 | June 2012 |
|---|---|---|---|---|---|
| Building & Materials | $98,098.68 | $71,474.04 | $91,507.88 | $109,538.21 | $278,534.47 |
| Labor | $58,777.00 | $71,210.00 | $46,850.00 | $36,055.00 | $52,926.75 |
| Rental Payments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Mortgage Payments | $1,991.44 | $3,269.44 | $4,409.26 | $3,355.49 | $3,251.52 |
| Management Fees | $6,250.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Administrative Fees | $3,953.00 | $2,953.00 | $2,953.00 | $2,598.00 | $1,952.00 |
| Professional Services | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Bank Charges | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Taxes | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Insurance | $0.00 | $0.00 | $0.00 | $0.00 | $3,127.20 |
| Legal Fees | $0.00 | $5,079.00 | $991.20 | $2,426.40 | $0.00 |
| Travel & Entertainment | $11,498.07 | $18,874.66 | $5,640.75 | $6,257.62 | $21,484.26 |
| Charitable Donations | $4,700.00 | $4,450.00 | $106.00 | $0.00 | $6,500.00 |
| Communications | $0.00 | $560.18 | $1,167.19 | $897.15 | $675.08 |
| Loan Interest | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| SG&A | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Condo Association Fees | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Recurring Bills | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Miscellaneous | $1,859.54 | $1,151.21 | $300.53 | $1,216.07 | $599.93 |
| **TOTAL** | $187,127.73 | $184,021.53 | $158,925.81 | $167,343.94 | $374,051.21 |

|  | July 2012 | Aug. 2012 | Sep. 2012 | Oct. 2012 |
|---|---|---|---|---|
| Building & Materials | $173,698.90 | $338,781.86 | $394,990.46 | $292,363.32 |
| Labor | $184,935.00 | $123,607.95 | $174,691.00 | $145,229.15 |
| Rental Payments | $4,569.80 | $8,320.00 | $2,472.00 | $1,200.00 |
| Mortgage Payments | $0.00 | $0.00 | $0.00 | $0.00 |
| Management Fees | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Administrative Fees | $2,953.00 | $0.00 | $0.00 | $3,056.39 |
| Professional Services | $13,245.50 | $0.00 | $11,479.80 | $3,487.50 |
| Bank Charges | $0.00 | $0.00 | $0.00 | $380.00 |
| Taxes | $4,554.58 | $0.00 | $0.00 | $0.00 |
| Insurance | $48.09 | $0.00 | $2,627.83 | $1,798.49 |
| Legal Fees | $0.00 | $0.00 | $0.00 | $0.00 |
| Travel & Entertainment | $7,538.29 | $5,716.10 | $8,866.33 | $7,377.13 |
| Charitable Donations | $344.87 | $0.00 | $0.00 | $0.00 |
| Communications | $2,185.21 | $0.00 | $0.00 | $3,469.14 |
| Loan Interest | $6,095.76 | $2,863.16 | $2,863.16 | $2,770.80 |
| SG&A | $0.00 | $36,691.27 | $13,743.12 | $0.00 |
| Condo Association Fees | $0.00 | $4,500.00 | $0.00 | $0.00 |
| Recurring Bills | $0.00 | $0.00 | $0.00 | $50,191.41 |
| Miscellaneous | $689.93 | $0.00 | $0.00 | $0.00 |
| **TOTAL** | **$405,858.93** | **$525,480.34** | **$616,733.70** | **$516,323.33** |

140.    During those nine months, Mr. Taffet and Ms. Williams claimed that Platypus spent over $1.8 million on materials, almost $900,000 on labor, and nearly $100,000 on travel and entertainment.  Mr. Taffet, Ms. Williams and Platypus never provided any explanation of how they allocated any of those expenses, and never provided any line-item reports specifying which material and labor costs were associated with which properties.

141.    Once Jeffrey began asking questions about the purported capital calls and the accompanying expense statements, Mr. Taffet and Platypus changed the format of the statements.  Mr. Taffet and Platypus broke down materials and labor costs by property (as Jeffrey had requested), but they eliminated other categories of expenses for example, travel and entertainment and replaced them with equally or more nebulous categories, such as "Total Recurring Costs" and "Administrative & Management Costs."

142.    Mr. Taffet contended that in some months Platypus incurred mortgage expenses, while it did not in other months, despite neither adding nor selling properties to or from its

-55-

portfolio.  According to Mr. Taffet, in some months Platypus paid insurance, while in other months it did not.

143.    During the same period, Mr. Taffet and Ms. Williams also claimed that Platypus spent nearly $150,000 on expenses with vague descriptions such as "administrative fees," "professional services," "SG&A" and "recurring bills."

144.    Mr. Taffet and Ms. Williams claimed that Platypus contributed over $16,000 to charities during the period February through October 2012, but they never identified or documented those contributions to the Russells, or provided the Russells with any documentation by which they could deduct their portion of those contributions on their federal and state income tax returns.

145.    Section 7 of the Operating Agreement provides: "It is the express intention of the Members that the Company be taxed as a partnership for purposes of Federal, state and local taxation and not as an association taxable as a corporation, and no election to the contrary shall be made."  Platypus, Mr. Taffet and Ms. Williams failed to provide the Russells with the necessary documents to enjoy their rights and benefits under the Operating Agreement.

*After Assuring the Russells that They Would Not Have to Contribute More, Mr. Taffet and Ms. Williams Continue to Ask the Russells for Money*

146.    At a June 2012 dinner meeting at Tequila's Restaurant in Philadelphia, Jeffrey asked Mr. Taffet and Ms. Williams whether the renovation schedule Mr. Taffet presented and memorialized in Annex B remained on track and how much more it would cost to renovate the New Orleans properties.

147.    Mr. Taffet assured Jeffrey that Platypus would complete the renovations by the dates set forth in Annex B.

148.    Ms. Williams advised Jeffrey that Platypus would require an additional $487,000 to complete the New Orleans property renovations and would require the Russells to pay their 30% of that amount ($146,000), as well as the amounts Mr. Taffet and Platypus would charge the Russells in the purported May and June capital calls (approximately $50,000 and $62,000 respectively).  She promised that the Russells' payment of those amounts would end their required contributions to Platypus.  The Russells paid those amounts.

149.    Ms. Williams confirmed her representations in a June 22, 2012 email to Jeffrey

> I will get you instructions later that way as I do my LAST calls to and for NOLA it is coming from the same place.
>
> As For NOLA upfront fee, your portion of the 487,000 is $146,100.  David and I discussed the credits due to you from Indiana and Exchange.  The properties were projected to cost about $300,000.  We still have deposits out and other expenses.  So, for now, let's treat the amount as $280,000.  That gives you $84,000 due back.  So, for the $146,100, you can subtract the $84,000 and only pay $62,100.  This is in addition to the $50,000+ in your May call and whatever the amount is of your upcoming June call which I est at about 62,000 which makes a grand total of 117,600 (with the $55,500 you owe me) plus MAY & JUNE …. great right!!! ( see how I count, that's better then 350 +) which leaves us to the fucking end of PLATYPUS; So that Flawless can grow…. (emphasis added)

(Ex. 11)

150.    Despite the representations and assurances Mr. Taffet and Ms. Williams provided at that June 2012 dinner, Platypus did not complete the New Orleans renovations by October 2012 as promised and the Russells' contributions did not end with the purported June capital call. Mr. Taffet and Platypus issued subsequent purported capital calls to the Russells requesting millions of dollars in additional capital contributions to pay for renovations they claimed they made on the New Orleans properties.  The Russells paid those purported capital calls, but have nothing to show for their investment.

151.    Also, during the summer of 2012, Ms. Williams contacted Jeffrey and informed him that she had purchased $185,000 of restaurant equipment for one of the New Orleans properties, and that the Russells' share of the expense was $55,000.  Ms. Williams did not provide any receipt for the purchase, and said she had paid cash out of her own pocket for the equipment.  She said that it would not be fair for her to have to "pay out of pocket," and said that she did not approach Platypus for reimbursement because she did not want Mr. Taffet to know about the purchase at the time.  Instead, she asked Jeffrey to reimburse her directly for the Russells' portion of the expense by wiring money to her personal bank account.

152.    Ms. Williams asked Jeffrey not to inform Mr. Taffet about the restaurant equipment as she planned to tell him personally.  She assured Jeffrey that she would arrange for a credit to be applied to the Russells' Platypus account.  Jeffrey wired $55,000 directly to Ms. Williams' personal bank account as she requested.  Despite Ms. Williams' representation, she never arranged for a corresponding credit to the Russells' Platypus account.

153.    In the fall of 2012, faced with the increasingly large capital calls which Mr. Taffet and Ms. Williams assured the Russells in June 2012 would not be necessary, Jeffrey inquired of Mr. Taffet about the status of each New Orleans property, how the labor and materials costs broke down for each property, and whether the completion timeline remained on track.

154.    Mr. Taffet mouthed words in response to Jeffrey's questions, but provided little insight.  He stated that New Orleans city officials and the permit process were corrupt, and continually changed their requirements.  He also stated that the renovation process took time, and that delays and cost overruns sometimes occur for obtaining permits, labor, and as a result of increases in raw material costs (despite the fact that the Russells had prepaid expenses to lock in the cost, at Mr. Taffet's and Ms. Williams' insistence).  Mr. Taffet assured Jeffrey that

-58-

everything was progressing according to plan, that Platypus would complete the properties on time, as scheduled, and at great financial benefit to the Platypus investors.

155.   Over the winter months of 2012, the amounts that Mr. Taffet and Platypus invoiced the Russells to pay continued to mount.  Mr. Taffet and Platypus claimed massive expenditures on several properties which they previously had described as comparatively low-cost, as well as substantial overhead, management and administrative costs.

156.   Mr. Taffet and Platypus claimed staggering amounts of undefined "Recurring Costs" and "Administrative & Management Costs" as the following chart reflects:

| | Recurring Costs | Administrative & Management Costs | TOTAL |
|---|---|---|---|
| November 2012 | $50,191.41 | $23,510.15 | $73,701.56 |
| December 2012 | $49,193.60 | $17,325.12 | $66,518.72 |
| January 2013 | $49,342.77 | $50,725.36 | $100,068.13 |
| February 1, 2013 | $48,656.90 | $59,210.05 | $107,866.95 |
| March 2013 | $46,327.44 | $54,271.91 | $100,599.35 |
| April 2013 | $34,404.29 | $19,428.37 | $53,832.66 |
| May 2013 | **NO BREAKDOWN** | **NO BREAKDOWN** | $51,009.00 |
| June 2013 | $32,338.36 | $17,758.37 | $50,096.73 |
| July 2013 | $31,808.42 | $20,206.62 | $52,015.04 |
| August 2013 | $18,672.13 | $14,947.01 | $33,619.14 |
| September 2013 | $18,043.53 | $13,849.42 | $31,892.95 |
| October 2013 | $16,565.00 | $14,382.74 | $30,947.74 |
| November 2013 | $18,071.97 | $16,376.23 | $34,448.20 |
| December 2013 | $17,819.82 | $16,147.73 | $33,967.55 |
| **TOTAL OF COLUMNS** | **$431,435.64** | **$338,139.08** | **$820,583.72** |

(Ex. 4, at 12-25)  Over fourteen months, from November 2012 through December 2013, Mr. Taffet and Platypus claimed over $800,000 in nondescript, undefined and unexplained administrative expenses.  In addition, Platypus and Mr. Taffet paid $70,000 in "management fees" to Ms. Williams during this period.

157.   Mr. Taffet and Platypus claimed they spent substantial amounts on materials and labor for some of the New Orleans properties as the following chart reflects:

|  | 907-909 Iberville | 2013 Dumaine | 1009 N. Claiborne | 1013 N. Claiborne | 1027 N. Claiborne | 1031 N. Claiborne | 1425 N. Prieur | 1441 N. Roman |
|---|---|---|---|---|---|---|---|---|
| December 2012 | $53,128.40 | $0.00 | $0.00 | $0.00 | $32,750.00 | $83,827.10 | $73,745.25 |  |
| January 2013 | $31,076.01 | $0.00 | $0.00 | $0.00 | $19,398.78 | $49,469.17 | $43,345.64 | $49,168.37 |
| February 2013 | $39,642.60 | $0.00 | $43,481.95 | $52,065.46 | $24,275.26 | $62,226.25 | $54,828.42 | $18,881.19 |
| March 2013 | $65,736.49 | $87,111.97 | $0.00 | $0.00 | $0.00 | $0.00 | $20,946.31 | $0.00 |
| April 2013 | UNKNOWN | UNKNOWN | UNKNOWN | UNKNOWN | UNKNOWN | UNKNOWN | UNKNOWN | UNKNOWN |
| May 2013 | $14,012.90 | $0.00 | $0.00 | $0.00 | $42,443.70 | $0.00 | $42,133.62 | $0.00 |
| June 2013 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| July 2013 | $0.00 | $53,794.13 | $0.00 | $0.00 | $0.00 | $41,329.12 | $0.00 | $34,774.65 |
| August 2013 | $9,681.82 | $0.00 | $0.00 | $0.00 | $6,608.33 | $15,950.16 | $15,767.70 | $0.00 |
| **TOTAL** | **$212,278.22** | **$140,906.10** | **$43,481.95** | **$52,065.46** | **$125,476.07** | **$252,801.80** | **$250,766.94** | **$102,824.21** |

158.    In persuading the Russells to invest with him in Platypus, Mr. Taffet represented that Platypus leased the property at 907-909 Iberville Street for $1,200 a month, and that it would cost $20,000 to renovate.  (Annex B, Ex. 2)  He further represented that Platypus would complete the renovation within a month of the Russells' initial investment.  However, as the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***over ten times*** the $20,000 Mr. Taffet previously represented it would cost to complete all the renovations to 907-909 Iberville Street, just from December 2012 through August 2013, and the renovations remained incomplete as of December 2013.  Additionally, Mr. Taffet represented that the monthly rent would increase from $2,100 to $5,000 following the $20,000 renovation.  (*Id.*)  As of December 2013, Mr. Taffet and Platypus had not collected a single dollar of rent for the property.

159.    In persuading the Russells to invest with him in Platypus, Mr. Taffet represented that Platypus purchased the property at 2013 Dumaine Street for $60,000, that it would cost $100,000 to renovate, and that Platypus would complete the renovation by June 2012.  (*Id.*)  However, as the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***over $40,000 more*** than the $100,000 Mr. Taffet previously represented it would cost to complete all the renovations to 2013 Dumaine Street just from December 2012 through July 2013, and the

-60-

renovations were far from complete, even a year after Mr. Taffet represented that Platypus would complete them.

160.     In persuading the Russells to invest with him in Platypus, Mr. Taffet represented that Platypus purchased the property at 1009 N. Claiborne Avenue for $2,300, that it would cost $100,000 to renovate, and Platypus would complete the renovation by May 2012.  (*Id.*) However, as the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***nearly half*** of the amount Mr. Taffet previously represented it would cost to complete all the renovations to 1009 N. Claiborne Avenue just from December 2012 through February 2013, and the renovations were far from complete in August 2013, more than 15 months after Mr. Taffet represented that Platypus would complete them.  In the December 7, 2013 "Schedule of Real Estate Owned," Mr. Taffet  stated that he and Platypus needed an additional $160,000 to complete the renovations, bringing the anticipated costs to more than double the $100,000 that Mr. Taffet previously represented it would cost to complete all the renovations to 1009 N. Claiborne Avenue.  (Ex. 1)

161.     In persuading the Russells to invest with him in Platypus, Mr. Taffet represented that Platypus purchased the property at 1013 N. Claiborne Avenue for $2,300, that it would cost $30,000 to renovate, and that Platypus would complete the renovation by April 2012.  (Annex B, Ex. 2)  However, as the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***nearly double*** the $30,000 Mr. Taffet previously represented it would cost to complete all the renovations to 1013 N. Claiborne Avenue just from December 2012 through February 2013, and the renovations were far from complete in August 2013, more than 16 months after Mr. Taffet represented that Platypus would complete them.

162.     In persuading the Russells to invest with him in Platypus, Mr. Taffet represented that Platypus purchased the property at 1025 N. Claiborne Avenue for $50,000, that it would cost $291,500 to renovate, and that Platypus would complete the renovation by June 2012.  (*Id.*)  Mr. Taffet and Platypus reported spending over $125,000 just from December 2012 through July 2013, and the renovations were far from complete in August 2013, more than 14 months after Mr. Taffet represented that Platypus would complete them.

163.     In persuading the Russells to invest with him in Platypus, Mr. Taffet represented that Platypus purchased the property at 1031 N. Claiborne Avenue for $135,000, that it would cost $210,000 to renovate and that Platypus would complete the renovation by June 2012.  (*Id.*) However, as the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***over 20% more*** than the $210,000 that Mr. Taffet previously represented it would cost to complete all the renovations to 1031 N. Claiborne Avenue, just from December 2012 through August 2013, and the renovations were far from complete in August 2013, more than 14 months after Mr. Taffet represented that Platypus would complete them.

164.     In persuading the Russells to invest with him in Platypus, Mr. Taffet represented that Platypus purchased the property at 1425 N. Prieur Street for $180,000, that it would cost $100,000 to renovate and that Platypus would complete the renovation by April 2012.  (*Id.*) However, as the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***more than two-and-a-half times*** the $100,000 Mr. Taffet previously represented it would cost to complete all the renovations to 1425 N. Prieur Street, just from December 2012 through August 2013.

165.     Mr. Taffet and Ms. Williams told the Russells that they would put 1425 N. Prieur Street on the market for $1.9 million, but they did not.  Ms. Williams also informed Jeffrey that

she and Mr. Taffet had rejected offers of approximately $1 million for 1425 N. Prieur Street as insufficient.  During the renovations the New Orleans Board of Zoning Adjustment rescinded the building permit it had issued for work on the property because Platypus, at Ms. Williams' direction, failed to adhere to the permit's restrictions.  Neither Mr. Taffet nor Ms. Williams disclosed to the Russells the zoning issues (and other litigation involving the property) prior to their Platypus investment.

166.    As discussed infra, in March 2014, Platypus sold 1425 N. Prieur Street to Ms. Williams for $180,000.

167.    Mr. Taffet represented that Platypus purchased the property at 1441 N. Roman Street for $82,119.20, and that it would cost $60,000 to renovate.  (*Id.*)  However, as the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***nearly double*** the $60,000 that Mr. Taffet previously represented it would cost to complete all renovations to 1441 N. Roman Street just from December 2012 through July 2013, and the renovations were far from complete.  In the December 7, 2013 "Schedule of Real Estate Owned," Mr. Taffet stated that he needed an additional $75,000 to complete the renovations on the property.  (Ex. 1)

168.    Mr. Taffet and Platypus also claimed that they spent substantial amounts on materials and labor renovating three Chicago properties as the following chart reflects:

-63-

| | 4009 S. Calumet | 7430 Kenwood | 1640 E. 50th |
|---|---|---|---|
| November 2012 | $102,379.13 | $172,325.23 | $81,213.17 |
| December 2012 | $22,708.39 | $23,034.02 | $20,714.68 |
| January 2013 | $16,178.14 | $113,918.91 | $15,615.06 |
| February 2013 | $115,930.00 | $115,754.22 | $0.00 |
| March 2013 | $53,869.18 | $44,565.89 | $20,438.60 |
| April 2013 | $30,354.32 | $40,152.55 | $0.00 |
| May 2013 | **NO BREAKDOWN** | **NO BREAKDOWN** | **NO BREAKDOWN** |
| June 2013 | $76,503.32 | $51,526.80 | $21,815.76 |
| July 2013 | $0.00 | $0.00 | $0.00 |
| August 2013 | $67,974.32 | $72,374.36 | $0.00 |
| September 2013 | $87,474.84 | $93,107.53 | $0.00 |
| October 2013 | $0.00 | $0.00 | $0.00 |
| November 2013 | $0.00 | $0.00 | $0.00 |
| December 2013 | $0.00 | $0.00 | $0.00 |
| January 2014 | $54,101.96 | $39,246.75 | $0.00 |
| **TOTAL** | **$627,134.40** | **$766,006.26** | **$159,797.27** |

169.    In persuading the Russells to invest with him in Platypus's Chicago properties, Mr. Taffet represented that Platypus purchased the property at 4009 S. Calumet Avenue for $105,000, it would cost $150,000 to renovate, and it would have a value of more than $670,000 when completed.  (Ex. 5, at 2)  As the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***over four times*** the $150,000 Mr. Taffet previously represented it would cost to complete all the renovations to 4009 S. Calumet Avenue just from November 2012 through January 2014, and the renovations were far from complete in January 2014.

170.    In persuading the Russells to invest with him in Platypus's Chicago properties, Mr. Taffet represented that Platypus purchased the property at 7430 S. Kenwood Avenue for $120,000, it would cost $200,000 to renovate, and it would have a value of more than $670,000 when completed.  (Ex. 5, at 1)  As the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***over three-and-a-half times*** the $200,000 Mr. Taffet previously represented it would cost to complete all the renovations to 7430 S. Kenwood Avenue just from November 2012 through January 2014, and the renovations were far from complete in January 2014.

171.     In persuading the Russells to invest with him in Platypus's Chicago properties, Mr. Taffet represented that Platypus purchased the property at 1640 E. 50th Street for $35,000, it would cost $50,000 to renovate, and it would have a value of more than $400,000 when completed.  (Ex. 5, at 1-2)  As the preceding chart demonstrates, Mr. Taffet and Platypus reported spending ***nearly three times*** the $50,000 Mr. Taffet previously represented it would cost to complete all the renovations to 1640 E. 50th Street just from November 2012 through January 2014, and the renovations were far from complete in January 2014.  The Russells' subsequent investigation demonstrated that comparable properties sold for approximately $190,000, less than one-half the value Mr. Taffet represented.

172.     Mr. Taffet and Platypus could not even keep their purported values for the properties straight.  On July 31, 2012 and September 30, 2012, Mr. Taffet and Platypus published a "Schedule of Real Estate Holdings – Modified Cash/704(b) Basis."  True and correct copies of the June 31, 2012 and September 30, 2012 Schedules of Real Estate Holdings are attached hereto as Exhibits "17" and "18."  Mr. Taffet stated that the purpose of this schedule was to aid the Platypus members in determining the value of their respective interests in Platypus.

173.     In both the July 31 and September 30, 2012 schedules, Mr. Taffet and Platypus listed book values for each of the New Orleans properties as of January 2012.  (Ex. 17; Ex. 18) However, Mr. Taffet reported dramatically different values for each property on each occasion, leading to a reported $700,000 increase in value for the same properties that Mr. Taffet supposedly valued as of the same date (January 2012) and simply re-reported on each schedule as the following chart reflects:

|  | July 31, 2012 | September 30, 2012 | DIFFERENCE |
|---|---|---|---|
| 901 Piety Street | $688,603 | $809,109 | $120,506 |
| 913-915 N. Prieur Street | $222,662 | $261,628 | $38,966 |
| 935 N. Prieur Street | $140,195 | $164,729 | $24,534 |
| 1425 N. Prieur Street | $577,272 | $678,295 | $101,023 |
| 1009 N. Claiborne Avenue | $118,258 | $138,953 | $20,695 |
| 1013-1015 N. Claiborne Avenue | $214,415 | $251,938 | $37,523 |
| 1025 N. Claiborne Avenue | $206,169 | $242,248 | $36,079 |
| 1031 N. Claiborne Avenue | $643,246 | $755,814 | $112,568 |
| 1839-1841 St. Ann Street | $131,123 | $154,070 | $22,947 |
| 2013 Dumaine Street | $206,169 | $242,248 | $36,079 |
| 2017-2019 Dumaine Street | $109,682 | $128,876 | $19,194 |
| 2031-2033 Dumaine Street | $288,636 | $339,147 | $50,511 |
| 2614 St. Claude Avenue | $453,571 | $532,946 | $79,375 |
| **TOTAL** | **$4,000,000** | **$4,700,000** | **$700,000** |

174.    Mr. Taffet and Platypus reported a *post hoc* increase in the valuation of Platypus's New Orleans portfolio ***as of the same date (January 2012)*** and thus increased the purported value of its properties (solely on paper) by nearly 20%.  (*Id.*)

175.    In December 2012, Jeffrey questioned Mr. Taffet about the status of the properties, and told Mr. Taffet that he wanted to tour the New Orleans properties while Mr. Taffet and Ms. Williams spent the holidays in New Orleans.  Mr. Taffet strongly discouraged Jeffrey from inspecting the New Orleans properties, claiming December was not a good time to visit, and that if Jeffrey waited a while longer, Platypus would make more progress, and Jeffrey could have a better idea of how the properties would look when completed.  Based upon Mr. Taffet's advice, Jeffrey decided not to inspect the New Orleans properties in December 2012, but rather do so at a later time.

176.    Mr. Taffet and Platypus did not meet the promised completion dates for any of the properties.  In persuading the Russells to invest with him in Platypus, Mr. Taffet represented, and provided Annex B (Ex. 2) which also represented, that Platypus would complete renovations on the properties as follows:

| | Stated Date of Completion |
|---|---|
| 901 Piety Street | October 2012 |
| 913-915 N. Prieur Street | February 2012 |
| 935 N. Prieur Street | February 2012 |
| 1425 N. Prieur Street | April 2012 |
| 1009 N. Claiborne Avenue | May 2012 |
| 1013-1015 N. Claiborne Avenue | April 2012 |
| 1025 N. Claiborne Avenue | June 2012 |
| 1031 N. Claiborne Avenue | June 2012 |
| 1839-1841 St. Ann Street | March 2012 |
| 2013 Dumaine Street | June 2012 |
| 2017-2019 Dumaine Street | June 2012 |
| 2031-2033 Dumaine Street | NOT PROVIDED |
| 2614 St. Claude Avenue | April 2012 |
| 907-909 Iberville Street | March 2012 |

Platypus did not complete the renovations of any New Orleans property by the dates Mr. Taffet and Platypus promised.

177.    In February 2013, Jeffrey bought a condominium (the "Brandywine Condo"). Ms. Williams offered to serve as the general contractor and oversee the condominium renovations.  She informed Jeffrey that she could minimize materials and labor costs by flowing the project through American Made Renovations, a company owned or controlled by Mr. Taffet and/or Ms. Williams.

178.    Ms. Williams stated that renovations to the Brandywine Condo would cost $66,000.  Ms. Williams also committed to obtaining all necessary permits, licenses and consents. At Ms. Williams' direction, Jeffrey advanced her $22,000 (paid to Ms. Williams personally) to begin purchasing materials and lining up subcontractors.  Jeffrey subsequently paid Ms. Williams an additional $23,000 for additional expenses she said she incurred.

179.    Ms. Williams assured Jeffrey that she had obtained all the necessary permits, licenses and consents, and she commenced work on the project.  Not long after work began, it became apparent to Jeffrey that the work being performed was subpar.  Measurements were inexact.  The work was shoddy.  The workers lacked attention to detail, were lackadaisical and

-67-

did not adhere to building codes or schedules.  Workers hung and sealed drywall over an open

water line pipe, which caused a flood and substantial damage to the Brandywine Condo when the

water was turned on.

180.    The HVAC unit in the Brandywine Condo stopped working after one of the

unlicensed workers hired and supervised by Ms. Williams made faulty repairs.  The Brandywine

Condo did not have adequate heat in the winter and did not have adequate air conditioning in the

summer.

181.    Workers hired and supervised by Ms. Williams removed from the condo ceiling a

plumbing vent that extended through the roof, and then failed to seal the void properly.  Water

came in through the roof, causing additional damage to the Brandywine Condo.  Additionally,

the workers never covered any of the floors or furnishings, so dust and debris permeated all the

condo surfaces, requiring the replacement of most of the floor coverings.

182.    At a point, all of the workers had left the worksite.  Jeffrey reached out to Ms.

Williams to determine when and how she would complete the work.  Ms. Williams arranged for

Sherby Hatchett, one of the workers who had worked on the site previously, to return to

complete the work.  Ms. Williams told Jeffrey she had paid Mr. Hatchett's outstanding child

support and moved him to Chicago so he could work on Platypus's properties or Ms. Williams'

properties without confronting additional legal issues.  Ms. Williams told Jeffrey that he would

have to pay an additional $2,000 in cash for Mr. Hatchett to complete the work.  Ms. Williams

always paid the workers at the Brandywine Condo in cash.  Jeffrey agreed to pay Mr. Hatchett.

183.    During the time that Mr. Hatchett worked on the Brandywine Condo, he and

Jeffrey discussed the work being performed there and at other Platypus sites at which Mr.

Hatchett worked.  Mr. Hatchett criticized the work Platypus and other workers performed, and

told Jeffrey that much of the work on the Chicago and New Orleans properties would have to be redone. As Jeffrey would later learn, Mr. Hatchett was correct. Ms. Williams, as general contractor, did not apply for appropriate permits or licenses, hired unskilled workers, failed to supervise them, and stood by idly while they performed inferior work, most of which had to be redone.

184.    Toward the end of the Brandywine Condo renovations, a City of Wilmington building inspector visited Jeffrey unannounced and informed Jeffrey that Ms. Williams had not obtained the necessary permits for the HVAC, plumbing and electrical work that had been performed at the property. Jeffrey confronted Ms. Williams who claimed that a "misunderstanding" existed, and that she would ensure that the proper permits were obtained. Ms. Williams never obtained the permits necessary to complete the work at the Brandywine Condo.

185.    After Jeffrey confronted Ms. Williams about the lack of permits, Ms. Williams (and most of the workers and subcontractors she had hired) abandoned the project. Ms. Williams never completed the work on the Brandywine Condo.

186.    In May 2013, after learning that Ms. Williams had failed to obtain permits to the Brandywine Condo despite her assurances that she would, Jeffrey began to fear that similar issues might plague Platypus's New Orleans properties.

187.    From May 4-8, 2013, Jeffrey visited each of the Platypus properties in New Orleans. Their condition was shocking. Most of the properties, into which Mr. Taffet and Platypus supposedly had invested millions of dollars, appeared not to have been completed, and several appeared to be uninhabitable.

188.    Each of the properties Jeffrey visited displayed varying states of decay.

189.     One of the Claiborne Street properties had a stop work order posted on its door for lack of permits, despite Mr. Taffet's and Ms. Williams' representations that they and Platypus had obtained the necessary permits months or even years earlier.

190.     In a warehouse at 1025 North Claiborne Avenue that served as Platypus's operations center, Jeffrey discovered a dry-erase board that listed all of the Platypus New Orleans properties and the status of each.  The listed statuses disclosed that Platypus, Mr. Taffet and Ms. Williams had made little to no progress, even after the Russells had invested millions of dollars into the properties.

191.     While his visit to some properties did not provide any explanation of why Platypus had failed to complete the promised renovations, Jeffrey observed official, posted notices on several properties shutting down all work due to a lack of permits.  This was particularly disturbing to Jeffrey, because in November and December 2012, Mr. Taffet and Platypus issued, and the Russells paid their portion of invoices for over $130,000 in permitting and related costs for the New Orleans properties.  (Ex. 4, at 12-13)  In a subsequent October 2013 statement, Mr. Taffet and Platypus requested that the Russells pay an additional $72,599.23 in permitting and legal costs for the same properties on which Mr. Taffet, Ms. Williams and Platypus supposedly had obtained permits.  (Ex. 4, at 22)  As of the time of this filing, a search of official city records indicated that New Orleans had issued few permits for Platypus properties for the work that Mr. Taffet and Ms. Williams contended they and Platypus had performed, although Mr. Taffet and Platypus claimed to have expended over $200,000 for New Orleans permits and related costs.

192.     Jeffrey recognized one of the workers at 1025 Claiborne Street as having worked previously on the Old Gulph Property.  When Jeffrey later asked Mr. Taffet about the worker,

#28986789 v1

Mr. Taffet informed Jeffrey that Ms. Williams had relocated the worker, along with his son, to New Orleans to help him avoid the child's mother and/or legal problems.

193.     When Ms. Williams heard that Jeffrey was in New Orleans inspecting the Platypus properties, Ms. Williams directed one of the workers to take a photograph of Jeffrey because she did not believe he was really there.  After the worker forwarded the photograph to Ms. Williams, and she confirmed that the photograph showed Jeffrey in New Orleans, two workers told Jeffrey that Ms. Williams instructed one of the workers to "rough him up."  Upon hearing this, Jeffrey left the property without further incident to protect his safety.

### The Russells Investigate Further and Seek to Exit from Platypus

194.     When Jeffrey returned from New Orleans after his May 2013 inspection, he informed Rosemary of what he had seen.  After discussing the state of their investments with Platypus, the Old Gulph Property, 50 Fairview and Woodlawn, the Russells decided that they wanted to get their money out of Platypus and move on.  They were concerned about the status of the properties and the poor management and oversight of the properties by Mr. Taffet, Ms. Williams and Platypus.

195.     Jeffrey contacted Mr. Taffet and explained that the financial pressure caused by the substantial monthly capital calls that Mr. Taffet and Platypus purported to issue made it impossible for the Russells to continue in Platypus.

196.     Mr. Taffet told Jeffrey that he understood, and that he would find another investor to assume the Russells' interest.  Mr. Taffet asked the Russells for a $275,000 advance against expenses to help him identify another investor.  Jeffrey paid the $275,000 that Mr. Taffet requested.

#28986789 v1

197.    Jeffrey also undertook his own further investigation into the Platypus properties. He contacted De Smith, a purported Platypus employee who maintained records and other paperwork for Platypus and its purported properties, and asked her for a current rent roll for the Platypus New Orleans properties.

198.    In response to Jeffrey's request, Ms. Smith provided a listing of the purported Platypus properties in New Orleans and Chicago, including the address, tenant name, current rent, lease status and other information.  The listing was current as of May 4, 2013 (the "Rent Roll").  A true and correct copy of the Rent Roll is attached hereto as Exhibit "19."

199.    Upon reviewing the Rent Roll, Jeffrey observed that several of the properties identified in Annex B, which Mr. Taffet had used to persuade the Russells to invest in Platypus, did not appear on the Rent Roll.  (*Compare* Ex. 2 *with* Ex. 19)  Furthermore, the Rent Roll listed several properties which Jeffrey did not recognize and which Annex B did not identify.  (*Id.*) The Rent Roll did not identify when those properties were purchased, who paid for them, or who owned them.

200.    The Rent Roll identified tenants in most of the properties, but disclosed that the rents which Platypus collected were substantially below the rents that Mr. Taffet and Annex B promised that Platypus would receive.  The Rent Roll indicated that Platypus was collecting $12,700 monthly in rent from all of the listed properties, but only $7,900 from the Platypus properties listed on Annex B.  (Ex. 19)

201.    By contrast, Mr. Taffet and Annex B promised that the Platypus New Orleans properties would generate $115,000 in monthly rent, (Ex. 2), substantially more than the $7,900 monthly rent that the properties actually generated.

202.     Jeffrey also discovered that Ms. Williams operated a hair salon called Flawless Hair Salon at 907 Iberville Street, a property which Platypus purported to rent but not own.  The Rent Roll did not identify Flawless Hair Salon as a tenant, and did not identify any rent that Flawless paid to Platypus.  (Ex. 19)  Mr. Taffet was aware of the Flawless Hair Salon, as he said it was the location where he first met Ms. Williams.  Nonetheless, Mr. Taffet had not collected any rent from Flawless Hair Salon on Platypus's behalf.

203.     The Rent Roll indicated that tenants occupied five of the properties, but noted that Platypus collected *no rent* from those tenants.  Further, squatters occupied fully 30% of the properties on Platypus's Rent Roll.  Mr. Taffet, Ms. Williams and Platypus not only knew about the squatters, they knew their names and permitted them to remain in Platypus properties rent-free.

204.     Jeffrey's research into the ownership of the Platypus properties identified by Mr. Taffet and Annex B revealed that Platypus owned only one of the properties Platypus purported to own in New Orleans and Chicago.  Jeffrey learned that third parties with no identifiable connection to Platypus owned most of the properties.  Specifically, the below-identified owners hold record title to purported Platypus properties:

-73-

| Property Address | Record Owner |
|---|---|
| 1640 E. 50th Street, Unit 16B, Chicago, IL | Platypus Holdings LLC |
| 4009 S. Calumet Avenue, Chicago, IL | Melnick IL Properties LLC Series 4009 Calumet Phase II |
| 4127 S. Michigan Avenue, Chicago, IL | Melnick IL Properties LLC Series 4127 Michigan Phase II |
| 7439 S. Kenwood Avenue | Melnick IL Properties LLC Series 7439 Kenwood Phase II |
| 901 Piety Street, New Orleans, LA | 901 Piety Street, LLC |
| 913-915 N. Prieur Street, New Orleans, LA | Geraldine Lewis Gassaway |
| 935 N. Prieur Street, New Orleans, LA | Dorothy Williams |
| 1425 N. Prieur Street, New Orleans, LA | Tracy Williams |
| 1009-1011 N. Claiborne Avenue, New Orleans, LA | 1009 N. Claiborne LLC |
| 1013-1015 N. Claiborne Avenue, New Orleans, LA | Swank Restaurant LLC |
| 1025 N. Claiborne Avenue, New Orleans, LA | Tracy Williams |
| 1031 N. Claiborne Avenue, New Orleans, LA | Swank Restaurant |
| 1441-1443 N. Roman Street, New Orleans, LA | 1443 North Roman LLC |
| 1839-1841 St. Ann Street, New Orleans, LA | Swank Restaurant, LLC |
| 2013-2017 Dumaine Street, New Orleans, LA | 2013-17 Dumaine Street, LLC |
| 2031-2033 Dumaine Street, New Orleans, LA | 2031-33 Dumaine Street, LLC |
| 2614 St. Claude Avenue, New Orleans, LA | St Claude Investments, LLC |

205.     Jeffrey's searches also revealed unpaid taxes on most of the purported Platypus properties.  Subsequent searches conducted before the filing of these claims confirmed large outstanding tax obligations for many properties, as well as liens for unpaid taxes, utilities, and other obligations, despite Mr. Taffet and Platypus having billed the Russells for tax obligations in December 2012 and October 2013 (and the Russells having paid their purported share of those tax liabilities), including interest on unpaid taxes.  (Ex. 4 at 13, 23-24)

206.     Confronted with evidence that Mr. Taffet and Ms. Williams had not been forthright with them, and fearing that Mr. Taffet and Ms. Williams may have concealed additional pertinent information about Platypus and its properties, the Russells began to investigate Mr. Taffet's and Ms. Williams' prior business practices.

207.     In a shockingly similar 2006 action filed in the United States District Court for the Northern District of Illinois, former investors in a real estate enterprise assembled by Ms. Williams sued Ms. Williams and several of her affiliated entities for fraud, breach of fiduciary duty, unjust enrichment, conspiracy, and violation of the Racketeer Influenced and Corrupt

Organizations Act (the "Blythe Lawsuit").  A true and correct copy of the Blythe Lawsuit

Complaint is attached hereto as Exhibit "20."

208.    The Blythe Lawsuit plaintiffs contended that Ms. Williams "developed schemes

to defraud investors, developers and business people.  Williams' schemes used the Flawless

entities to falsely claim, at various times, that Williams and Flawless were financial advisors,

general contractors, mortgage brokers, developers, financial consultants and were generally

involved in financial transactions and deals involving the development, improvement,

rehabilitation, purchase and sale of real estate.  Williams has also falsely claimed that she was a

licensed attorney." (*Id.* at 5)

209.    The Blythe Lawsuit further contended that Ms. Williams (1) made false

statements to unsuspecting investors to entice them to invest with her and her affiliates, (2)

solicited individuals interested in specific properties to renovate and resell at a profit, (3)

fraudulently induced a bank to issue inflated mortgages so she could pocket the additional

money, (4) convinced investors to invest in a fraudulent scheme to acquire and develop vacant

lots in an underdeveloped ward of Chicago, and (5) claimed to be politically connected and have

political clout, which further induced her victims to trust her.  (*Id.* at 6-40).

210.    She and Mr. Taffet would execute a similar game plan years later to entice the

Russells to invest in Platypus.

211.    The Blythe Lawsuit plaintiffs sought an accounting and imposition of a

constructive trust over Ms. Williams' property, as well as damages in excess of $6 million.  (*Id.*

at 50-53)

212.    In 2013, the Court awarded the Blythe Lawsuit plaintiffs $9,319,999.98 in

damages, and entered judgment in their favor and against Ms. Williams and her affiliated

-75-

entities.  A true and correct of the Blythe Lawsuit Judgment Order dated May 3, 2013 is attached hereto as Exhibit "21."

213.    The Blythe Lawsuit was not the only lawsuit that accused Ms. Williams of fraud. In another action, a homeowner sued Ms. Williams for fraud arising from her failure to complete renovation work on his residence (the "Khounsary Lawsuit").  Ms. Williams allegedly took the homeowner's money, used his credit cards for her personal benefit, and left him with incomplete renovations.  The court awarded that plaintiff a judgment against Ms. Williams.

214.    Court records revealed the entry of multiple judgments against Ms. Williams over the ten years prior to the Russells' Platypus investment.

215.    The Russells also discovered that Ms. Williams had filed for bankruptcy twice in 2010.  In the first bankruptcy, filed on March 19, 2010 under Chapter 13 of the United States Bankruptcy Code, Ms. Williams identified nearly $2 million in liabilities, including judgments against her and in favor of the plaintiffs in the Blythe and Khounsary Lawsuits, a secured loan, and debts to multiple financial institutions and utility providers.  Ms. Williams listed $381,000 in assets, primarily a residence (the "Chapter 13 Case").  A true and correct copy of an excerpt from Ms. Williams' March 19, 2010 Chapter 13 Bankruptcy Petition is attached hereto as Exhibit "22."

216.    Ms. Williams' Chapter 13 Case was dismissed on July 15, 2010, after Ms. Williams filed a separate petition under Chapter 7 of the United States Bankruptcy Code (the "Chapter 7 Case").  A true and correct copy of an excerpt from Ms. Williams' July 15, 2010 Chapter 7 Bankruptcy Petition is attached hereto as Exhibit "23."  The Chapter 7 Case was discharged on September 16, 2010 after the Bankruptcy Trustee could not unearth any assets to satisfy the claims of Ms. Williams' creditors.

217.     On June 13, 2013, the Blythe Lawsuit plaintiffs commenced an adversary proceeding in the United States Bankruptcy Court for the Northern District of Illinois against Ms. Williams, seeking an order that their judgment against Ms. Williams in the Blythe Lawsuit should not have been discharged in the Chapter 7 Case.  That action remains unresolved and pending.

218.     Research into Mr. Taffet revealed that he also had a litigation history.  Several entities had sued Mr. Taffet and companies he controlled over the last 6 years for failing to fulfill their business commitments.

219.     In 2008, Shelley Romm, Inc., the company from which Mr. Taffet bought the Lippincott business, sued Mr. Taffet, Platypus Management, Inc., and Lippincott in the Court of Common Pleas for Philadelphia County, Pennsylvania (the "First Lippincott Lawsuit").  A true and correct copy of the Complaint in the First Lippincott Lawsuit is attached hereto as Exhibit "24."

220.     In the First Lippincott Lawsuit, Shelly Romm alleged that Mr. Taffet and Lippincott had purchased certain assets from Shelly Romm for $12 million, paid $10 million in cash at closing and provided a $2 million promissory note for the remaining balance (the "Lippincott Note").  (Ex. 24, at 3-4)  Shelly Romm alleged that Mr. Taffet and Lippincott failed to make the promised payments under the Lippincott Note, and accused Mr. Taffet, Platypus Management and Lippincott of breach of contract, breach of the implied covenant of good faith and fair dealing, fraud in the inducement, fraud, conversion, and civil conspiracy.  (*Id.* at 7-13)

221.     Shelly Romm subsequently filed a second lawsuit against Mr. Taffet, Platypus Management, and Lippincott in the Court of Common Pleas for Philadelphia County,

#28986789 v1

Pennsylvania, in March 2009 (the "Second Lippincott Lawsuit").  A true and correct copy of the Complaint in the Second Lippincott Lawsuit is attached hereto as Exhibit "25."

222.    In the Second Lippincott Lawsuit, Shelly Romm alleged that Mr. Taffet and the other defendants agreed to settle the First Lippincott Lawsuit (and related claims) for $3 million. (Ex. 25, at 6)  Shelly Romm stated that in reliance on the settlement agreement with Mr. Taffet and his affiliated companies, Shelly Romm dismissed the First Lippincott Lawsuit on February 17, 2009.  (*Id.* at 7)  Shelly Romm's Second Lippincott Lawsuit complaint contended that the same day Shelly Romm dismissed the First Lippincott Lawsuit, Mr. Taffet reneged on the settlement agreement, declaring that he could not obtain financing for the settlement payment. (*Id.*)  Shelly Romm sued Mr. Taffet and his affiliated companies for breach of contract for failing to abide by his settlement agreement resolving the First Lippincott Lawsuit, and sought to compel Mr. Taffet's and Lippincott's performance under the settlement agreement.  (*Id.* at 7-8)

223.    An experienced attorney and businessman, Mr. Taffet has the ability to use the law as both a sword and a shield to maximize his personal gain at the expense of those who do business with him and his enterprises.

224.    Neither Mr. Taffet nor Ms. Williams ever informed the Russells, whom they were persuading to invest with them in a multi-million dollar business endeavor, that they had each been involved in substantial prior litigations alleging that they failed to honor their business commitments, obligations and agreements.  Ms. Williams also never disclosed to the Russells that she had filed for bankruptcy, had over $9,000,000 in judgments awarded against her, or that her bankruptcy filings might impact her ability to guarantee loans to Platypus, jeopardizing Platypus's potential funding opportunities.

*Desperate to Maintain His Cash Cows, Mr. Taffet Refuses to Negotiate in Good Faith*

225.    By the Summer of 2013, when Jeffrey asked Mr. Taffet to have another investor or Mr. Taffet and Ms. Williams buy out the Russells' Platypus investment, the Russells had paid approximately $3.4 million into Platypus, paid Mr. Taffet $275,000 to help locate an investor to buy out the Russells, guaranteed the Penn Liberty loan (discussed *infra*) and bought 50 Fairview, all based upon Mr. Taffet's representations and their long-standing friendship.  In addition, Rosemary had loaned Mr. Taffet $200,000 for Old Gulph and invested $160,000 in Woodlawn, based upon Mr. Taffet's and Ms. Williams' representations.

226.    In late July 2013, Mr. Taffet represented to the Russells that he had identified an unnamed investor to acquire the Russells' interest in Platypus for the amount of their "hard costs," which he said included the initial $1.2 million they had invested and the $2.2 million they had contributed through capital calls, but excluded "soft costs," which Mr. Taffet described as dining and entertainment expenses and the costs for operating the business.  Mr. Taffet proposed a sale price of $3.042 million for the Russells' interest.  Mr. Taffet would not identify the unnamed investor, despite the Russells' many requests that he do so.  As a condition to the purported sale, Mr. Taffet demanded that the Russells prepay future invoices prior to the sale.

227.    Jeffrey and Rosemary reviewed the amount of their investment as calculated by Mr. Taffet.  Jeffrey determined that the Russells actually paid hard costs totaling $3.242 million not $3.042 million as Mr. Taffet said.  Jeffrey proposed to split the difference and sell the Russells' Platypus interest for $3.14 million.

228.    Mr. Taffet claimed to have transmitted Jeffrey's proposal to the unnamed investor, and reported that the unnamed buyer refused the offer and walked away from the transaction.  In an August 8, 2013 email to the Russells reporting that the investor had pulled out,

Mr. Taffet blamed the Russells for changing the terms of the proposed sale, and stated that the prospective investor no longer trusted them because they sought to correct the amount of the hard costs they had paid.  A true and correct copy of the August 8, 2013 email is attached hereto as Exhibit "26."

229.    When Jeffrey pressed Mr. Taffet for details about the supposed investor, Mr. Taffet could not tell, nor stick to, a consistent story.  At one point, he said the investor was a couple.  At other times Mr. Taffet described the investor as two couples, or a bank loan officer.  Mr. Taffet, despite presenting various iterations describing the prospective investor, refused to disclose the investor's identity to the Russells.  Upon information and belief, no such investor ever existed.

230.    Jeffrey subsequently suggested to Mr. Taffet and Ms. Williams that Platypus sell some of its purported properties and use the proceeds to buy out the Russells.  Mr. Taffet refused and said that he alone had full, complete and absolute discretion to determine when to sell properties.

231.    Every step of the way, Mr. Taffet resisted the Russells' efforts and suggestions about salvaging some value for their Platypus investment.

232.    Mr. Taffet never returned the $275,000 advance which he requested, and Jeffrey paid to locate another investor.

### *The Penn Liberty Loan and Platypus's Sale of One of Its Most Valuable Properties to Ms. Williams in a Self-Dealing Transaction*

233.    In February 2012, shortly after the Russells paid their $1.2 million initial capital contribution to Platypus, Mr. Taffet approached Penn Liberty Bank about obtaining a $700,000 unsecured loan claiming he would use the proceeds to "pay off assumed loans with higher interest rates and to close on a number of properties and capital commitments" (the "Penn

Liberty Loan").  Specifically, Mr. Taffet told Jeffrey that Platypus would use the proceeds to pay off loans on two New Orleans properties.

234.    Mr. Taffet asked the Russells to guaranty the Penn Liberty Loan.  He said their guaranty was necessary because Ms. Williams did not want to assume debt.  Mr. Taffet also claimed that Penn Liberty would not accept just Mr. Taffet as a guarantor because all of his reported income and assets were in Sharon's name alone, not joint names or Mr. Taffet's name.  Mr. Taffet assured the Russells that Platypus would sell some properties if necessary to repay the Penn Liberty Loan.  Fresh into their honeymoon stage with Platypus and Mr. Taffet, and trusting their supposed friend, the Russells agreed.

235.    The Russells subsequently learned that Ms. Williams could not guaranty the Penn Liberty Loan because of her recent bankruptcy, and a review of her credit history would jeopardize Platypus's chances of securing the Penn Liberty Loan.  Neither Mr. Taffet, Ms. Williams or Platypus ever disclosed Ms. Williams' financial instability to the Russells in connection with Mr. Taffet's and Platypus's pursuit of the Penn Liberty Loan or otherwise.

236.    On April 24, 2012, the Penn Liberty Loan closed.  Platypus executed a Promissory Note in the amount of $700,000, the Russells and the Taffets each signed Commercial Guaranties, and Platypus, Mr. Taffet and Ms. Williams took the $700,000 in cash.

237.    Ms. Williams did not guaranty the Penn Liberty Loan, although with a 35% equity stake in Platypus, she benefited from the Russells' guarantee.

238.    The Russells' guaranty to Penn Liberty required them to maintain liquid assets, net of encumbrances, of at least $2.5 million at all times and provide the bank with their annual tax returns, personal financial statements, and semi-annual liquidity statements.  The Russells

subsequently learned that the Taffets had negotiated with Penn Liberty so that the bank did not require the Taffets to provide the same information or abide by the same terms as the Russells.

239.    The Penn Liberty Loan matured on April 23, 2013. Mr. Taffet claimed that Platypus could not repay the balance, and he would not agree to convert the loan from unsecured to secured. The bank agreed to extend the maturity date, first to July 31, 2013, and later to December 31, 2013.

240.    In July 2013, Mr. Taffet informed the Russells that he was in the process of arranging for an investor to buy the Russells out of their Platypus investment (as described *supra*), and threatened the Russells that he would not permit the buyout unless they agreed to continue as guarantors and extend the repayment date of the Penn Liberty Loan. The Russells again agreed to Mr. Taffet's request.

241.    On December 31, 2013, after the purported buy-out of the Russells' interest by the unnamed third-party investor had fallen through, Mr. Taffet again claimed an inability to repay the Penn Liberty Loan. Mr. Taffet informed the Russells that Platypus was working to obtain other loans to pay off the Penn Liberty Loan. Mr. Taffet assured the Russells that Platypus would sell some of its properties to repay the $700,000 Penn Liberty debt if his efforts were unsuccessful.

242.    Mr. Taffet's assurances again rang hollow. As the Russells would later learn, Mr. Taffet did not undertake any substantive effort to obtain other financing to satisfy the Penn Liberty Loan (*see infra*), and never intended to sell any of the Platypus properties. The Penn Liberty Loan went into default.

243.    In February 2014, Jeffrey offered to take a mortgage in his own name on the property which Platypus purported to own at 1425 N. Prieur Street in New Orleans to repay the

Penn Liberty Loan.  When Jeffrey proposed this solution to Mr. Taffet, Mr. Taffet refused,

explaining that he did not want to separate 1425 N. Prieur from the Platypus portfolio, and that

he and Ms. Williams spent time at that property, and they enjoyed too much personal history

with the property to risk its sale.  Instead, Mr. Taffet preferred to leave the Russells liable as

guarantors for the entire balance of the Penn Liberty Loan.

244.    On March 18, 2014, after refusing Jeffrey's offer to take a mortgage in his own

name on 1425 N. Prieur Street, Platypus (either directly or through an affiliate) sold the property

to Ms. Williams personally.

245.    Mr. Taffet and Platypus had identified 1425 N. Prieur Street on Annex B, which

they used to persuade the Russells to invest in Platypus.  Mr. Taffet and Platypus claimed to have

acquired 1425 N. Prieur Street for $180,000 and invested $320,000 to renovate the property prior

to the Russells' investment.  Mr. Taffet and Platypus represented on Annex B that, prior to the

Russells' investment, the property was worth $700,000.  (Ex. 2)  Over the ensuing months,

Platypus claimed to have expended over $250,000 in additional renovation costs for the property,

as documented on the monthly statements sent to the Russells.  (Ex. 4, at 13-17, 20)  As set forth

in preceding paragraphs, Mr. Taffet and Ms. Williams previously had informed the Russells that

they planned to put 1425 N. Prieur Street on the market for $1.9 million, and had rejected offers

of approximately $1 million for the property as insufficient.

246.    Despite Mr. Taffet's and Platypus's stated investment of $750,000 into the

property, and their repeated valuations of the property in excess of $1 million, Platypus sold the

property to Ms. Williams personally for only $180,000.

247.    Mr. Taffet has a long-standing banking relationship with Penn Liberty, and upon

information and belief, has multiple lines of credit currently open with the bank.

-83-

248.     In April 2014, with the Penn Liberty Loan still unpaid, Mr. Taffet leveraged his

relationship with Penn Liberty and persuaded the bank to pursue the Russells on their guaranty.

Upon information and belief, as a result of Mr. Taffet's efforts, Penn Liberty pursued neither the

Taffets nor Platypus for recovery of the debt that the Taffets and Platypus arranged and from

which they benefited.

249.     The Penn Liberty Loan remains in default today.

250.     Despite the Russells' frequent inquiries, neither Mr. Taffet, Ms. Williams nor

Platypus ever informed the Russells how they spent the proceeds of the Penn Liberty Loan.

Upon information and belief, Mr. Taffet and Ms. Williams used the proceeds to finance the

Taffets' and Ms. Williams' exorbitant lifestyles, with no benefit flowing to the Russells.

*Mr. Taffet and Ms. Williams Sabotage Platypus's Chicago Loan Application*

251.     In January 2013, Mr. Taffet and Platypus applied for a loan with Urban

Partnership Bank ("UPB") to finance some Chicago properties (the "Chicago Loan").  UPB is a

small bank with a mission to provide financing to underserved urban communities.  Although not

disclosed to the Russells (though as they would later learn), Ms. Williams had a prior history

with UPB, having previously applied for a loan to finance Woodlawn, which UPB denied.

252.     Over a period of months, UPB tried to obtain from Mr. Taffet, Ms. Williams and

Platypus the required documentation to move the loan application through the approval process.

Despite their frequent assurances to the Russells that they wanted to close on the Chicago Loan,

Mr. Taffet and Ms. Williams never followed through on many of UPB's requirements and

deliberately failed to provide required information that prevented UPB from approving the loan.

253.     For example, on March 1, 2013, Andrea Townson, the UPB representative

assigned to the loan application, wrote to Ms. Williams and reported that UPB had not received

many basic pieces of information that it had requested.  A true and correct copy of the March 1, 2013 email chain between Ms. Townson and Ms. Williams is attached hereto as Exhibit "27."

254.    Ms. Townson stated that, despite several requests, "[e]ven as late as yesterday, we had not even received basic <u>final</u> financial statements.  In addition, we are still awaiting various documents needed from each guarantor.  These checklist items have been continually and clearly communicated . . . ."  (Ex. 27, at 5) (emphasis in original)  Ms. Townson continued that "we cannot move forward without the basic items needed to underwrite, and lacking answers to questions regarding the role and experience of the parties."  (*Id.*)

255.    In an email later the same day, Ms. Townson stated that the UPB loan application was stalled "by the lack of bank statements to confirm ancillary repayment sources.  Moreover, we still do [not] have a clear picture of successfully completed projects."  (*Id.* at 1)

256.    The Russells later learned that Mr. Taffet and Ms. Williams had not provided the necessary information to UPB, despite complaining vociferously to Ms. Townson and her supervisors about the slow pace at which UPB processed the application.  As late as March 27, 2013, Ms. Williams still had not provided her bank statements to UPB.  A true and correct copy of Ms. Townson's March 27, 2013 email is attached hereto as Exhibit "28."

257.    On April 10, 2013, with the Chicago Loan application in underwriting, UPB attempted to obtain a credit report for Ms. Williams.  TransUnion, one of the major credit reporting agencies, reported that Ms. Williams had frozen her own credit file, thus preventing UPB from obtaining a copy.  A true and correct copy of Ms. Townson's April 10, 2013 email is attached hereto as Exhibit "29."

258.    On April 23, 2013, Ms. Williams inquired about why she should guarantee the Chicago Loan, and presented excuses about why she should not.  She stated that "[w]ith my

name being common . . . it's going to take time to go through."  A true and correct copy of the April 23, 2013 email chain between Ms. Williams and Ms. Townson is attached hereto as Exhibit "30."  Ms. Townson responded that UPB might not require Ms. Williams to serve as a guarantor, but raised questions about Ms. Williams' construction company, Flawless Construction, which Ms. Williams had designated to work on the Chicago properties, but whose ownership she had not disclosed to UPB.  (Ex. 30)

259.    Ms. Townsend stated that if Flawless is a new company, its participation "generates questions of expereienc [sic] and competence.  References?  Project in Process? Financials?"  (*Id.*)  Upon information and belief, Ms. Williams intentionally withheld her status as the principal of Flawless Construction from UPB, failed to provide her bank statements and froze her credit report, because she knew those documents would reveal the judgments entered against her in the Blythe and Khounsary Lawsuits and her bankruptcies.

260.    Following Ms. Townson's emails to Mr. Taffet and Ms. Williams requesting information about Ms. Williams and Flawless, Mr. Taffet purported to become incensed, purported to withdraw the Platypus loan application, and threatened Ms. Townson that "I will share my sentiments with your superiors."  A true and correct copy of Mr. Taffet's April 23, 2013 email is attached hereto as Exhibit "31."  UPB did not grant Platypus a loan.

261.    The pursuit of the Chicago Loan, like so many other aspects of Platypus's, Mr. Taffet's and Ms. Williams' operations, was a ruse.  When Mr. Taffet and Ms. Williams realized they could not obtain the loan without providing their pertinent financial information and committing personal resources, they withdrew.

*Mr. Taffet and Ms. Williams Sabotage Platypus's Application For a Loan to Buy Out the Russells*

262.    In June 2013, purportedly in response to the Russells' request to be bought out of Platypus, Mr. Taffet and Ms. Williams contacted Fidelity Homestead Savings Bank ("Fidelity"), based in New Orleans, to attempt to secure a $2-4 million loan, in part to buy out the Russells' Platypus interest (the "New Orleans Loan").

263.    Based on the requested amount of the loan, Fidelity requested financial information from Platypus, and required personal guaranties (and financial information from the prospective guarantors) before it could consider approving the loan.

264.    Over a six month period, Platypus, Mr. Taffet and Ms. Williams hedged and delayed the process, claiming that they had provided documents when they had not, and failing to provide the information that Fidelity required.

265.    At the conclusion of the process in December 2013, based on the lack of responsiveness and the deceptive, non-forthright manner in which Mr. Taffet and Ms. Williams had dealt with Fidelity, the bank required personal guaranties from Mr. Taffet and a second liquid guarantor before it would consider approving any loan.  Based on its review of the financial records provided by Mr. Taffet and Ms. Williams, even if such guaranties were provided, Fidelity said it would lend Platypus only $85,000 to test the lending relationship and Platypus's creditworthiness, despite Mr. Taffet's, Ms. Williams' and Platypus's claim that the Company owned an $8 million unleveraged real estate portfolio.

266.    Mr. Taffet and Ms. Williams claimed they were livid, as they had during the course of negotiations with UPB for the Chicago Loan, and blamed Fidelity for its "misunderstanding" and failure to realize "the opportunity" Mr. Taffet, Ms. Williams and

Platypus had presented to Fidelity.  A true and correct copy of Ms. Williams' December 20, 2013 email is attached hereto as Exhibit "32."

267.    Ms. Williams stated that Mr. Taffet would sign as a guarantor on the New Orleans Loan, and chastised Fidelity as "only willing to extend less credit than the guaranteeing partner enjoys each month on just one of his unsecured credit cards." (Ex. 32, at 1)  She also stated that Platypus had a second, liquid investor lined up to guaranty the loan.  (*Id.*)

268.    Ms. Williams represented to Fidelity that Platypus had completed five New Orleans properties, which generated $12,275 monthly rental revenue.  (*Id.* at 2)  She also advised Fidelity that Platypus nearly had completed two additional New Orleans properties.  (*Id.*)

269.    Although the Platypus New Orleans properties generated approximately $12,000 in monthly income at the time of Ms. Williams' representation, fifteen separate properties (including two in Chicago) generated income – not five – and Platypus had not completely renovated any of the properties.

270.    Ms. Williams further represented to Fidelity that "Platypus Holdings has purchased, improved and managed properties in Chicago, New Orleans and outside of Philadelphia that are valued upon completion in excess of $21 million.  The cost to obtain and improve these properties, not including taxes, utilities and soft costs associated with running the Company, has been only slightly more than $4 million." (*Id.* at 1)

271.    Ms. Williams represented to Fidelity, on behalf of Platypus, that Platypus had invested just over $4 million in hard costs in its property portfolio.  At the time Ms. Williams made this representation to Fidelity, the Russells had invested approximately $3.4 million – of the $4 million – in hard costs associated with the Platypus portfolio.

272.     Mr. Taffet and Ms. Williams misrepresented the status of the Platypus properties and the Company's finances to Fidelity and their misrepresentations backfired.  As expressed in Ms. Williams' December 20, 2013 email, Fidelity would only loan a small amount of money ($85,000) even if Platypus provided two personal guaranties.  (*Id.*)

273.     Upon information and belief, the second liquid guarantor that Fidelity required never existed.

### *Left Without Options, the Russells Cease Capital Contributions*

274.     Despite Mr. Taffet's representations and assurances throughout 2013 that he would arrange for an investor to acquire the Russells' Platypus interest or otherwise arrange to buy out the Russells, he failed to do so.  The Operating Agreement purported to obligate Jeffrey and Rosemary to continue to meet the monthly capital calls that Mr. Taffet purported to initiate.

275.     In an effort to feign concern for the Russells' financial concerns, after Jeffrey informed Mr. Taffet that he and Rosemary struggled to keep up with his purported capital calls, Mr. Taffet reduced the amount of the purported monthly capital calls dramatically.  While the Russells' purported monthly capital calls averaged nearly $150,000 from July 2012 through March 2013 (including calls of more than $100,000 in eight of nine months), Mr. Taffet reduced the amount of the purported calls to an average of only $46,000 during the remaining months of 2013 (with calls of less than $50,000 in six of nine months).

276.     The amount of the capital calls did not impact Mr. Taffet, Sharon or Ms. Williams because they did not pay capital calls as the Russells did, or they otherwise funneled their capital contributions back out of Platypus to themselves.

277.     This decrease (more than two-thirds) in the amount of money that Mr. Taffet and Platypus demanded that the Russells contribute to operate Platypus directly coincided with

Jeffrey's statements to Mr. Taffet about the Russells' financial difficulty.  Mr. Taffet realized his primary funding source might come to an end, so he reduced his monthly monetary demands to try to extract as much money from the Russells for as long as he could before they could pay no more.

278.    Faced with Mr. Taffet's self-declared iron grip on the Platypus operations, recognizing that he had taken advantage of their 20-year friendship to inveigle them to invest with him, Ms. Williams and Platypus, and confronted with the reality of their depleted funds, in January 2014 the Russells again informed Mr. Taffet that they could no longer continue to make such large capital calls without any demonstrated results from Platypus.

279.    Mr. Taffet again manipulated the Russells' situation to his advantage.  Despite his representations that he would arrange to release the Russells from their Platypus obligations, Mr. Taffet continued to issue purported capital calls.  Mr. Taffet purported to issue additional capital calls on January 7, 2014 and February 1, 2014, even as Mr. Taffet continued to assure the Russells that he would work with them to find an investor to buy them out of their Platypus investment.  (Ex. 4, at 26-27)  Mr. Taffet purported to issue the Russells additional capital calls exceeding $100,000.

280.    On January 28, 2014, Mr. Taffet and Jeffrey again spoke about releasing the Russells from their Platypus investment.  Mr. Taffet agreed that Mr. Taffet and Ms. Williams would buy out the Russells' position in Platypus for 100% of the Russells' "hard costs," and that Mr. Taffet and Ms. Williams would work with Penn Liberty to release the Russells' guaranty.

281.    Jeffrey confirmed this arrangement in an email the following day.

282.    Mr. Taffet subsequently changed the proposal and on February 1, 2014, demanded that the Russells pay ***to him and Sharon personally*** $119,485.79 which he claimed

the Russells owed for unpaid capital calls. A true and correct copy of Mr. Taffet's February 1, 2014 email is attached hereto as Exhibit "33." Mr. Taffet said that if the Russells did not pay that $119,485.79 to Sharon and him, he would not approve the Russells' buyout.

283. Mr. Taffet subsequently reneged on the Russells' proposed buyout claiming that he learned that the Russells had a discussion with Ms. Williams and proposed that Ms. Williams purchase their Platypus position.

284. Mr. Taffet claimed that he took Jeffrey's discussion with Ms. Williams as a personal affront. Thereafter, Mr. Taffet used his position as Platypus's manager to retaliate against the Russells. In a February 5, 2014 email, Mr. Taffet issued another purported capital call and purported to impose penalties on the Russells for their alleged failures to meet prior capital calls. A true and correct copy of Mr. Taffet's February 5, 2014 email is attached hereto as Exhibit "34."

285. In a second email later the same day, calling his twenty-year friend Jeffrey a "Craven, Vapid, Lying, Sinister Man," Mr. Taffet purported to revoke his prior buyout offer, and claimed that the Russells had defaulted on five capital calls. A true and correct copy of Mr. Taffet's second February 5, 2014 email is attached hereto as Exhibit "35." Citing the Capital Forfeiture Provision, Mr. Taffet stated that he had reduced the Russells' original 30% interest in Platypus (300 Class B shares) to merely .9375% (9.375 Class B shares) because of the supposed cumulative halving of their interest for failure to pay capital calls. (Ex. 35) He also claimed that he reduced the Russells' interest in their capital account from 100% to 3.125%. (*Id.*) At this point, the Russells had invested over $3.4 million in Platypus, and Mr. Taffet valued their interest at barely $200,000.

286.    Mr. Taffet's February 5, 2014 email also threatened the Russells that he intended to continue to make additional capital calls, citing the Operating Agreement as giving him the unfettered right to make additional, uncapped and unlimited capital calls.  (*Id.*)

287.    On February 16, 2014, Mr. Taffet and Platypus made an additional purported capital call, purportedly because the Russells failed to contribute capital following the purported February 5 call.

288.    Neither Mr. Taffet nor Platypus ever sent notice to the Russells exercising any of the remedies under Section 4 of the Operating Agreement by any of the methods specified in GP10; only via email.

### *Mr. Taffet Purports to Exercise the Capital Forfeiture Provision and Redeem the Russells' Platypus Membership Interest, and Sells One of Its Most Valuable Properties to Ms. Williams in a Self-Dealing Transaction*

289.    Also on February 16, 2014, John M. Gerber, Esquire emailed Jeffrey and Rosemary, attaching a letter in which Platypus purported to exercise the Capital Forfeiture Provision (the "February 16 Gerber Email").  A copy of the February 16 Gerber Email is attached to the Complaint as Exhibit "O."

290.    As described by Mr. Taffet in his February 5 email, Attorney Gerber cited Section 4.3(a) of the Operating Agreement.  (Compl. Ex. O)  He contended that the Russells had defaulted on five capital calls, and that their percentage interest in Platypus had thus halved five separate times, resulting in a reduction of their interest from 30% to .94%, and a reduction in their share ownership from 300 to 9.4 Class B shares.  (*Id.*)

291.    Attorney Gerber further demanded that the Russells pay $149,485.70, which he contended was outstanding, and threatened that Platypus might pursue the Russells for attorneys' fees incurred in collecting that amount.  (*Id.*)

-92-

292.    Three days later, on February 19, 2014, Platypus filed its Complaint against the Russells (D.I. 1).

293.    Since February 19, 2014, the Russells continued to attempt to negotiate an amicable exit from Platypus.  The parties could not reach an agreement because Mr. Taffet has refused to negotiate in good faith.

294.    On June 16, 2014, Mr. Taffet emailed the Russells, purportedly notifying them that "the company has elected to redeem your shares in full.  This redemption has the immediate effect of stripping you of membership in Platypus and of terminating any remaining rights in, obligations to or expectations from Platypus" (the "June 16 Taffet Email").  A copy of the June 16 Taffet Email is attached to the Complaint as Exhibit "Q."

295.    The June 16 Taffet Email cited Section 4.3(b) of the Operating Agreement, and stated that Section afforded Mr. Taffet, as manager, "sole discretion" to choose the fair market value of the Russells' membership shares.  (Compl. Ex. Q)  Mr. Taffet further stated "I have elected to rely on your own valuation, which is $2.45 million."  (*Id.*)

296.    The Russells never valued their $3.4 million investment in Platypus at $2.45 million.

297.    The June 16 Taffet Email then purported to calculate the redemption amount owed to the Russells by multiplying Mr. Taffet's assigned $2.45 million valuation by the .9375% ownership interest Mr. Taffet contended that the Russells held in Platypus.  (*Id.*)  The Russells' 20 year long friend and confidant thus calculated the Russells' redemption amount for their $3.4 million investment as $11,484.38, and stated that Platypus would credit this amount against the Russells' allegedly outstanding capital balance.  (*Id.*)

298.     Mr. Taffet sent the June 16 Taffet Email only via email, and not by any of the permissible methods of providing notice pursuant to GP10 of the Operating Agreement.

## COUNT I
### Rescission

299.     The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

300.     As set forth in the preceding paragraphs, the Platypus Class A members Mr. Taffet and Ms. Williams, and through them Platypus, made substantial representations to the Russells to induce them to invest in Platypus.

301.     Mr. Taffet's, Ms. Williams' and Platypus's representations were false, and Mr. Taffet and Ms. Williams knew that their statements were false when they made them.

302.     Mr. Taffet, Ms. Williams and Platypus persuaded the Russells to invest approximately $3.4 million in Platypus.

303.     Based on their longstanding friendship, the Russells justifiably relied on Mr. Taffet's representations and invested $3.4 million.

304.     The Russells have suffered substantial financial damages as a result of Mr. Taffet's, Ms. Williams' and Platypus's misrepresentations, namely the entirety of their $3.4 million investment in Platypus.

WHEREFORE, the Russells demand judgment in their favor and against Platypus Holdings, LLC rescinding the Operating and Subscription Agreements and awarding the Russells compensatory damages in an amount to be determined at trial, together with punitive damages, attorneys' fees, interest and costs according to law, and such other and further relief as this Court deems just and proper.

## COUNT II
### Breach of Contract – Capital Calls/Defaults

305.    The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

306.    The Russells, the Taffets, Ms. Williams and Platypus entered into and executed the Operating Agreement.

307.    The Russells met their obligations under the Operating Agreement.

308.    The Operating Agreement explicitly provided that any notice, demand or other communication to any member of Platypus required or permitted under the Operating Agreement must be made in writing and sent by (1) personal delivery, (2) first-class registered or certified mail, return receipt requested, postage prepaid, or (3) nationally recognized next-day delivery courier, charges prepaid.

309.    Mr. Taffet and Platypus purported to make over two dozen capital calls to the Russells since February 2012.  Mr. Taffet and Platypus communicated each of the purported capital calls by email only.

310.    Because none of the purported capital calls were made in accordance with the notice requirements of the Operating Agreement, they were not valid.  Indeed, they were ineffective for any and all purposes.

311.    Furthermore, the Operating Agreement authorizes Platypus to issue capital calls, but does not specify the circumstances under which Mr. Taffet or Platypus may issue capital calls.

312.    The implied covenant of good faith and fair dealing inherent in every contract, including the Operating Agreement, requires that in the absence of an express contractual provision, parties to an agreement must perform in a good faith, reasonable manner.

-95-

313.     Mr. Taffet and Platypus made purported monthly capital calls for tens and hundreds of thousands of dollars at a time, but the work which was supposedly performed on the properties and for which those funds were allegedly required was either not performed, or performed in a subpar manner.

314.     Mr. Taffet and Platypus made the purported capital calls knowing that the funds solicited in those calls would not be, and were not, used for the stated purposes.

315.     Mr. Taffet and Platypus failed to notify the Russells of the purported capital calls in the manner prescribed by the Operating Agreement and agreed to by Platypus and the Russells.

316.     By failing to properly notify the Russells of their capital obligations, by purportedly declaring the Russells in default for failing to make capital calls that were made in an unreasonable and unauthorized manner, and for all the reasons set forth in the preceding paragraphs, Platypus breached the Operating Agreement.

317.     The Russells have suffered damages as a result of Platypus's breach.

WHEREFORE, the Russells demand judgment in their favor and against Platypus Holdings, LLC for compensatory damages in an amount to be determined at trial, together with attorneys' fees, interest and costs according to law, and such other and further relief as this Court deems just and proper.

## COUNT III
### Breach of Contract – Capital Forfeiture

318.     The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

#28986789 v1

319.    The Operating Agreement authorizes Platypus to invoke the Capital Forfeiture Provision, but does not specify the circumstances under which exercise of the Capital Forfeiture Provision would be appropriate.

320.    Because none of the purported capital calls to the Russells were made in accordance with the notice requirements of the Operating Agreement, they were not valid. Indeed, they were ineffective for any and all purposes.

321.    Mr. Taffet and Platypus purportedly exercised the Capital Forfeiture Provision on the basis of alleged defaults by the Russells of capital calls that were not properly made.

322.    Mr. Taffet and Platypus failed to notify the Russells of their purported exercise of the Capital Forfeiture Provision in the manner prescribed by the Operating Agreement and agreed to by Platypus and the Russells.

323.    By failing to properly notify the Russells of Platypus's purported exercise of the Capital Forfeiture Provision, by purportedly exercising the Provision in bad faith and in an unreasonable manner, and for all the reasons set forth in the preceding paragraphs, Platypus breached the Operating Agreement.

324.    The Capital Forfeiture Provision as written and applied by Mr. Taffet and/or Platypus violates the pertinent law and is unenforceable as a matter of law.

325.    The Russells have suffered damages as a result of Platypus's breach.

WHEREFORE, the Russells demand judgment in their favor and against Platypus Holdings, LLC for compensatory damages in an amount to be determined at trial, together with attorneys' fees, interest and costs according to law, and such other and further relief as this Court deems just and proper.

-97-

## <u>COUNT IV</u>
**Breach of Contract – Share Redemption**

326.    The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

327.    The Operating Agreement authorizes Platypus to redeem the shares of a defaulting member, but does not specify the circumstances under which exercise of the Redemption Provision would be appropriate.

328.    Because the capital calls were not valid, even if the Russells failed to pay one or more of the purported capital calls, they were not in default because they were not properly notified.

329.    Because the Russells were never in default, the Redemption Provision cannot be exercised as to their Platypus interest.

330.    Mr. Taffet and Platypus purportedly exercised the Redemption Provision on the basis of alleged defaults by the Russells of capital calls that were never properly made.

331.    Mr. Taffet and Platypus failed to notify the Russells of Platypus's purported exercise of the Redemption Provision in the manner prescribed by the Operating Agreement and agreed to by the Company and the Russells.

332.    By failing to properly notify the Russells of Platypus's purported exercise of the Redemption Provision, by purportedly exercising the Provision in bad faith and in an unreasonable manner, and for all the reasons set forth in the preceding paragraphs, Platypus breached the Operating Agreement.

333.    The Redemption Provision as written and applied by Mr. Taffet and/or Platypus violates the pertinent law and is unenforceable as a matter of law.

334.    The Russells have suffered damages as a result of Platypus's breach.

WHEREFORE, the Russells demand judgment in their favor and against Platypus Holdings, LLC for compensatory damages in an amount to be determined at trial, together with attorneys' fees, interest and costs according to law, and such other and further relief as this Court deems just and proper.

### COUNT V
### Breach of Contract – 50 Fairview

335.    The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

336.    Mr. Taffet approached the Russells and offered them the opportunity to purchase 50 Fairview, as set forth in the preceding paragraphs.

337.    The Russells purchased 50 Fairview in a bona fide transaction in November, 2012.  That transaction was properly documented and recorded, and the Russells hold title solely in their names.

338.    Although Platypus purportedly hired contractors and performed some work on 50 Fairview, the renovation is far from complete.  Contractors who worked on the property claim that Platypus owes them over $100,000, and have threatened to place liens against the property if they are not paid.

339.    The work that Mr. Taffet and Platypus had represented would be completed by April 2013 remains incomplete, and the house remains vacant, partially renovated, and unsalable.

340.    As the owners of 50 Fairview, the Russells have paid substantial interest, taxes, and other upkeep on the property for more than a year since the date that Mr. Taffet and Platypus represented the renovations would be complete.

341.    Platypus breached its agreement to complete renovations on 50 Fairview within six months.

342.     The Russells have suffered damages as a result of Platypus's breach.

WHEREFORE, the Russells demand judgment in their favor and against Platypus Holdings, LLC for compensatory damages in an amount to be determined at trial, together with attorneys' fees, interest and costs according to law, and such other and further relief as this Court deems just and proper.

## COUNT VI
### Breach of Contract – Charitable Contributions

343.     The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

344.     The Platypus Operating Agreement provides that Platypus should be treated as a partnership for its members' tax purposes.

345.     As set forth in the preceding paragraphs, Platypus claims to have made over $16,000 in charitable contributions from February through October 2012.  Upon information and belief, the Russells allege that Platypus made more charitable contributions after October 2012, but those contributions were not disclosed to the Russells.

346.     Platypus never identified those contributions to the Russells, nor did it provide them with any documentation by which they could deduct their portion of those contributions on their federal and state income tax returns.

347.     Platypus's failure to provide the Russells the necessary documents to deduct their share of the Platypus charitable contributions constitutes a breach of the Operating Agreement.

348.     The Russells have suffered damages as a result of Platypus's breach.

WHEREFORE, the Russells demand judgment in their favor and against Platypus Holdings, LLC for compensatory damages in an amount to be determined at trial, together with

#28986789 v1

attorneys' fees, interest and costs according to law, and such other and further relief as this Court deems just and proper.

**COUNT VII**
**Breach of Contract – Reporting**

349.    The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

350.    As set forth in the preceding paragraphs, on May 6, 2012, Mr. Taffet promised to distribute, by the end of June 2012, a forward-looking financial projection, a rent roll, and updated photographs of the Platypus properties.

351.    Neither Mr. Taffet nor Platypus provided the Russells with the forward-looking financial projection, the rent roll or updated photographs as promised.

352.    Mr. Taffet and Platypus had an obligation to provide the forward-looking financial projection, the rent roll and updated photographs, and they breached that obligation.

353.    Furthermore, GP6.4 of Annex C provides:  "Within ninety (90) days after the end of each Fiscal Year, the Company shall endeavor to cause to be prepared and mailed to each Member a report in draft form setting forth in sufficient detail all such information and data with respect to the Company during such Fiscal Year as shall enable such Member to prepare its income tax returns in accordance with all Applicable Law."

354.    Platypus's 2012 fiscal year ended on December 31, 2012.

355.    Platypus was obligated to provide the Russells with the required tax documents by March 31, 2013.

356.    Platypus failed to provide the Russells with their IRS Form K-1 until January 28, 2014, nearly ten (10) months later.

-101-

357.   Mr. Taffet and Platypus had an obligation to timely provide the Russells with tax documents as required by the Operating Agreement, and they breached that obligation.

358.   The Russells have suffered damages as a result of Platypus's breaches.

WHEREFORE, the Russells demand judgment in their favor and against Platypus Holdings, LLC for compensatory damages in an amount to be determined at trial, together with attorneys' fees, interest and costs according to law, and such other and further relief as this Court deems just and proper.

## COUNT VIII
### Fraud – Capital Calls

359.   The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

360.   As set forth in the preceding paragraphs, Mr. Taffet and Platypus purported to issue capital calls every month from February 2012 through April 2013.  These calls were accompanied by invoices that identified work that was allegedly performed on Platypus properties during the previous month, and other expenses such as travel, entertainment, and administrative costs.

361.   While in New Orleans in May 2013, Jeffrey visited the Platypus properties.

362.   The properties had had little to no renovation work performed on them, and many were in a deplorable condition.

363.   Mr. Taffet and Platypus issued purported capital calls for work that was never performed, billing the Russells for materials that were never purchased and labor that was never supplied.

364.     Mr. Taffet and Platypus issued these purported capital calls to extract additional capital contributions from the Russells which were used to finance the extravagant lifestyles of Mr. Taffet, Sharon, Ms. Williams and others.

365.     As set forth in the preceding paragraphs, Mr. Taffet, the Class A members and Platypus operated Platypus as a sham enterprise, issuing purported capital calls to the Russells, but not issuing commensurate capital calls to Mr. Taffet, Sharon and Ms. Williams and not collecting on capital calls issued to Mr. Taffet, Sharon and Ms. Williams, as it collected on purported capital calls to the Russells.  Mr. Taffet and Platypus paid expenses for, and monies to Mr. Taffet, Sharon and Ms. Williams, as set forth in the preceding paragraphs and used the Russells' monies to fund those expenses.

WHEREFORE, the Russells demand judgment in their favor and against Platypus Holdings, LLC for compensatory damages in an amount to be determined at trial, together with attorneys' fees, punitive damages, interest and costs according to law, and such other and further relief as this Court deems just and proper.

## COUNT IX
### Declaratory Judgment – Capital Calls

366.     The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

367.     The Operating Agreement explicitly provided in GP10, that all notices from Platypus to the members must be made in writing, and delivered personally, by registered or certified mail, or by overnight courier.

368.     From February 2012 through February 2014, Mr. Taffet and Platypus purported to make a series of capital calls to the Russells.  None of those purported calls were sent in

-103-

accordance with GP10's notice requirements, and were therefore never valid.  Indeed, they were ineffective for any and all purposes.

369.   Because the purported capital calls were never validly issued, the Russells were not obligated to contribute capital to Platypus in response to the calls.

370.   Platypus contends that the purported capital calls were valid, and that Russells defaulted on five such calls.

371.   Thus, an actual and justiciable controversy exists between the parties about whether any of the purported capital calls made by Mr. Taffet and Platypus from February 2012 through February 2014 were properly issued, and whether the Russells were obligated to make any payments in response to the calls.

WHEREFORE, the Russells respectfully request that the Court enter an order and judgment in their favor and against Platypus Holdings, LLC declaring that none of the purported Platypus capital calls from February 2012 through February 2014 complied with the notice requirements of GP10, and were therefore never validly issued, and awarding such other and further relief as this Court deems just and proper.

## COUNT X
### Declaratory Judgment – Russells' Membership Status

372.   The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

373.   On February 16, 2014, John M. Gerber, Esquire, emailed the February 16 Gerber Email to the Russells, purporting to exercise the Capital Forfeiture Provision, alleging that because the Russells had defaulted on five capital calls, their percentage interest in Platypus had thus been halved five times, resulting in a reduction from 30% to .94%, and a reduction in their share ownership from 300 to 9.4 Class B shares.

374.    Like the purported capital calls that preceded it, and all other purported notices from Platypus to the Russells, the February 16 Gerber Email did not comply with the notice requirements outlined in GP10.

375.    Because Platypus failed to comply with the Operating Agreement in making the purported calls, none of the purported calls were valid, and the Russells were never in default.

376.    Because the Russells were never in default, Platypus's exercise of the Capital Forfeiture Provision was invalid under the Operating Agreement.

377.    Thus, an actual and justiciable controversy exists between the parties about the validity of the February 16 Gerber Email and the percentage of Platypus interest that the Russells own.

WHEREFORE, the Russells respectfully request that the Court enter an order and judgment in their favor and against Platypus Holdings, LLC declaring that the Russells are the proper and rightful owners of 30% of Platypus's overall membership interest (300 Class B shares), and awarding such other and further relief as this Court deems just and proper.

### COUNT XI
### Declaratory Judgment – Dissolution
### (Pled in the Alternative)

378.    The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

379.    Mr. Taffet and Platypus contend that purported capital calls made between February 2012 and February 2014 were valid.

380.    Mr. Taffet and Platypus further contend that the Russells did not make timely capital contributions in response to five purported capital calls Mr. Taffet and Platypus made.

#28986789 v1

381.    Section 4.2 of the Operating Agreement provides that if a Class B Member elects to not make any such Capital Contribution more than twice, then, absent contrary action by the manager, the Company is dissolved.

382.    The Russells are Class B members of Platypus.

383.    If the purported 2013 capital calls were validly issued, as Mr. Taffet and Platypus contend, then the dissolution mechanism in Section 4.2 triggered when the Russells elected "not to make any such Capital Contribution more than twice."

384.    After  the Russells elected not to make a Capital Contribution more than twice, Mr. Taffet, as Platypus's manager, never determined not to dissolve Platypus.  An express determination to continue Platypus's existence in contravention of the Operating Agreement would have to be communicated to the members (so they were aware of the Company's continuation).  Neither Mr. Taffet nor Platypus ever sent such notification, in accordance with GP10 or otherwise.

385.    Because the manager never determined that Platypus should not dissolve after the Russells elected not to make a Capital Contribution more than twice, Platypus automatically dissolved, pursuant to Section 4.2 of the Operating Agreement, when the Russells elected  not to make a Capital Contribution more than twice.

386.    Platypus purports to continue to operate as a going concern.

387.    Thus, an actual and justiciable controversy exists between the parties about whether Platypus dissolved.

            WHEREFORE, the Russells respectfully request that the Court enter an order and judgment in their favor and against Platypus Holdings, LLC declaring, in the alternative, that

Platypus dissolved when the Russells elected not to make a Capital Contribution more than twice, and awarding such other and further relief as this Court deems just and proper.

## COUNT XII
### Declaratory Judgment – 50 Fairview Ownership

388.    The Russells repeat and incorporate the averments of the above paragraphs as if fully set forth herein.

389.    As set forth in the preceding paragraphs, Mr. Taffet promised the Russells that Platypus would perform all necessary renovations on 50 Fairview, enabling the Russells to sell the property at a substantial profit.

390.    Relying upon Mr. Taffet's promises and representations, the Russells purchased 50 Fairview in a bona fide transaction.  That transaction was properly documented and recorded, and the Russells hold title solely in their names.

391.    Mr. Taffet, as Platypus's manager, has acknowledged publicly on multiple occasions that the Russells are the sole owners of 50 Fairview.

392.    Despite Mr. Taffet's prior acknowledgements and admissions, Platypus now contends that it has some ownership interest in 50 Fairview.

393.    Thus, an actual and justiciable controversy exists between the parties about the rightful ownership of 50 Fairview.

#28986789 v1

WHEREFORE, the Russells respectfully request that the Court enter an order and judgment in their favor and against Platypus Holdings, LLC declaring that the Russells are the exclusive, rightful owners of 50 Fairview, that Platypus Holdings, LLC has no ownership interest in the property, and awarding such other and further relief as this Court deems just and proper.

Dated:      July 31, 2014

*/s/ Francis P. Devine, III*
Francis P. Devine, III, Esq.
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
Telephone: 215-981-4000
*devinef@pepperlaw.com*

and

James H. S. Levine
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Telephone: 302.777.6536
*levinejh@pepperlaw.com*

*Attorneys for Jeffrey B. Russell
and Rosemary Russell*

## CERTIFICATE OF SERVICE

I, James H. S. Levine, hereby certify that on July 31, 2014, I caused a true and correct copy of the foregoing *First Amended Answer, Affirmative Defenses and Counterclaim of Jeffrey B. Russell and Rosemary Russell* to be served on the following counsel of record via ECF transmission:

Aaron J. Freiwald, Esquire
Layser & Freiwald
1500 Walnut Street, 18th Floor
Philadelphia, PA  19102


/s/ *James H. S. Levine*
James H. S. Levine