**EXHIBIT 20**

TP:kr 04.25.2008 14:06:28

In the United States District Court for the
Northern District of Illinois, Eastern Division

Blythe Holdings, Inc., a foreign corporation and
Chicago 100, Inc., an Illinois corporation,

                Plaintiffs,

             v.

Flawless Financial Corporation, an Illinois corporation,
Flawless Financial Mortgage Corporation, an Illinois corporation,
Tracy Williams, individually,
Tracy Williams d/b/a Flawless Financial,
Tracy Williams d/b/a Flawless Financial Corporation,
Tracy Williams d/b/a/ Flawless Financial Mortgage Corporation,
Shirley Coleman, John A. DeAngelis, Michael Brown,
Glenn Udell, Michael Pomerantz, Brown, Udell and
Pomerantz, Ltd., an Illinois corporation, Phillip A. Kupritz,
Phillip A. Kupritz d/b/a K2, Phillip A. Kupritz d/b/a K2 Studio,
Phillip A. Kupritz d/b/a K2 Architects, Inc.,
Phillip A. Kupritz d/b/a Cion Companies. Inc.,
K2 Architects, Inc., an Illinois corporation and Cion
Companies Inc., an Illinois corporation,

                Defendants

No.: 06 CV 5262

Judge Dow

## First Amended Complaint

Blythe Holdings, Inc. ('Blythe' hereafter) and Chicago 100, Inc. ('100, Inc.' hereafter),

pursuant to leave of court first had and obtained, complains against Flawless Financial

Corporation, an Illinois corporation, Flawless Financial Mortgage Corporation, an Illinois

corporation, Tracy Williams, Tracy Williams d/b/a Flawless Financial, Tracy Williams d/b/a

Flawless Financial Corporation, Tracy Williams d/b/a/ Flawless Financial Mortgage Corporation

(individually and collectively 'Flawless' hereafter), Shirley Coleman ('Coleman'), John A.

DeAngelis ('DeAngelis'), Michael Brown, Glenn Udell, Michael Pomerantz individually and

1

Brown, Udell and Pomerantz, Ltd., an Illinois corporation, (individually and collectively 'Brown and Udell' hereafter) Phillip A. Kupritz, Phillip A. Kupritz d/b/a K2, Phillip A. Kupritz d/b/a K2 Studio, Phillip A. Kupritz d/b/a K2 Architects, Inc., Phillip A. Kupritz d/b/a Cion Companies. Inc. (individually and collectively 'Kupritz' hereafter), K2 Architects, Inc., an Illinois corporation ('K2') and Cion Companies Inc., an Illinois corporation ('Cion'), as follows:

Predicate

1.    This complaint alleges, *inter alia*, violations under the Organized Crime Control Act of 1970, Pub. L. No. 91-452, Section 901(a), 84 Stat. 941, Racketeer Influenced and Corrupt Organizations ("RICO") and is brought by Blythe and 100, Inc. under that statute and state law claims in connection with schemes devised, conducted, participated and/or assisted in by defendants Williams, Flawless and Coleman, each of whom was employed by or is associated with Flawless to conduct or participate in, to various degrees, directly or indirectly, the conduct of the affairs of Flawless through a pattern of racketeering activity, or to conspire to do so, or to conspire to assist Flawless in conducting a pattern of racketeering activity and to wrongfully and unlawfully divert assets of Blythe and 100, Inc., and to conspire to do so or to conspire to assist to do so, all to the detriment of Blythe, 100, Inc. and others.

2.    This complaint further alleges (i) violations of common law fiduciary duties by Coleman, Williams and Flawless; (ii) claims for constructive trust against Flawless, Coleman and Williams; (iii) claims for unjust enrichment against Flawless, Williams, Coleman, DeAngelis, Brown and Udell, Kupritz, K2, and Cion; (iv) civil conspiracy against Williams, Flawless and Coleman; (v) common law fraud against Flawless, Williams, and Coleman; (vi) legal malpractice against DeAngelis and Brown and Udell; and (vii) equitable accounting against Williams, Flawless, Coleman, DeAngelis, Brown and Udell, Kupritz, K2 and Cion.

2

3.     The relief sought includes actual damages, punitive damages and treble damages arising from the scheme to defraud set forth herein, the imposition of constructive trusts with tracing, the imposition and execution of equitable liens, voiding of fraudulent transfers, an accounting, costs of investigation and suit, statutory interest and attorney's fees.

### Jurisdiction

4.     This Court has jurisdiction over the claims for relief under 18 U.S.C. § 1964(c) (Right to Sue and Treble Damages), 28 U.S.C. § 1331(a) (Federal Question) and 28 U.S.C. § 1367 (Supplemental Jurisdiction State Claims).

### Personal Jurisdiction and Venue

5.     Personal jurisdiction and venue are predicated upon 18 U.S.C § 1965(a) and (b) and 28 U.S.C. § 1391(b) and (d) since the Defendants are residents of, or transact their affairs in, the Northern District of Illinois and the acts and occurrences in furtherance of the claims alleged herein arose in the Northern District of Illinois.

### Relevant Times

6.     The relevant times to this Complaint are from 2003 through the present time.

### Parties/Participants

7.     Blythe is a Nevada corporation, which was originally incorporated in Oregon and which currently has its principal place of business in California.

8.     100, Inc. is an Illinois corporation and was formed by the principals of Blythe in 2006.

9.     Flawless Financial Corporation is an Illinois corporation with its registered office in Illinois.

10.     Flawless Financial Mortgage Corporation is an Illinois corporation with its registered office in Illinois.   Flawless Financial Mortgage Corporation was never a licensed mortgage corporation, as same is defined in Illinois Compiled Statutes, at any time.

11.     Tracy Williams is an individual residing in Illinois.

12.     Flawless Financial is one of Tracy Williams's business entities and the nature of its organization cannot be determined.

13.     Flawless Financial Corporation and Flawless Financial Mortgage Corporation are also Tracy Williams's business entities and the true nature of their organization cannot be determined.

14.     Shirley Coleman is an individual residing in Illinois.   Coleman was an elected public official in the City of Chicago, Illinois and is an associate of Flawless and Williams.

15.     John A. DeAngelis is an individual residing in Illinois.   DeAngelis is an attorney and an associate of Michael Brown, Glenn Udell, Michael Pomerantz and Brown, Udell and Pomerantz, Ltd.

16.     Michael Brown, Glenn Udell, and Michael Pomerantz are all attorneys and individuals residing in the State of Illinois and are the principal owners of Brown, Udell and Pomerantz, Ltd., an Illinois corporation with its registered office in Illinois.

17.     Phillip A. Kupritz is an individual and a resident of Illinois.

18.     K2 Architects, Inc. is an Illinois corporation with its registered office in Illinois. On information and belief it is an entity controlled and operated by Kupritz.

19.     Cion Companies Inc. is an Illinois corporation with its registered office in Illinois. On information and belief Cion is an entity controlled and operated by Kupritz.

20.     K2 Studio is a registered and authorized assumed name of Cion Companies Inc.

21.     Willie Miles is an individual and a resident of the State of Illinois.  Miles is an associate of Flawless, Williams and Coleman.

22.     Frank Sasco is an individual and a resident of the State of Illinois.  Sasco is an associate of Flawless and Williams.

23.     Nancy Villacorta is an individual and a resident of the State of Illinois.  Villacorta is an associate of Williams, Flawless and Degante.

24.     Carolina Degante is an individual and a resident of the State of Illinois.  Degante is an associate of Williams, Flawless and Villacorta.

25.     Mozell Barnes is an individual and a resident of the State of Illinois.  Barnes is the stepfather of Williams and an associate of Williams and Flawless.

26.     Florin Burlan is an individual whose present whereabouts are unknown but who at relevant times was a resident of the state of Illinois.  Florin Burlan was Williams's fiancé and an associate of Williams and Flawless.

27.     Lavoren Blakely is an individual and a resident of the state of Illinois.  Blakely is an associate of Williams and Flawless.

<u>The Pattern of Unlawful Racketeering Activity</u>

28.     Starting in 2003 Williams and Flawless developed schemes to defraud investors, developers and business people.  Williams's schemes used the Flawless entities to falsely claim, at various times, that Williams and Flawless were financial advisors, general contractors, mortgage brokers, developers, financial consultants and were generally involved in financial transactions and deals involving the development, improvement, rehabilitation, purchase and sale of real estate.  Williams has also falsely claimed that she was a licensed attorney.

5

### Khounsary Scheme

29.   In 2003 Williams, using the entities Flawless Financial Company and Flawless Construction Company, convinced one Ali Khounsary to engage her services as a contractor, developer and for other roles.   Khounsary was the owner of real estate located in Chicago, Illinois and had purchased property in the city for the purpose of investment.

30.   Khounsary's intention was to rehabilitate the property he owned and resell it for a profit.  Khounsary was a homeowner but had no experience in rehabilitating real estate.

31.   Williams, using the Flawless entities in furtherance of her general scheme to defraud, steal and obtain money from unsuspecting victims, devised a plan to ostensibly manage, control and execute Khounsary's project.   Williams represented that she and Flawless had specialized knowledge and expertise in construction and contracting and real estate development as well as resources and access to resources.   These claims were false and untrue.

32.   Williams told Khounsary she was an attorney and had extensive experience in construction, permitting and in general all of the areas involved in these types of projects. Williams's and Flawless's representations were false and untrue and were made with the knowledge they were false and untrue.  The statements were intended to and actually did mislead Khounsary into relying on them.

33.   Williams induced Khounsary to pre-pay half of the cost of the project and she also obtained the use of his credit card, ostensibly for the purchase of goods and materials for the project.  Williams and Flawless agreed to loan Khounsary up to $75,000.00, repayable with interest, to pay for the labor on the project.  Khounsary was to repay the loan and interest from the proceeds of the sale.

34.     Williams attempted to further lull Khounsary into a false sense of security and to enhance her credibility by telling him she had political connections and was a political insider and who had clout and influence.

35.     At no time did Williams or Flawless have the ability, skill, experience or knowledge they misrepresented they had to undertake and complete such a real estate project. Similarly, Williams and Flawless did not have $75,000.00 to loan to Khounsary or the funds to pay for the cost of labor on the project.

36.     Williams did have the clout she claimed to have.  Williams stated that she controlled Shirley Coleman, the former alderman of the 16th Ward of Chicago.  Williams stated that she, Williams, ran the 16th ward and not Coleman, the elected alderman.

37.     Williams proceeded to take $55,000.00 of Khounsary's money and eventually ran up credit card obligations of almost $25,000.00.

38.     Instead of using the credit card Khounsary entrusted to her for the project, Williams converted and diverted Khounsary's money and a substantial amount of his credit to her own personal use and for the benefit of Flawless instead of applying it to the project Khounsary had hired her for.

39.     On November 28, 2003 she presented Khounsary's credit card at Country Club Paintball in Glenwood, Illinois and caused the transmission by wire of the purchase and approval of entertainment amounting to $ 420.19 to be taken from Khounsary's credit card account and converted to her own use.  Playing paintball was not part of Khounsary's project.

40.     On November 29, 2003 she presented Khounsary's credit card at the Burlington Coat Factory in Lansing, Illinois and caused the transmission by wire of the purchase and

approval of clothing amounting to $ 186.68 to be taken from Khounsary's credit card account and converted to her own use. Buying clothing was not within the scope of Khounsary's project.

41.     Starting at least on or about October 30, 2003 and then again on November 3, 2003 and again on December 10, 2003, Williams caused the transmission by wire of letters – faxes - to Khounsary purporting to be status reports, answering his questions and in general making it appear that the project was going forward in an appropriate and professional manner.

42.     The project itself was a complete disaster, riddled with defects, flaws, substandard workmanship and inferior materials. Not only did Williams steal from Khounsary for personal items, she engaged in using wire transmissions – faxes - to keep Khounsary from discovering the true status of the job and the lack of progress at the worksite so she could continue to use his credit card and to obtain his funds.

43.     Williams attributed the plans used in the project to an architect. Khounsary later discovered that Kupritz was the architect.

44.     Khounsary discovered Williams's and Flawless's financial frauds and thefts in early 2004. After confronting Williams, she initially denied stealing from him but later admitted that she had used his credit for personal reasons unrelated to the project. Williams gave him $20,000.00 as partial repayment of the fraudulent credit card charges she initiated.

45.     Later in 2004 Khounsary filed a suit against Williams and the Flawless entities in the Circuit Court of Cook County, Illinois in a case docketed at 04 CH 6526 in that court. Khounsary obtained a judgment against Williams and the Flawless entities on November 18, 2005 for more than several hundred thousand dollars; that judgment has not been satisfied and released of record as of the date hereof.

8

46.     In connection with the Khounsary scheme, Williams engaged in numerous acts of wire fraud.  Williams used Khounsary's credit card, causing the transmission of electronic data across wires from retail establishments such as The Burlington Coat Factory and Country Club Paintball to the bank that had issued Khounsary's card and further causing the bank to transmit approvals back to the initiating retailer.

Park Federal Mortgage Fraud Scheme One

47.     While in the course of executing her scheme against Khounsary, Williams and the Flawless entities perpetrated a scheme with Burlan, Barnes and others in or about September of 2003.  Burlan obtained a fraudulent mortgage loan in connection with the purported sale of real estate whose value had been inflated in an effort to defraud Park Federal Savings Bank.  Williams and Flawless were active participants in these schemes and obtained and controlled disbursement funds as a result of the fraudulent mortgage loan made to Burlan.

48.     Williams, in furtherance of the scheme to defraud Park Federal, purportedly entered into an agreement with Burlan to sell real estate that she did not own to Burlan for $1.3 million dollars.  The property, located in the City of Chicago at 932-944 79th Street, was not worth the alleged sale price and the contract sale amount was unrelated to market value.  The price was made up to support the scheme to defraud the bank of mortgage proceeds.  The contract was a sham because it was not negotiated at arms' length but was the result of collusion.

49.     In connection with this putative sale, an application was made to Park Federal Savings Bank for mortgage financing to close the purchase and sale.  It appeared to the bank to be a legitimate and customary real estate transaction involving the need for a mortgage to allow the buyer to consummate the transaction.

9

50.     Burlan falsified the amount of down payment and earnest money allegedly paid to Williams in connection with the purchase of the property.  On information and belief Williams claimed to have received an earnest money deposit from Burlan of $325,000.00.  The HUD-1 Settlement Statement from the closing of the 'sale' claims a payment of $400,000 of earnest money by Burlan to Williams.  Burlan, on information and belief, did not pay those amounts and Williams did not receive those amounts.

51.     Burlan misrepresented the financial terms of the transaction for personal gain and profit.  Park Federal Saving Bank was induced to fund the purchase of the property by virtue of the actions of Williams, Barnes and Burlan to make a mortgage loan to Burlan.

52.     Park Federal Savings Bank, in reliance on the false and fraudulent application submitted by Burlan, made a mortgage loan far in excess of the value of the property.  Park Federal Savings Bank was only going to make a loan for 75% of the market value of the property.  The loan the bank approved was for $975,000.00 – 75% of the 'contract' purchase price.  Due to the frauds of Williams, Barnes and Burlan that approximately twenty-five percent of the purchase price was already paid Williams by Burlan in the form of earnest money, Park Federal Savings Bank was induced to make the loan.  As it turns out, the security for the loan was worth substantially less than represented.

53.     At the closing of the sale, Williams, for her own and Flawless's benefit, directed fraudulent payment of 'sale' proceeds – the source of which was the Park Federal mortgage loan to her fiancé Burlan – to her stepfather Barnes for $580,000.00 and to Young Construction for $25,000.00, despite the lack of any documentation, let alone recorded instruments, that these two payees had any claim to any proceeds from the sale.

54.     Williams and Flawless knew Burlan had fraudulently induced the bank to make a mortgage loan to him that was a complete fraud, based on a false sale and with false documents, including false representations of the amount of earnest money paid.  Williams and Flawless actively participated in Burlan's fraud upon Park Federal by misrepresenting the true nature of the transaction so that Burlan could obtain a fraudulent mortgage and Williams would be able to obtain a portion of those loan proceeds for Flawless, Burlan and Barnes.

55.     John A. DeAngelis represented Burlan in his capacity as an attorney in connection with the transaction that defrauded the bank by obtaining a fraudulent mortgage.

56.     Williams, for Flawless's and her own benefit, obtained the use of money she knew was stolen and fraudulently obtained from Park Federal by Burlan in violation of 18 U.S.C. § 1957.

Park Federal Mortgage Fraud Scheme Two

57.     A few months later, having successfully defrauded Park Federal Savings Bank once before, Burlan and one Lavoren Blakely, at the direction of and with the involvement and assistance of Williams and Flawless, defrauded Park Federal Savings Bank in connection with loans on other real estate at 4800-4810 S. Calumet Ave. in Chicago, Illinois.

58.     Like the scam on the 79th Street property alleged above, the purchase price of property at 4800-4810 S. Calumet in Chicago was inflated to $1.8 million dollars.

59.     As in the first scheme alleged above, once again the amount of earnest money allegedly paid was falsely represented to Park Federal Saving Bank, thus making it appear that the loan amount sought was a percentage of the sales price.  The amount of the loan actually exceeded the value of the property.

60.     Once again Williams, who had no documented claim let alone a recorded interest, directed that a portion of the sale proceeds at the closing on the loan on February 26, 2004, be paid to payees had no interest in the sale.  Williams directed Blakely that Flawless receive $150,421.90 from the proceeds of the closing of Burlan's fraudulent mortgage loan, purportedly to pay off a mortgage, which did not exist and for which there was no recorded paperwork to substantiate.

61.     DeAngelis in his capacity as attorney-at-law represented Flawless and Williams in connection with the putative transaction.

62.     Eventually Burlan defaulted on the loan and Park Federal Savings Bank filed suit in the Circuit Court of Cook County in a case docketed as number 05 CH 18964 against Williams, Flawless and others.  The matter remains pending.

63.     Williams, for Flawless's and her own benefit, obtained the use of money she knew was stolen and fraudulently obtained from Park Federal by Blakely in violation of 18 U.S.C. § 1957.

### Venture Equities Management Scheme

64.     In another scheme to steal in connection with real estate transaction sales proceeds, Williams and Flawless diverted the proceeds from another real estate closing.

65.     In April of 2005 one Venture Equities Management, Inc. entered into a short term loan agreement with Burlan for more than $2.5 million dollars.  The loan was guaranteed by one Deepak Shah and closed on April 12, 2005.  There was a surplus of $140,000.00 from the closing.

66.     At the time of closing an escrow was established with Flawless ostensibly to pay interest obligations from the loan as they came due for the three months until the maturity date,

for Shah's benefit.  $140,000.00 was entrusted to Flawless Financial to hold in escrow for the benefit of Shah, the guarantor of Burlan's obligation, to make these monthly interest payments.

67.     Instead of holding the funds in escrow, Flawless and Williams either converted the funds to their own use and/or passed them to Burlan.  Instead of making interest payments as they came due after the closing, the money ostensibly being held in escrow was diverted by Williams and Flawless.  Burlan defaulted on the loan.

68.     Burlan's default left a balance due as of December of 2005 of approximately $2.9 million dollars.  Venture Equities was able to collect a portion of the outstanding debt and filed suit in the Circuit Court of Cook County against Shah as guarantor.  The case is docketed as number 06 L 3898 and remains pending and undetermined.

69.     Shah has filed a third party action in the same proceeding against Williams and Flawless seeking damages he sustained due to their frauds.

70.     Williams, for Flawless's and her own benefit, and/or the benefit of her co-conspirator and fiancé Burlan obtained the use of money she knew was the property of Deepak Shah or other third parties in violation of 18 U.S.C. § 1957.

<u>Negotiated Sale of Redevelopment Project Area Properties Fraud</u>

71.     During the relevant times, and while Williams and Flawless were engaged in executing the aforesaid schemes and engaged in the aforesaid pattern of racketeering activity with Barnes, Burlan and Blakely, the Defendants conspired with one another to defraud Blythe and later 100, Inc. and others of their assets and to divert unlawfully those assets to the benefit of themselves and others who had no lawful right to those assets in connection with another purported real estate transaction. The multifarious racketeering activities through which these

broad objectives of the Defendants were carried out consisted of a pattern of individual transactions and groups of transactions.

72.     It was a part of the scheme to defraud plaintiffs that Flawless, Williams and Coleman would and did agree and conspire together and with others to devise and participate in a plan of deceit and deception, whereby they would and did abuse their positions of trust and fiduciary relationships with Blythe and later 100, Inc.

A.      Flawless, Coleman and Williams would and did abuse the discretion granted to them and breach their obligations of loyalty and fidelity and their duty to act honestly and faithfully in the best interests of Blythe and 100, Inc. and not for their own self interests.

B.      Coleman, Flawless and Williams would and did use false and fraudulent pretenses, representations and promises calculated to deceive persons of ordinary prudence and due care and made material nondisclosures and concealment of material fact and information important to Blythe and 100, Inc. in deciding whether to act in the conduct of their affairs, all so as to unlawfully, intentionally and willfully, and with intent to defraud and with specific intent to deceive in order to cause financial gain to themselves, procure secret profits and divert the assets and profits of Blythe and 100, Inc. to the use and benefit of themselves and others and to the detriment of Blythe and 100, Inc. and others.

73.     Williams's and Flawless's schemes to defraud evolved over time starting at least in 2003 as a pattern of racketeering activities that inflicted discrete harms on Blythe and others in 2005 and Blythe, 100, Inc. and others in 2006. The victims of the unlawful patterns of

racketeering activity suffered discrete losses as a result of these activities.    Individual racketeering acts directed against Blythe and 100, Inc. are listed in Appendices A and B. Some of the losses attributable to the individual racketeering acts directed against Blythe are listed in Appendices C and D.

74.    In carrying out the scheme to defraud Blythe and 100, Inc. defendants engaged, *inter alia*, in conduct in violation of Federal laws, to wit: mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. In carrying out the scheme to defraud Blythe and 100, Inc. defendants also engaged, *inter alia*, in conduct in violation of the laws of the State of Illinois, *to wit*: theft in violation of 720 ILCS 5/16-1 and conspiracy to commit theft in violation of 720 ILCS 5/8-2.

75.    In 2005 Flawless and Williams devised another real estate based scheme to defraud investors with the promise of substantial profits in the connection with redevelopment of vacant tracts of land in the City of Chicago and in particular in the 16th Ward of the city. Flawless enlisted the aid, assistance and participation of Coleman, the then elected alderman of the 16th Ward, to effectuate and execute this plan.  Coleman was a willing and active participant in the Flawless plan to defraud potential real estate investors and developers.  Coleman conspired with Williams to put Flawless in a position to profit at the expense of applicants to a city real estate development program.

76.    The City of Chicago's program is called Negotiated Sale of Redevelopment Project Area Properties, under which it will sell developers vacant land owned by the city for the purpose of development and offer them assistance in planning, acquisition, zoning, permitting, construction and subsequent sale.  These programs are administered by the city's Department of

Panning and Development but are subject to the approval and control of the alderman in the wards where the properties are located, the City of Chicago and the Chicago City Council.

77.     Coleman controlled and had approval over the program in the 16th Ward of Chicago, Illinois.  Coleman was actually controlled by Williams.

78.     Prior to October of 2005, Miles was advised by Williams that she knew of lots to sell in the City of Chicago.  Williams advised Miles that if he knew of anyone with funds to invest, that she and Flawless would pay Miles a 1% finder's fee in connection with the sale of real estate to any such investor.

79.     One meeting in Williams's home in or around early October of 2005, Williams and Coleman pursued, persuaded and imposed on Miles to convince Stephanie Hill, a principal with Blythe, that Coleman and Flawless controlled real estate for sale by the City of Chicago and that there were substantial financial and other incentives available in connection with the sale, development and resale of developed lots in the city if Blythe did business with Coleman and Williams.  Miles was promised a finder's fee and he agreed to assist Coleman and Williams.

80.     Miles advised Stephanie Hill, a principal with Blythe, that Coleman and Flawless had control over real estate for sale in the City of Chicago and that there were substantial financial and other incentives available in connection with the sale, development and resale of developed lots in the city.  Miles advised Ms. Hill that she and her associates stood to make substantial profits from the development of real estate by doing business in Chicago with Coleman and Flawless.

81.     Miles initially had wanted Blythe to concentrate their development efforts at the site of the old US Steel plant (USX) on the southeast side.  However due to the pressure Coleman

and Williams placed on Miles, he directed Blythe's attentions to the 16th Ward and away from the USX site.

82.     Miles agreed to go along with Coleman and Williams in part because of the financial incentive they offered him.  Miles also believed that an alliance with Coleman and Williams would offer him additional opportunities in the future.  Williams told Miles, in Coleman's presence at this meeting, that she, Williams, had total control over the 16th Ward. Coleman not only did not contradict or limit Williams' statement to Miles but reinforced Williams's influence and power by telling Miles at that time that she, Coleman, and Williams were "best of friends."

83.     On October 6, 2005 at Miles' urging and after he had relayed Coleman's deal terms, Hill wrote a letter of intent to Coleman formally requesting information concerning the purchase of 400 vacant lots in Chicago for one million dollars – or $2,500.00 per lot.  Hill was unaware when she wrote Coleman, that the price of the lots had to be negotiated with the City of Chicago, which would only be decided much later in the application process and only after independent appraisals were conducted.

84.     Subsequently, at Coleman's urging, Miles introduced Hill to Williams.  Hill met with Williams in Chicago, Illinois between October 19th and 21st, 2005.  Miles, on behalf of Coleman and Flawless, advised Hill to work with and through Williams to reach a deal for the purchase, development and eventual resale of 400 lots with Coleman.

85.     Williams advised Hill that Coleman had 400 city lots available, all in contiguous parcels, in the 16th Ward of Chicago.  Contiguous parcels in blocks of at least 2 or 3 lots were essential for efficient development to reduce and control costs of development and construction.

17

86.     Hill and Blythe were unaware that earlier in 2005 Flawless had devised the scheme to enrich the enterprise and its participants, aiders, abettors and co-conspirators at the expense of real estate investors and developers in connection with the sale and development of those city lots.

87.     In the course of their plotting, at least one meeting took place at the home of Coleman.  This meeting was attended by Williams and Flawless and one Nancy Villacorta, a mortgage loan processor hired by Flawless to ostensibly administer mortgage loans through one of the enterprises' entities – Flawless Mortgage.

88.     Coleman, Williams and Flawless decided that all mortgages for purchase and sales activity connected to the development scheme would be through Flawless.   Coleman, Williams and Flawless conspired to and made other decisions essentially controlling the professionals, who potential developers would hire in connection with potential transactions.

89.     Williams advised Hill that Flawless was a licensed mortgage company.  Williams stated that Flawless would provide attractive construction financing as well as mortgages for the ultimate purchasers.  Williams advised Hill that she had 1,200 pre-qualified and approved clients ready to buy developed property.  These representations were in furtherance of Coleman and Williams's/Flawless's plot.  These claims were all false and untrue.  Flawless also had no mortgage license.

90.     Subsequently, Williams brought in an individual named Sasco to meet Hill. Sasco was introduced to Hill as a real estate developer.  Sasco told Hill, in Williams's presence, that he had acquired 400 lots for $1,500,000.00 and that construction was already well underway. Sasco praised Flawless and Williams involvement in his development deal.  Sasco confirmed the representations Williams and Coleman had made and confirmed the details of the representations

Williams and Coleman had made concerning the parcels, the city program and how and with whose assistance the project would proceed. Sasco's representations were false and untrue.

91.     Williams further represented that there would be no additional costs for surveys, permits or soil testing due to the nature of the city program. These representations were false and untrue.

92.     Williams advised Hill that Flawless would act as co-developer and consultant. This status, according to Williams, would permit Coleman to 'walk all of the paperwork through' city hall, obtain necessary permits and start construction, weather permitting, no later than March of 2006. These claims were false and untrue. Hill and Blythe were assured that Coleman would play an essential role directing and moving the deal through any bureaucratic maze.

93.     Williams and Flawless had used Coleman's position and influence in other real estate transactions to cut through red tape and to avoid the common delays and problems associated with the purchase and sale of real estate in Chicago.

94.     In one particular transaction that Williams was involved with, the essential details of which are known to plaintiffs but not the identity of all participants, Williams called Coleman from the middle of a real estate closing. The transaction was not going to be able to close because the seller failed to obtain water certification from the City of Chicago. Normally the water certification procedure must be arranged well in advance of the closing and the process may require a visit to the property by city water department representatives. It cannot be done on the same day as the closing is scheduled.

95.     Williams called Coleman and told Coleman in the presence of Nancy Villacorta that she, Coleman, had to get her a water certification immediately. Coleman did as Williams

directed and the certification was obtained as a result of Coleman's call to a city water department employee identified only as 'the man with the wooden leg.'

96.     Williams was frantic to close the transaction since she intended to take the sale proceeds even though Williams was not the seller and not entitled to sale proceeds. The title company refused to disburse any money to Williams from the sale, but a lawyer who had a relationship with and represented Williams drafted a document and obtained the seller's signature on it. Villacorta was present at the closing and observed Williams deceive the seller into signing away the sale proceeds to Williams.

97.     Williams received approximately $90,000.00 from the sale even though she had no interest in the property and had no lien or other claims to sale proceeds. Coleman assisted Williams in getting the transaction closed to aid and assist Williams and Flawless. Coleman's role in the enterprises schemes was to assure and reassure investors.

98.     Coleman also enjoyed substantial economic benefits from Williams and Flawless's activities including indirect payments of money, entertainment and payment of a personal expenses for decorating her home.

99.     Williams drove Hill around the 16th Ward and created an inventory of the "good" purchasable lots that would be part of the 400 lot deal. On or around the time Williams was driving Hill around, Williams made representation of the merits of investing in the 16th Ward through Flawless and with Coleman's assistance and involvement.

100.    Williams advised Hill that:

A.   Flawless already had an architect, who was approved by Coleman, "whose designs and *pro formas* had already been approved" by both Coleman and the City of Chicago. 'No time would be wasted,' according to Williams, since

the 400 parcels were 25 x 125 feet, a common buildable lot in the City of Chicago, and the architect already had plans for houses to fit those lot sizes.

B. Flawless and Coleman had an attorney (DeAngelis) who knew exactly what to do and was experienced in the acquisition process.

C. That the 400 lots were adjacent to each other in increments of two to three and had a standard size of 25' x 125' making building on them efficient and cost effective.

D. Flawless was highly connected with the City of Chicago and the administration of the city. Coleman was part of the deal and would use her office to reduce or eliminate 'red tape', see to it that the project got preferential treatment and got done.

E. Williams's Flawless Financial Mortgage Company could provide construction financing and purchase mortgages for buyers of the homes.

F. Tax incentives of $40,000.00 would be provided to the developer for each house.

These representations were all false and untrue.

101. In October of 2005, Hill met with Williams, Coleman and Miles in a condominium apartment in Chicago owned by Williams. Williams had told Hill that the Coleman was anxious to meet her.

102. Hill had a 'Property Profile' developed to investigate the aspects of a potential deal. Attached hereto as Exhibit "A" is a copy of Hills' property profile worksheet. Hill had gone over and discussed her Property Profile with Williams in Miles's presence. At the meeting with Williams, Coleman and Miles, Coleman in furtherance of the conspiracy between Williams,

21

Coleman and Flawless, confirmed the representations made by Williams and Flawless in connection with the Property Profile. Coleman advised Hill that this was a legitimate program, that there were 400 lots available and that Coleman was eager to move forward with Blythe.

103.   Coleman, in performance of the conspiracy that she formed with Williams and Flawless, told Hill that Blythe would have to enter into an agreement with Flawless to accomplish the project.   Other than being a part of Coleman's requirement, Williams and Flawless brought nothing of value to Blythe in the transaction and were only involved as a result of the defendants' scheme to make money.

104.   Coleman and Williams were so anxious to get Blythe to 'invest' in the scheme, that Coleman, in an effort to induce Hill to go forward, even offered Hill a substantial parcel of real estate in the 16th Ward for free.  At the October meeting Coleman proposed a "sweetener" to Hill. Williams advised Hill that if she would make the improvements on the lots by building a shopping area she, Williams and Coleman would then own and run the commercial real estate together.

105.   On October 25, 2005 Flawless sent Blythe an 'agreement.'   A copy of the 'agreement' is set out hereto as Exhibit 'B.'  There was also a letter sent the same day to reiterate and explain the essential terms of the  plan explained by Coleman and Williams to Blythe.  A copy of the letter is set out hereto as Exhibit "C."

106.   Flawless's 'agreement' of October 25, 2005 and Williams's letter of October 25, 2005 confirmed the dimensions of the lots, the $40,000 tax incentive for the developer, the roots of Flawless's relationships with the City of Chicago, mortgage procurement and other essential terms of the deal.  These representations and terms were false and untrue.

107.   The lots would be processed in increments of 100.  Williams advised Blythe to deposit $200,000 and the City would provide a letter guaranteeing the acquisition of these lots.

108.   Blythe agreed to pay $50,000 to Flawless upon execution of the agreement and to pay Flawless $20,000 a month upon receipt of a written monthly progress report, and retain and pay fees to the lawyer and the architect selected by Coleman and Flawless, among other things.

109.   On November 7, 2005 Blythe hand delivered a cashier's check to Flawless in the amount of $50,000.00 representing the agreed upon retainer.

110.   At Flawless's direction, $150,000.00 was wired on November 16, 2005 from US Bank on behalf of Blythe's account to Flawless's bank for use in the acquisition of the 400 lots.

111.   Williams paid Coleman her share of the money wired by Blythe.  Williams directed Villacorta to send Coleman's church $50,000.00.

112.   Because she had received or was about to receive a substantial share of Blythe's money for her involvement in the scheme, Coleman wrote an official letter to Blythe on November 21, 2006, thanking her for her interest in the 16th Ward and reiterating Flawless was "an excellent consultant and well proficient in all areas associated with project development." She further wrote confirming that Flawless' attorney hired for this project, John DeAngelis, and the architect Phil Kupritz, were held in "high regard with the City of Chicago."  Coleman wrote these letters to fulfill her role in the conspiracy formed with Williams and Flawless, to assist in implementing the scheme, to profit from the funds Coleman and Flawless anticipated getting from Blythe and to make clear to Blythe that unless Coleman's associates were used in connection with the transaction, it would not go forward.

113.    Neither Flawless, nor Williams, nor Kupritz nor DeAngelis were held in any particular regard by the City department which was responsible for analyzing and approving the purchase of lots in the program Blythe thought it was going to be involved with.

114.    No one told Hill or Blythe that DeAngelis was Flawless's and Williams's lawyer and that he had been actively involved in other real estate transactions that involved the fraudulent Park Federal Savings Bank mortgages.

115.    Neither Coleman nor Williams told Hill that Kupritz was the architect who was developed plans for Khounsary and was involved in the Flawless fraud against Khounsary.

116.    In or about November of 2005 Williams had persuaded one Nancy Villacorta, a licensed real estate mortgage producer, to come to work for Flawless Financial Mortgage Corp. Williams needed Villacorta's license to give the mortgage aspects of her scheme the appearance of legitimacy and to try and obtain a license from the state for Flawless Financial Mortgage Corp.

117.    Williams promised Villacorta that they would be partners, that Williams had many projects and that there would be a lot of opportunities.  Villacorta accepted Williams's offer and began working for Flawless Mortgage around the time Flawless put together the scheme to defraud Blythe.

118.    Originally Williams wanted Blythe to hire DeAngelis and Kupritz through Flawless. Hill balked because she wanted Blythe's counsel to be 'independent' of Williams and Flawless.  Hill was unaware how deep and extensive DeAngelis and Brown and Udell's relationship was with Williams, Flawless, Burlan and a developer named Hobbs.

119.    Hill spoke with DeAngelis about the deal, telling him about the plan to purchase 400 lots from the City of Chicago, develop and resell them at a profit.

120.   DeAngelis told Hill that he would represent Blythe, that he had substantial experience with the City program and had done these deals before.

121.   DeAngelis's claims to have substantial experience with the City program was false and untrue.  DeAngelis had only had experience with one deal in the program Blythe was going to pursue, involving a client named Hobbs.  The deal for Hobbs had only been pending since around the summer of 2005 and was mired in the Department of Planning and Development, due to numerous and repeated errors made in the application process and supporting documentation.

122.   Blythe subsequently entered into written 'agreements' with DeAngelis and Brown and Udell ostensibly for the performance of legal services in connection with the acquisition and development of the 400 lots.  A copy of the 'agreement' is set out hereto as Exhibit 'D.'

123.   Neither DeAngelis nor Brown and Udell told Hill or Blythe that they had represented Williams and Flawless in the past.  Neither DeAngelis nor Brown and Udell told Hill or Blythe that they were representing Hobbs in connection with an application to the same program at the time and for the same lots promised to Blythe

124.   Had Hill and Blythe known that DeAngelis and Brown and Udell had a pre-existing attorney-client relationship with Williams and Flawless and were not independent they would not have hired them.

125.   Had Hill and Blythe known that DeAngelis and Brown and Udell were inexperienced and had never done a transaction using the City program Blythe was planning to participate in they would not have hired them.

126.   On December 1, 2005 Blythe paid DeAngelis $25,000.00 as a 'retainer' for the legal work he was ostensibly going to do in connection with the acquisition and in compliance

with their agreement.  DeAngelis and Brown and Udell agreed to represent Blythe in connection with all legal matters arising in connection with the acquisition of the 400 lots.

127.    Independently, Blythe would also not have hired DeAngelis or Brown and Udell and did so because they were deceived about their experience and not informed about their divided loyalty and only because they were required to by Coleman and Flawless as a condition of going forward.  Had Blythe known that DeAngelis and Brown and Udell would directly assist Flawless and indirectly assist Williams and Coleman in their scheme and would not protect Blythe's interests they would not have hired them to act as its attorneys.

128.    In violation of their duties as attorneys to maintain client confidences and client loyalty, DeAngelis and Brown and Udell immediately sent Williams and Flawless a copy of Blythe's retainer agreement.  DeAngelis sent the agreement to Flawless because of his conflicted loyalty to Williams.  DeAngelis and Brown and Udell placed themselves in an untenable position of owing duties of loyalty and fidelity to Blythe and Hill when they already had such duties to Williams and Flawless.

129.    Blythe intended to enter into a written agreement with Phillip Kupritz, the architect Williams and Coleman told them to hire.  However, no written agreement was actually executed with him.

130.    A document was signed, ostensibly for the rendering of architectural drawings and services in connection with Blythe's development with an entity called K2.  The writing, however, was a meaningless piece of paper, void and unenforceable.  A copy of that writing is set out hereto as Exhibit 'E.'

131.    The party signing the writing in Exhibit 'E' is K2.  K2 is a legal nothing.  It is not a corporation, it is not an assumed name, it is not a partnership and it, whatever it is, had no legal

26

capacity of any kind, let alone any legal capacity to contract. K2 the non-existent entity was also not licensed by the State of Illinois to provide architectural design services which is a requirement of Illinois law.

132.    Neither of the two corporate defendants, K2 Architects Inc. or Cion Companies Inc., were registered or licensed to practice architecture or deliver architectural services in Illinois at the time the writing was signed by K2. K2 Architects Inc.'s license expired in April of 2005 – months before the writing was signed by K2. Cion Companies Inc. did not become licensed to practice architecture until 2006 – well after Exhibit 'E' was signed by K2.

133.    On December 1, 2005 Blythe paid Kupritz $25,000.00 as a 'retainer' for the 'architectural' work he was ostensibly going to do in connection with the acquisition, development and construction and in compliance with their agreement. Subsequently, after Blythe was directed to incorporate 100 Inc. Kupritz agreed to do all the same architectural work for the new entity. Both agreements Kupritz made, the first with Blythe and second with 100, Inc. were oral.

134.    Independently Blythe would not have hired Kupritz and did so only because they were required to do so by Coleman and Flawless as a condition of the project going forward. Had Blythe known that Kupritz was double dealing, as hereafter alleged and would be selling the same plans to one Hobbs, who actually was trying to obtain all of the 100 lots in the initial phase, Blythe would not have hired him. Kupritz was working with DeAngelis to help Hobbs acquire the same 100 lots that had been promised to Blythe.

135.    Kupritz has, controls and used several other entities in his communications with Hill and Blythe. These entities are K2 Architects and Cion Companies. The exact nature of Kupritz's relation to these companies and what precise role he had either in the management or

27

operation of the enterprise or their involvement in the scheme to defraud the plaintiffs, if any, are not known to the plaintiffs. Their names appear on written communications between Kupritz and Blythe.

136.    K2 Architects was not licensed to provide architectural services in Illinois after April 2005. Cion Companies was not licensed to practice architecture until 2006, well after Kupritz was personally retained by Blythe to provide architectural services. Providing architectural services without a license violates 225 ILCS 305/36 and is a crime in Illinois.

137.    On December 12, 2005 Coleman wrote an official letter to Blythe confirming and approving the agreement between Flawless and Blythe and enclosed a list of the 100 lots that had been 'reserved' in the first phase of the plan. Coleman, in furtherance of the conspiracy with Williams and Flawless, wrote the letter as an inducement to Blythe to transfer substantial sums of money to Flawless so that a portion could be paid to Williams, Flawless, Coleman and money paid to DeAngelis/Brown and Udell and Kupritz. Unbeknownst to Blythe, these 100 lots had already been reserved for Hobbs in the deal he was trying to move forward with the City. Hobbs's application was approved by Coleman; DeAngelis and Kupritz were assisting Hobbs. Williams too played a role in Hobbs' efforts, as yet unknown, but she attended at least one meeting with Coleman and city officials including the city's project manager Michelle Nolan.

138.    On December 8, 2005 Blythe caused to be transferred via wire $15,000.00 to Flawless.

139.    Later in December 2006 Flawless and Coleman demanded Blythe pay the $250,000 'purchase price' immediately. Flawless communicated a threat that the 'city housing commissioner' would take away the lots reserved for Blythe if further funds were not paid immediately. This was a complete fabrication. Neither Coleman, nor Williams, nor DeAngelis,

nor Kupritz had even approached, let alone made application for the 100 lots to the City's Department of Planning and Development. The Commissioner was not even aware that Coleman had enticed Blythe to 'purchase' 400 lots in her ward until after an application for 100 lots, as hereafter alleged, was submitted by DeAngelis months later.

140.    When the demand for the purchase price money was made, Kupritz and DeAngelis had already been working on the deal for lots in the 16th Ward on behalf of Hobbs.

141.    On or about December 20, 2005, Blythe caused to be transferred via wire on its account to the client trust account of DeAngelis and Brown and Udell the total sum of $250,000.00.  This was accomplished by initiating two seperate wire transfers for $100,000 and $150,000 respectively.  The funds were to be held by DeAngelis and Brown and Udell until such time as the City of Chicago was prepared to deliver deeds to the 100 lots or other suitable documents of title for the property.

142.    DeAngelis and Brown and Udell, instead of protecting Blythe's interests in connection with the money, violated their duties to Blythe by turning around and sending the money to Flawless and Williams.

143.    Brown and Udell had no procedures in place to protect their clients from conflicts of interest or the inappropriate use of client trust accounts.  There were no procedure or practices in place to supervise or oversee DeAngelis' work as a lawyer employed by Brown and Udell. DeAngelis was able to take the clients' money and turn around and send it to Flawless without any safeguards or procedures to insure that the payment of the money was appropriate and in the clients' best interest.

144.    DeAngelis imposed upon Hill to send him a letter authorizing the transfer of money from the lawyers' trust account to Flawless.  DeAngelis and Brown and Udell had an

29

untenable conflict of interest because of their divided loyalty and failed to tell Blythe and Hill that such a letter could compromise Blythe's legal position and interests.

145.    The contents of the letter ostensibly directing DeAngelis to give the wired money, earmarked for the City of Chicago, to Flawless was actually dictated by DeAngelis. DeAngelis knew that the money was supposed to go to the City of Chicago when it was ready to deliver deeds to Blythe for the first 100 parcels. DeAngelis knew, because of the experience he had with the Hobbs deal, that no money was to be paid to the city until the process application had been approved and a price for the lots had been negotiated and agreed upon. DeAngelis and Brown and Udell failed to protect Blythe's interest by requesting Blythe send the money for the purchase of the property even though they knew there were no deeds being issued.

146.    Instead of holding the money in their trust account for the benefit of Blythe, on December 21, 2005 DeAngelis and Brown and Udell wire transferred the money to Flawless without obtaining any deeds or title for any of the 400 lots. DeAngelis and Brown and Udell had not yet even filed an application with the city which eventually, if the application was complete, would have led to the sale of real estate owned by the city.

147.    Flawless started spending the money it had received from Blythe that was destined for the City of Chicago to pay for the acquisition of the lots. Flawless directed Villacorta to issue checks to Coleman and/or Coleman's church in the amount of $50,000.00 and at Williams's direction Villacorta issued a substantial check to an individual who was a decorator or interior designer who had redecorated Coleman's home and made tens of thousands of dollars of other payments.

148.    Thousands of dollars were spent on Williams's personal obligations, including loans, boat expenses and other matters unrelated to Blythe's deal.

30

149.   Flawless issued numerous other checks which were to pay for Williams's personal expenses, debts and obligations including a motor boat, mortgage payments on property owned by Williams's friends and for lavish gifts. No money was paid to the City of Chicago for even one lot let alone 400 lots. Villacorta, who was ostensibly hired for her skills originating mortgages, had morphed into Williams's administrative assistant, booking travel, paying expenses and issuing checks from Flawless accounts for Coleman's and Williams's personal expenses.

150.   In December 2005, after having obtained control of Blythe's money, Williams called Hill and told her that it would take a few months to get the lot numbers for the remaining 300 lots, only later to claim Flawless already had all 400 lots prepared and that unless the remainder of the agreed-upon purchase price funds were provided to her immediately, the 'city housing commissioner' would take the initial 100 lots away. This was a complete fabrication and an effort to get more money from Blythe.

151.   Coleman, Williams, DeAngelis and Brown and Udell knew or should have known that the process to acquire lots under the program could take years. Coleman, Williams, DeAngelis and Brown and Udell knew that there were no fees or costs associated with the making the application to the city or to acquire lots through the program and that no money needed to be paid until after the application had been approved and accepted.

152.   Blythe refused to pay for the remaining lots or pay any additional money until the first 100 lots were completed. Later Flawless told Blythe that the lots were no longer available to Blythe and that Flawless was going to sell them to another client for two million dollars.

153.   In January 2006 Flawless abruptly reversed course and stated that Blythe could have the remaining 300 lots after all. Hill then brought one of its financial backers to Chicago

and the two were driven around the 16th Ward by one of Flawless's associates, Calvin Hollister. The 300 lots shown to Hill and the investor were completely unsuitable for development and were not the lots that had been promised to Blythe by Coleman and Flawless the prior fall. The 'new' lots were widely scattered and were different from the lots shown to Blythe in October 2005. Blythe's investor backed out of a commitment for funding.

154.   On February 17, 2006, Flawless sent a letter of termination to Blythe, citing Plaintiff's inability to secure funding for the remaining 300 lots as a basis. Flawless reiterated its outstanding obligation with respect to the first phase 100 lots. This termination letter was a pretense since the 300 remaining lots that were offered were unsuitable, Flawless knew they were unsuitable and that the first 100 lots had actually been applied for by Hobbs.

155.   In February 2006 John Jones, Plaintiff's financial consultant and a principal in Blythe, sent a letter to DeAngelis, demanding performance from all parties upon threat of litigation. Neither Jones nor Blythe knew at that time that DeAngelis was actually protecting the interests of Flawless, Williams and Coleman and had done nothing to protect Blythe's interests or money. DeAngelis told Williams about the threat of litigation. DeAngelis and Brown and Udell sent a letter trying to reassure Blythe, including a representation that acknowledged that Blythe had paid all fees associated with the acquisition. DeAngelis and Brown and Udell knew or should have known that there are no fees that need to be paid and failed to advise Blythe of that fact.

156.   Williams called and threatened Hill, telling her that 'bad things' could happen to her if Blythe made good on the threat communicated by Jones.

157.   On February 23, 2006 Kupritz sent Blythe a facsimile instructing Blythe that instead of a 20% affordable housing ratio to an 80% market value ratio, they should assume a

25/75 ratio.  Chicago's ordinance for affordable housing set aside only requires that 20% of the units in such a project be set aside as affordable units.  Kupritz ostensibly was the project architect and working for Blythe; he had no official or unofficial capacity with the City.

158.    After he was hired, Kupritz had been unavailable for weeks despite Hill's and Blythe's repeated calls and faxes seeking information about the architectural drawings, permits and other matters incident to the project that Kupritz was working on, ostensibly on Blythe's behalf.  Unbeknowst to Blythe, Kupritz and DeAngelis were working on an application on behalf of Hobbs at the time they were supposed to be working on behalf of Blythe.

159.    Hobbs was seeking to obtain 100 lots from the city.  Eventually after the threat of litigation, DeAngelis applied for lots on behalf of 100 Inc., as hereafter alleged, but these were the same lots Coleman had approved for Hobbs and that DeAngelis and Kupritz were already working to acquire for Hobbs.

160.    Kupritz at various times used the entities K2 and Cion in his communications with Blythe.  The role of either of these two companies in the scheme is unknown.

161.    The reason for Kupritz's absence, silence and failure to communicate with Blythe soon became apparent.  On or around February 23, 2006 Kupritz sold the original drawings that Blythe paid Kupritz to render to Hobbs.  Hobbs was an associate of Flawless and Williams and was also DeAngelis's and Brown and Udell's client.  It turns out that while Blythe thought DeAngelis, Kupritz, Coleman and Flawless were working on the initial 100 lot phase, Hobbs was working on acquiring those 100 lots and the plans Kupritz had rendered for Blythe were submitted with Hobbs' application to the City of Chicago's Department of Planning and Development.

33

162.    After Jones's threat of litigation against all involved, the defendants started to take steps to make it appear that they were actually performing their end of transaction.  In late February of 2006 DeAngelis and Williams advised Blythe to form a new Illinois corporation, Chicago 100, Incorporated.  DeAngelis and Williams claimed this was necessary to complete the acquisition of the lots and move the project forward.  Chicago 100, Inc. succeeded in interest, according to DeAngelis, to the rights of Blythe in connection with the lot acquisition application. DeAngelis allegedly then substituted 100, Inc. for Blythe in requests to the city to participate in the lot development program.  Blythe was not told that neither Coleman, nor Williams, nor DeAngelis nor Kupritz had ever submitted an application on their behalf to the city for any lots.

163.    The idea to create a new corporate entity was actually Flawless's idea.  Because DeAngelis's and Brown and Udell's conflict of interest they took direction from Flawless and Williams instead of from clients Blythe and Hill.  DeAngelis incorporated Chicago 100, Inc. on March 15, 2006.

164.    DeAngelis ostensibly continued to work on the acquisition of the real estate, obtaining the necessary permits and proceeding with the development except now in the name of 100, Inc. instead of Blythe.  Unknown to Blythe and Hill, DeAngelis had never applied for lots on behalf of Blythe, Coleman had never reserved any lots for Blythe or even told the Department of Planning and Development that Blythe was going to be doing a massive development of 400 lots in her ward and Williams did nothing except spend Blythe's acquisition money on herself and Coleman.

165.    On March 28, 2008 DeAngelis and Kupritz met with Michelle Nolan, the Community Development Division – South Region Project Manager of the City of Chicago's Department of Planning and Development on the Hobbs deal.  In the course of that meeting they

34

presented a proposal by 100, Inc. to acquire and develop 100 lots. The application was incomplete, error filled and lacking numerous required attachments. Shortly thereafter Nolan learned that the 100 lots that DeAngelis and Kupritz applied for on behalf of 100 Inc. were the same 100 lots that had already been applied for by DeAngelis and Kupritz for Hobbs.

166.    Coleman had mentioned to Nolan shortly before the March 28, 2006 meeting that she, Nolan, could expect an application from 100, Inc. for redevelopment of city owned land in the 16th (Coleman's) ward. Coleman did not tell Nolan that Blythe had already paid over half a million dollars the prior November and December to acquire 100 lots from the City under the program. This was the first contact Coleman, DeAngelis or Kupritz had with the city in connection with the project despite having been retained almost four months earlier. The first time the City (other than Coleman's informal 'heads up' to Nolan in her capacity as alderman) was formally advised that 100 Inc. was seeking to acquire lots was at the Hobbs meeting.

167.    Kupritz and DeAngelis promised to make a formal application on behalf of 100 Inc. by the end of the following week (April 6, 2006). They did not tell Nolan that Blythe had paid substantial sums of money to acquire lots the past November and December and that they had been paid substantial sums of money to apply for the lots but had done nothing for 4 months. DeAngelis and Kupritz failed to meet the deadline.

168.    Flawless had promised to have permits for construction by April 1, 2006. No permits were obtained or issued by the deadline or at any time since up to and including the date hereof. Flawless made this promise for Williams and Coleman and ostensibly for the City. This statement was a fabrication and an effort to continue to forestall Blythe. It actually takes many months from the time an application is made until permits can be issued in these types of developments.

35

169.    Blythe's requests for construction loan information from Flawless went unanswered.   Blythe was unaware that Flawless was not a licensed mortgage company and was not legally able to obtain or secure financing.   Flawless's representation that it could and would provide construction financing was false and untrue.

170.    On April 19, 2006, Kupritz faxed Blythe a revised timetable for the application process, indicating that the lots would not be Plaintiffs' until August.  Kupritz also indicated that the $40,000 tax incentive originally promised to the developer would be provided to homeowners and not Blythe.  The promise of this incentive made by Flawless and which was confirmed by Coleman was false and untrue.   The City does not offer financial incentives to prospective developers seeking to acquire lots under the program.

171.    On or around April 25, 2006, there was a conference call with Hill and her associate John Jones, Coleman, DeAngelis, Kupritz and Williams.   Coleman reassured Blythe and two of its principals that the project was going forward despite the earlier problems. Coleman had, by virtue of her role as the alderman of the 16th Ward, control over the project.

172.    Coleman promised that if the applications were finished by May 15, 2006, she would fast-track all documentation through City Hall so that construction would begin on June 15, 2006.  DeAngelis stated he would have all of the paperwork completed by that deadline. Kupritz indicated that construction could begin on June 15, 2006.  These claims and statements were all lies and fabrications.   It is not possible to go from application to the beginning of construction in just one month.

173.    Coleman also advised Blythe that she had changed her mind and that now the ratio for affordable housing and market value housing was now to be 80/20, a complete reversal of what she had initially promised to lure Blythe into the deal and completely undercut the

36

premise upon which Blythe decided to invest and proceed with the project. The city ordinance only requires 20% set aside for affordable housing in projects such as this.

174.    Shortly after the conference call Williams admitted to Blythe that Flawless had no ability to obtain construction financing.

175.    Williams then claimed that the 'city housing commissioner' had approved twenty lots and that he would send Blythe a letter confirming this and permitting construction before the lots were purchased. No such letter ever arrived. The 'city housing commissioner' never approved anything in connection with Blythe or 100 Inc.

176.    On May 5, 2006, Kupritz provided Blythe a second parcel map of 100 lots. Lots that had been reserved to Hobbs had been removed from the list Kupritz sent Hill. The list of lots was largely unsuitable and the parcels were widely scattered throughout the 16th ward.

177.    DeAngelis, Coleman, Kupritz and Flawless knew of Hobbs's deal but did not tell Blythe. Kupritz tried to cover up his double dealing by telling Blythe that the Hobbs lots should not have been included on the original list given to Blythe. Hobbs never was able to complete the application process – DeAngelis and Kupritz never submitted a complete and correct application - and his efforts were eventually abandoned.

178.    One of the reasons Hobbs's application foundered was that DeAngelis repeatedly failed to submit complete information or submitted erroneous information or failed to submit required information. Nolan had to return Hobbs's application to DeAngelis at least three times due to errors or omissions. DeAngelis not only did not ever submit a complete and accurate application for Hobbs, he made the same errors and omitted the same information on the application he tendered on behalf of 100 Inc. DeAngelis had no experience consummating this type of acquisition deal despite his representations to Blythe and Hill. Coleman, Flawless and

Williams deceived and lied to Blythe and Hill about DeAngelis's pedigree since they wanted him involved in the project to make it easier to steal and divert Blythe's money to their own uses.

179.    Kupritz continued to attempt to mollify Blythe and supplied subsequent lists of lots from the city program, but these lots were inadequate and unsuitable.  Blythe demanded a revised list of suitable lots but this was never supplied.  How Kuptriz, a private citizen, was able to obtain the lists of lots and offer them to Blythe as substitutes for the lots promised in phase one by Coleman, Williams and Flawless is unknown to plaintiff.

180.    While trying to obtain proper and acceptable parcels, Hill wrote Coleman on May 4, 2006 to confirm that payment for the lots had been received and that the lots were to be deeded upon completion of the application process DeAngelis was going to submit on or before May 15, 2006.  Coleman did not respond.

181.    On May 18, 2006 Blythe wrote Coleman again, explaining in detail the difficulties in working with Flawless and pleading for a meeting to solve the problem.  There was no response.

182.    Blythe engaged the services of an independent project manager named Jacquanette Johnson to take charge of getting the application approved and construction underway.

183.    On May 23, 2006 Michelle Nolan, after meeting with Jacquanette Johnson, provided Blythe with a new list of 'possible' sites on May 24, 2006, noting that all previous parcel maps included lots that were previously given to Hobbs or were unsuitable.  DeAngelis, Coleman, Flawless, Williams and Kupritz were aware of this and told Blythe nothing and did nothing to protect Blythe's interest in those lots.  It was in May that Nolan first learned of Blythe's involvement predating 100, Inc. by months.

38

184.    Nolan informed Blythe and 100 Inc. for the first time that none of the 400 lots promised to Blythe by Coleman and Flawless had not been reserved or paid for. Nolan informed Blythe what the real steps were to apply for and proceed with an application to purchase and develop property. The acquisition process that had been represented to Blythe by Williams, Coleman, DeAngelis, Kupritz was untrue.

185.    The May 15, 2006 date committed to by Flawless, Kupritz, DeAngelis and Coleman passed without the issuance of any permits, due to the lack of suitable lots, the lack of suitable plans and in general due to the pre-ordained failure of Flawless, Coleman, Williams, Kupritz and DeAngelis.

186.    Flawless, Williams, Kupritz, DeAngelis and Coleman knew that it was not possible to get permits in only a few days or weeks from the time an application was lodged under the program. It takes many months to reach the permit stage when a proper application is made to the city to acquire lots for redevelopment and all things go smoothly.

187.    DeAngelis left Brown and Udell in around June of 2006 and no further work was performed to acquire lots under the program.

188.    Villacorta, around the same time, left Flawless and, believing she needed to protect herself against the consequences of the conduct she observed Flawless associates engaged in, took a substantial amount of Flawless records and documents.

189.    Villacorta went to North Carolina after she quit and received phone calls there from Williams, who was trying to find and recover the documents.

190.    Williams threatened Villacorta's mother and indicated that her mother could be harmed if Flawless documents were not returned to Williams. Williams repeatedly asked Villacorta where the Flawless documents were placed by Villacorta, who refused to say.

191.   Shortly after Williams threatened Villacorta to obtain her cooperation, persons unknown broke into Villacorta's home. The house and its storage spaces were ransacked; it was evident that whoever broke in was looking for something. Nothing, however, was taken. The Flawless records had been stored in another location by Villacorta.

192.   Blythe and 100, Inc. suffered millions of dollars in damages. Blythe for itself and its successor in interest 100, Inc. have paid $515,000.00 out of pocket to the defendants. Flawless has been paid approximately $465,000, of which at least $60,000.00 was paid to Coleman or on her behalf to individuals she owed money, and $25,000 each was paid to DeAngelis, Brown and Udell and Kupritz.

193.   The whereabouts of the $400,000.00 in funds that were earmarked to pay for the acquisition of the lots is unknown but Villacorta wrote checks for a substantial portion of it on Flawless accounts at Williams's direction. $150,000.00 in acquisition funds were deposited with Flawless in November. Another $250,000.00 was deposited with DeAngelis and Brown and Udell in December, but those funds were then transferred to Flawless by the lawyers. None of the funds, destined for the City of Chicago to acquire lots, were ever paid to the city.

194.   Blythe and 100, Inc. have also lost millions of dollars in unrealized profits, opportunity costs and incurred unnecessary expenses for legal counsel to take legal action to recover their damages. Blythe had expected, based on the representations of Flawless, Williams and Coleman to realize millions of dollars of profits from investing in the aforesaid real estate development program. Blythe's investors and funding sources cancelled their commitments and refused further involvement.

<u>Summary</u>

195.    The activities of Defendants in the formation and execution of the scheme to defraud had a pervasive, debilitating, and ultimately crippling impact on Blythe's and 100, Inc.'s efforts to function as a developer and to complete the project. The time of Hill and John Jones was diverted from potentially profitable ventures and misspent on the Chicago Redevelopment Project Area Properties Fraud. Assets were not only diverted to the defendants, but these assets also were not then available for the lawful operation of Blythe and 100, Inc. As such, Blythe and 100, Inc. were not only directly injured in their property by paying money and receiving nothing in return without the breaches of fiduciary duty, it was also distinctly injured in its business, that is the activity of acquiring and developing real estate.

196.    In connection with the activities giving rise to this action, the Defendants acted with malice, insult, intent and knowledge, and with a wanton and reckless disregard of the rights of Blythe and 100, Inc. and others.

197.    During the relevant times, the "enterprise," that is, Flawless, was engaged in interstate commerce, in that it used Blythe's capital, services, expertise and know how, and later 100, Inc.'s, which originated outside the State of Illinois.

198.    During the relevant times, in connection with the activities giving rise to this action, Defendants Coleman, Williams and Flawless conspired with each other, and with others, to engage in the various activities set forth herein and aided and abetted one another in these activities, all as proscribed and prohibited by 18 U.S.C. §§ 2 and 1962(c) and (d). Defendants DeAngelis, Brown and Udell, Kupritz, K2 and Cion aided and abetted the aforesaid conspiracy by failing to inform Hill and Blythe of facts which they knew would have caused Hill and Blythe

41

to not send money to Flawless and to not pursue or become involved in a deal with Coleman, Williams and Flawless.

199.    During the relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, Defendants, on numerous occasions, used and caused to be used wire communications in interstate commerce, by both making and causing to be made telephone calls, facsimile transmissions and wire banking transfers, as proscribed and prohibited by 18 U.S.C. § 1343. A schedule of some of the relevant uses of wire communications is included in Appendix A and incorporated by reference herein.

200.    During the relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, Defendants on numerous occasions used and caused to be used mail depositories of the United States Postal Service by both placing and causing to be placed mailable matter in said depositories and by removing and causing to be removed mailable matter from said depositories, each such use of the mails in connection with the scheme and artifice to defraud and to obtain money by means of false pretenses, constituting the offense of mail fraud as proscribed and prohibited by 18 U.S.C. § 1341. A schedule of some of the relevant uses of the mails is included in Appendix B and incorporated by reference herein.

<u>First Claim for Relief</u>

(Violation of 18 U.S.C. § 1962(c))

201.    The plaintiffs here repeat the allegation of paragraphs 1-200 of the Complaint.

202.    Blythe and 100, Inc. are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

203.    The defendants Williams and the various Flawless entities Williams controlled are each a "person" within the meaning of 18 U.S.C. § 1961(3).

204.    Flawless is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

205.    The defendant Williams was employed by or associated with an enterprise, that is, Flawless, and did conduct or participate, directly or indirectly, in the conduct of the affairs of Flawless through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B) and 1961(5) and 1962(c), to wit:

> (a)  Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;
>
> (b)  Multiple instances of wire fraud in violation of 18 U.S.C. § 1343 and
>
> (c)  Two instances of extortion in violation of 18 U.S.C. § 1951.

206.    By reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants, Blythe and 100, Inc. were injured in an as yet undetermined amount, believed to be not less than approximately Six Million Dollars ($6,000,000.00), within the meaning of 18 U.S.C. § 1964(c).

<u>Second Claim for Relief</u>

(Violation of 18 U.S.C. § 1962(d) by Conspiracy to Violate 18 U.S.C. § 1962(c))

207.    The plaintiffs here repeat the allegations of paragraphs 1-200 of the Complaint.

208.    Blythe and 100, Inc. are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

209.    Flawless is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

210.    The Defendants Coleman and Williams were each employed by or associated with an enterprise, that is, Flawless, and did conduct or participate, directly or indirectly, in the

conduct of the affairs of Flawless through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B) and 1961(5) and 1962(c), to wit:

    (a)  Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;

    (b)  Multiple instances of wire fraud in violation of 18 U.S.C. § 1343; and

    (c)  Two instances of extortion by Williams in violation of 18 U.S.C. § 1951.

    211.   By reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants Blythe and 100, Inc. were injured in an as yet undetermined amount, believed to be not less than approximately six million dollars ($6,000,000.00), within the meaning of 18 U.S.C. § 1964(c).

Third Claim for Relief

(Common Law Fraud)

    212.   The plaintiffs here repeat the allegations of paragraphs 1-200 of the Complaint.

    213.   Williams, Flawless and Coleman made their false and untrue material misrepresentations for the purpose of inducing Blythe and 100, Inc. to rely upon them, the plaintiffs did rely upon them, the plaintiffs reasonably relied on them and the plaintiffs were harmed and damaged as a result of that reliance.

    214.   By reason of the fraud committed by Williams, Flawless and Coleman, Blythe and 100, Inc. were injured in an as yet undetermined amount, believed to be not less than approximately six million dollars ($6,000,000.00).

Fourth Claim for Relief

(Legal Malpractice All Attorneys)

    215.   The plaintiffs here repeat the allegations of paragraphs 1-200 of the Complaint.

    216.   It was the duty of DeAngelis, Brown, Udell, Pomerantz and Brown, Udell and Pomerantz, Ltd. at all of the foregoing times to use the skill of reasonable competent and trained

44

attorneys and lawyers, to avoid conflicts of interest, to hold their clients' interests above and before the interests of others, to comply with the terms of the Agreement they reached with the plaintiffs and to diligently perform their duties as attorneys.

217.    At all times relevant, DeAngelis was the agent, servant and employee of Brown, Udell and Pomerantz, Ltd. and was always acting within the scope of his agency, service and employment.

218.    Despite their duty aforesaid, DeAngelis, Brown, Udell, Pomerantz and Brown, Udell and Pomerantz, Ltd. were then and there guilty of one or more of the following acts or omissions:

A.  Failed to diligently devote their time and energy in completing an application for the acquisition of the lots,

B.  Failed to advise Blythe and 100, Inc. that they had a conflict of interest due to their prior and continuing representation of Williams, Flawless and Hobbs,

C.  Failed to protect Blythe and 100, Inc's funds on deposit in their client trust account and instead transferred the money to their clients Flawless and Williams,

D.  Failed to advise Blythe and 100, Inc. that the representations of Coleman and Flawless were false and untrue and that the project could not be completed on the terms outlined by Coleman and Flawless,

E.  Failed to skillfully prepare and file the necessary application with the City of Chicago to acquire the lots Blythe had retained them to apply for and acquire,

F.  Failed to timely and diligently prepare and file the and file the necessary application with the City of Chicago to acquire the lots Blythe had retained them to apply for and acquire,

45

G. Failed to advise Hill, Blythe and 100, Inc. that they did not have any significant experience in handling these types of real estate deals and transactions,

H. Failed to advise Blythe, 100 Inc and Hill that the steps Coleman and Williams outlined and claimed needed to be taken to acquire the lots were not true and correct and that the procedures were far different that what Coleman and Williams had promised and outlined, and

I. Failed to determine whether the city was prepared to deliver deeds for the lots prior to making payment to Flawless.

219. As a direct and proximate result of one or more of the foregoing errors or omissions of DeAngelis, Brown, Udell, and Pomerantz and Brown, Udell and Pomerantz, Ltd., Blythe and 100, Inc. were injured in an as yet undetermined amount, believed to be not less than approximately six million dollars ($6,000,000.00).

Fifth Claim for Relief

(Legal Malpractice of Brown, Udell, Pomerantz and the law firm Brown, Udell and Pomerantz)

220. The plaintiffs here repeat the allegations of paragraphs 1-200 of the Complaint.

221. It was the duty of Brown, Udell, and Pomerantz individually and Brown, Udell and Pomerantz, Ltd. at all of the foregoing times to use the skill of reasonable competent and trained attorneys and lawyers, to avoid conflicts of interest, to hold their clients' interests above and before the interests of others, to comply with the terms of the Agreement they reached with the plaintiffs, to manage their law firm in conformity with reasonable and appropriate practices customarily employed by attorneys and law firms that have professional and clerical employees and those which are required by the Illinois Supreme Court.

222. It was the further duty of Brown, Udell, and Pomerantz individually and Brown, Udell and Pomerantz, Ltd.'s at all of the foregoing times to:

46

A. Supervise, manage and oversee the work of its employees, clerical staff and attorneys,

B. To have management practices and procedures in place to determine, manage and control the type and scope of legal work being done by its employees and attorneys,

C. To supervise and manage the firm's operation to insure that its clerical and professional employees and attorneys were diligently and appropriately engaged in the firm's legal business and not assisting others in engaging in the practice of law that was neither authorized nor approved by the firm,

D. To use the skill of a reasonable competent and trained attorneys and lawyers, to avoid conflicts of interest, to hold their clients interests above and before the interests of others and to comply with the terms of the Agreement they reached with the plaintiffs,

E. To use the skill of a reasonable competent and trained attorneys and lawyers, to have practices and procedures in place to insure that its attorney employees avoid conflicts of interest, to hold their clients interests above and before the interests of others and to comply with the terms of the Agreement they reached with the plaintiffs, and

F. To develop, implement and follow policies, practices and procedures for checking for and avoiding conflicts of interest and the timely and diligent attention to client matters entrusted to their professional care.

223.    At all times relevant, DeAngelis was the agent, servant and employee of Brown, Udell and Pomerantz, Ltd. and was always acting within the scope of his agency, service and employment.

224.    Despite their duty aforesaid, DeAngelis, Brown, Udell, Pomerantz and Brown, Udell and Pomerantz, Ltd. were then and there guilty of one or more of the following acts or omissions:

A.  Failed to diligently devote their time and energy in completing an application for the acquisition of the lots,

B.  Failed to advise Blythe and 100, Inc. that they had a conflict of interest due to their prior and continuing representation of Williams, Flawless and Hobbs,

C.  Failed to protect Blythe and 100, Inc's funds on deposit in their client trust account and instead transferred the money to their clients Flawless and Williams,

D.  Failed to advise Blythe and 100, Inc. that the representations of Coleman and Flawless were false and untrue and that the project could not be completed on the terms outlined by Coleman and Flawless,

E.  Failed to have any policy, procedure or practice in place to identify and avoid conflicts of interest of lawyers like DeAngelis who had prior legal practices that they brought with to the law firm,

F.  Failed to have any policies, procedures and practices in place to prevent lawyers, including DeAngelis, from working on client matters independent of oversight and their duty to manage and supervise,

G.  Allowed DeAngelis to act unsupervised, in the firms' name, representing clients despite untenable conflicts of interest and divided loyalties,

H.  Allowed law firm employees including receptionists and secretaries to work on legal matters that were being handled independently and unsupervised by them, in the firm's name, and

I.  Allowed law firm infrastructure – fax machines, computers, telephone systems, stationery, envelopes, postage, messenger services, incorporation vendors and other firm assets to

be used by the firm's attorneys and employees to work on client matters, in the firm's name, without any supervision or oversight.

225.    As a direct and proximate result of one or more of the foregoing errors or omissions of DeAngelis, Brown, Udell, Pomerantz and Brown, Udell and Pomerantz, Ltd., Blythe and 100, Inc. were injured in an as yet undetermined amount, believed to be not less than approximately six million dollars ($6,000,000.00).

Sixth Claim for Relief

(Breach of Fiduciary Duty)

226.    The plaintiffs here repeat the allegations of paragraphs 1-200 of the Complaint.

227.    By virtue of the promises and undertakings that Coleman, Flawless and Williams agreed to perform for the plaintiffs, including representing the plaintiffs' interests with the City of Chicago, the holding of purchase money funds to consummate the sale they assumed and owed the plaintiffs a fiduciary duty.

228.    Despite their duty aforesaid, Coleman, Flawless and Williams held their own interests above the plaintiffs' interest to the plaintiffs' detriment, as follows:

    A.    Paid themselves or accepted for themselves money that they did not earn and that they were not entitled to,

    B.    Diverted or allowed to be diverted funds intended for the City of Chicago to consummate the purchase of the 400 lots and

    C.    Enriched themselves at the plaintiffs' expense by taking money and accepting money that was the plaintiffs' property.

49

229.    As a direct and proximate result of one or more of the foregoing breaches of duties of Coleman, Williams and Flawless Blythe and 100, Inc. were injured in amount not less than five hundred and fifteen thousand (515,000) dollars.

### Seventh Claim for Relief

#### (Unjust Enrichment)

230.    The plaintiffs here repeat the allegations of paragraphs 1-200 of the Complaint.

231.    The defendants, and each of them, obtained and have retained the plaintiffs' money which they did not earn and which they, in good conscious, should return.

232.    Defendants Coleman, Flawless and Williams obtained plaintiffs' money by theft and deception and did not perform any service that were bargained for or agreed upon. Defendants DeAngelis, Brown and Udell, Kupritz, K2 and Cion obtained money from the plaintiffs ostensibly to render the services they agreed to perform.  They did not perform the services they agreed upon but actually aided and assisted Williams, Coleman and Flawless in their scheme to defraud the plaintiffs, thereby rendering their services worthless and meaningless to the plaintiffs.  For the defendants to retain the money they received from the plaintiffs under the circumstances violates all principles of fundamental fairness, justice, equity and good conscience and the retention of the plaintiffs' money by defendants is unjust.

### Eighth Claim for Relief

#### (Constructive Trust)

233.    The plaintiffs here repeat the allegations of paragraphs 1-200 of the Complaint.

234.    Flawless, Williams and Coleman have appropriated the assets, income and resources of the plaintiffs while they were in a fiduciary capacity and they engaged in common law fraud to divert and obtain control over plaintiffs' money.

50

235.    The court should impose, once the extent of Williams's, Coleman's and Flawless's financial gains are determined, a constructive trust upon the property of the defendants that they have accumulated by virtue of their breaches of fiduciary duty, fraud and unjust enrichment.

### Ninth Claim for Relief

(Equitable Accounting)

236.    The plaintiffs here repeat the allegations of paragraphs 1-200 of the Complaint.

237.    Flawless, Williams and Coleman have appropriated the assets, money and resources of the plaintiffs while they were in a fiduciary capacity and they engaged in common law fraud to divert and obtain controll over plaintiff's money.

238.    The court should order Williams, Coleman and Flawless to account to plaintiffs for the money they received from the plaintiffs.

239.    Defendants DeAngelis, Brown and Udell, Kupritz, K2, and Cion have received and retained the money and resources of the plaintiffs, which retention is unjust, unfair and violates all principles of equity and good conscience.

240.    The court should order DeAngelis, Brown and Udell, Kupritz, K2 and Cion to account for the money they received from the plaintiffs.

### Tenth Claim for Relief

(Conspiracy)

241.    The plaintiffs here repeat the allegations of paragraphs 1-200 of the Complaint.

242.    Coleman, Flawless and Williams conspired to and agreed upon a scheme to enrich themselves, at the expense of the plaintiffs, using a vehicle that appeared to be a legitimate and legal program for the acquisition and development of real estate in the City of Chicago.

243.    Coleman, Flawless and Williams conspired and agreed to each play a role and participate in unlawful acts of fraud and deception.

244.    The plaintiffs were harmed, injured and damaged by said defendants' unlawful overt acts of fraud and deception.

245.    The defendants' overt acts of fraud and deception were done pursuant to and in furtherance of the common scheme of the defendants to enrich themselves at the plaintiffs' expense.

Prayer for Relief

Wherefore the plaintiffs pray:

That judgment be entered for them and against Williams and the Flawless entities and each of them jointly and severally:

A.    In an undetermined amount not less than six million dollars, ($6,000,000.00) upon the First Claim for Relief, for violation of 18 U.S.C. § 1962(c), the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

B.    In an undetermined amount not less than six million dollars ($6,000,000,00) upon the Second Claim for Relief, for violation of 18 U.S.C. § 1962(d) by conspiracy to violate 18 U.S.C. § 1962(c), the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

That judgment be entered for them and against Coleman, Williams and Flawless and each of them jointly and severally:

C.    In an undetermined amount not less than six million dollars, ($6,000,000.00) upon the Third Claim for Relief.

That judgment be entered for them and against DeAngelis and Brown and Udell

     D.     In an undetermined amount not less than six million dollars, ($6,000,000.00) upon the Fourth and Fifth Claims for Relief.

That judgment be entered for them for

     E.     Not less than five hundred and fifteen thousand dollars ($515,000) against Coleman, Williams and Flawless on the Sixth Claim for Relief;

     F.     Not less than four hundred and sixty-five thousand dollars ($465,000) against Coleman, Williams and Flawless, twenty-five thousand dollars ($25,000) against DeAngelis, Brown, Udell, Pomerantz and Brown, Udell and Pomerantz, Ltd. and twenty-five thousand dollars ($25,000) against Kupritz, K2 and Cion on the Seventh Claim for Relief;

     G.     Not less than four hundred and sixty-five thousand dollars ($465,000) against Coleman, Williams and Flawless on the Eighth Claim for Relief;

     H.     For an accounting on the Ninth Claim for Relief;

     I.     Not less than six million dollars ($6,000,000) against Coleman, Williams and Flawless on the Tenth Claim for Relief; and

     J.     For the costs of suit including reasonable attorney's fees in accordance with 18 U.S.C. § 1964(c);

The plaintiffs demand trial by jury on all claims except the Eighth and Ninth Claims for Relief.

April 25, 2008          Blythe Holdings, Inc., a foreign corporation and Chicago 100, Inc., an Illinois corporation


          By: _____/sign/_____
              Craig D. Tobin, their attorney

Craig D. Tobin
Tomas Petkus
Karl H. Schook
Tobin Petkus & Muñoz, L.L.C.
Attorneys for Plaintiffs
Three First National Plaza, #1950
Chicago, IL 60602-4298
Office (312) 641-1321
Facsimile (312) 641-5220
Email  ctobin@barristers.com
        tomaspetkus@barristers.com
        khschook@barristers.com

\\Ma01\data - client\Tobin, Craig\Blythe v. Williams\Pleadings\complaint, amended, 1st.doc

<u>Appendix A</u>

Wire Fraud (18 U.S.C. § 1343) Predicate Acts Cognizable as Racketeering Activity under RICO (18 U.S.C. § 1961(l)(B))

| From | To | Date | Purpose | Complaint |
|------|-----|------|---------|-----------|
| US Bank | Flawless Financial | 11/16/05 | Lot Acquisition Funds | 110 |
| Blythe/Hill | Tracy Williams | 12/8/05 | Consulting Fees | 138 |
| Blythe/ Roger White | DeAngelis/ Brown and Udell | 12/20/05 | Lot Acquisition | 141 |
| Blythe/ Roger White | DeAngelis/ Brown and Udell | 12/20/05 | Lot Acquisition | 141 |
| DeAngelis/ Brown and Udell | Flawless | 12/21/05 | Payment for lots | 145 |

55

Appendix B

Mail Fraud (18 U.S.C. § 1341) Predicate Acts Cognizable as Racketeering Activity under RICO (18 U.S.C. § 1961(1)(B))

| From | To | Date | Purpose | Complaint |
|---|---|---|---|---|
| Flawless | Blythe | 10/25/05 | Form Agreement | 105 |
| Flawless | Blythe | 10/25/05 | Induce    Acceptance of Agreement | 105 |
| Coleman | Blythe | 11/21/05 | Induce payment | 112 |
| Coleman | Blythe | 12/12/05 | Induce payment | 137 |
| DeAngelis and Brown and Udell | Blythe | 11/28/05 | Induce payment | 122 |
| Kupritz | Blythe | 11/05 | Induce payment | 129 |

Appendix C

Plaintiffs' Monies Fraudulently Obtained by Defendants

| From: | To: | Date: | Purpose | Amount | Complaint |
|---|---|---|---|---|---|
| Blythe/Hill | Flawless Financial | 11/7/06 | Deposit for Signed Agreements | $50,000.00 | 109 |
| Blythe/Roger White | Flawless Financial | 11/16/06 | Lot Acquisition | $150,000.00 | 110 |
| Blythe/Hill | John DeAngelis | 12/1/06 | Retainer Fee | $25,000.00 | 126 |
| Blythe/Hill | Phil Kupritz | 12/1/06 | Retainer Fee | $25,000.00 | 133 |
| Blythe/Hill | Tracy Williams | 12/8/06 | Lot Acquisition | $15,000.00 | 138 |
| Blythe/Roger White | Flawless Financial | 12/19/06 | Lot Acquisition | $150,000.00 | 141 |
| Blythe/Roger White | Flawless Financial | 12/19/06 | Lot Acquisition | $100,000.00 | 141 |
| Total: | | | | $515,000.00 | |

<u>Appendix D</u>

Damages Suffered by Plaintiffs as a Result of Defendants' Wrongful Acts

| Profit Ratio: 20% Affordable, 80% Market Value | |
|---|---|
| Affordable: | First 100 homes: $80,000 (expected profit) x 20 homes (20% affordable) = $1,600,000.00 |
| Market Value: | First 100 homes: $100,000 (expected profit) x 80 homes (80% market value) = $8,000,000.00 |
| **Total:** | $9,600,000 profit for the first 100 homes<br>$38,400,000 profit for 400 homes |

<u>Other Injuries</u>:
1. Loss of Investor's Funds (See Appendix C)
2. Loss of Business Relationships and Reputation

# Exhibit A

# PROPERTY PROFILE

## CHICAGO LOTS

1.     Is the land commercial?

2.     Is the land residential? How many homes had to be Affordable Living (10-20%) and how many Market Value (80%)?

3.     What is the size of the property? Are the lots adjacent to each other? Are there fill-in or single lots?

5.     What is the zoning on the property?  Residential or commercial

6.     Is the property an approved plat?  Can we have a copy?

7.     Are there extra costs for the surveys, permits, soil testing?

8.     Can an existing lot be split and added to another existing lot to satisfy square footage requirements to get building permits?

9.     How many actual building lots are on the property?

10.    Who issues the permits on the property?

11.    Is the property ready to apply for building permits now?

12.    What improvements are on the property?  Water, sewage, electric, gas, telephone, etc. Does the City do this?

13.    Is the property in a designated flood area?

14.    Are there any assessments or taxes due on the individual lots?

15.    What is the $40,000 tax incentive per lot and how does it work?

16.    Is there a written memorandum or decree that explains the incentive program?

17.    What is the asking price of the property? 400 lots

18.    What escrow company would be used to handle the purchase transaction?  Are you a licensed mortgage company?

19.    What title insurance company would be used by Escrow?

20.    What is the anticipated length of time to close this transaction?

21.    Is there a Master Plan for the site?

22.    What future community development is proposed for the surrounding area?

23.    What other properties are available to the building lot property?

24.    What is the procedure for purchasing the 400 lot?

25.    Are there public schools, hospitals in the area?

26.    How far is the nearest airport to the site?

27.    Do you have any comps for this area?  What is the value of the land?

28)    Profit Ratio:  what is the anticipated profit to be made on the Affordable Living and the Market Value homes?  How long would it take to build them in Chicago (politics, weather, etc.)

# Exhibit B

10/26/2005  10:12   7737763118          ECLIPSE TRAVEL              PAGE  02/05

## CONSULTING CONTRACT
## BETWEEN
## FLAWLESS FINANCIAL AND BLYTHE HOLDINGS, INC.

October 25, 2005

This agreement is a consulting contract between Flawless Financial of Chicago and Blythe Holdings, Inc. of California. The purpose of this agreement is to outline the terms, conditions and responsibilities of the parties involved.

WHEREAS, Flawless Financial, Tracy Williams has agreed to deliver up to 400 residential building lots to Blythe Holdings, Inc. or assigns for $1 million or $2,500 per lot in a minimum 6-9 month time frame period.

WHEREAS, Blythe Holdings, Inc. agrees to the following:

1)   Blythe Holdings, Inc. will deposit a $50,000 retainer to Flawless Financial when the consulting agreement has been executed by both parties.

2)   Blythe Holdings, Inc. agrees to use architectural firm of Phil Kittredge recommended by Flawless Financial.  Developer will enter into a separate agreement with the architect and pay a retainer of $25,000 upon the execution of the consulting agreement.  The total funds for his services will not exceed $125,000.

3)   Developer agrees to pay legal fees for a total of $50,000 to the attorney recommended by Flawless Financial and deliver a retainer fee of $25,000 to begin the process. Developer will have a private agreement with the attorney.

4)   Blythe Holdings, Inc. will enter into a minimum of a 6 month consulting agreement with Flawless for $20,000 per month. This fee will be paid every 30 days.  A written monthly progress report will be sent to Blythe Holdings, Inc. as a billing statement in order to receive the monthly $20,000 payment.

**DEA 0004**

PAGE  05                      STEPHANIE              17022407689   12:42  02/08/2006

JD3

10/26/2005 19:22   7737763110                    ECLIPSE TRAVEL                    PAGE 83/85

Consulting Agreement
Blythe Holdings, Inc.
Page Two


5)     Blythe Holdings, Inc. agrees to pay a bonus payment of $400,000
($1,000 per lot) to Flawless as each lot has been secured to Blythe Holdings,
Inc. or assigns.

6)     Blythe Holdings, Inc. will produce an equity partner for the
development, construction and build out of the 400 lots that meets all the
requirements of the City of Chicago.  The Document titled "City of Chicago
Economic Disclosure Statement" will be filled out to begin the process.

Upon execution of this agreement by both Flawless Financial and Blythe
Holdings, Inc., a deposit of $100,000 will be wired to Flawless Financial, a
$25,000 retainer for the architect and $25,000 for the attorney for a total of
$100,000.  Flawless Financial will disburse the retainer fees accordingly.
These funds will be deducted from the individual contracts.

This agreement constitutes the acceptable terms and conditions of both
parties.  The signatures below acknowledge this mutual agreement.

FLAWLESS FINANCIAL


_Tracy Williams_     Date: _Oct 26-05_
Tracy Williams

BLYTHE HOLDINGS, INC.


_Stephanie Hill_     Date: _10/26/05_
Stephanie Hill, President


**DEA 0005**

# Exhibit C



*Flawless Financial*

October 25, 2005

BLYTHE HOLDINGS, INC.
4489 W. Wells Rd. #43
Blythe, CA 92225

      Re:    Acquisition of 400 lots

Dear Ms. Hill:

Per our conversation in Chicago last week, I am writing you to confirm the terms of our pending
agreement regarding the 400 lots. As you know, Flawless Financial is acting as the Consultant
who will be arranging for the transaction on the lots from the City to the developer. As you
suggested, the City will be deeding the property to the developer in 4 stages of 100 lots for a total
of 400 lots. The lots are approximately 25 x 125 sq.ft., and the City requires a minimum of
1,700 sq.ft. per residential home. The developer will have several options for building on the
lots which are outlined in the "Negotiated agreement the Redevelopment Project Area
Properties" which I have sent you. (Example: single family homes, 4-6 units, town homes and
condos.) The City is also providing a tax incentive of $40,000 per home to the Developer. The
time involved to deed the lots will be approximately 6 months as a minimum. A copy of the
Master Plan for the project will also be provided to you.

I have also sent you the "City of Chicago Economic Disclosure Statement and Affidavit" which
explains the rules for transferring public property. This form must be filled out completely by
the developer immediately to begin the process.

My services are based upon my consulting services and my relationship with the City and
various agencies to assure that all of the necessary steps and legal aspects of this transaction are
accomplished. These services will ensure the acquisition and development of the property, along
with my arranging for the architectural designs by an architect who has already been approved
by the City. The developer will enter into a private agreement with the architect and a retainer
fee of $25,000 will be required immediately.

Flawless Financial will be using their attorney of choice to represent all the legal transactions
necessary in working with the City of Chicago and the developer will be responsible for these
fees. The maximum fee will be $50,000. A retainer fee of $25,000 will be required immediately.

3040 W. 63RD ST CHICAGO, IL 60629 PHONE 773.434.7200 FAX 773.776.5110

Blythe Holdings, Inc
Page Two
Consulting

Flawless Financial will arrange for a real estate broker to sell the homes as they are built and
Flawless Financial will have the exclusive right to handle the mortgages on the property for the
purchaser.

In addition, I will be providing the following information to the Developer:
1)    Processing information
2)    business affairs for the City
3)    Technical information required
4)    copyrights
5)    future plans for development of the area.
6)    working directly with the City officials to accomplish this transaction
7)    appraisals on the value of lots in the area (SEE ATTACHED VACANT LAND
       LISTINGS & Total agreement equaling the sum 1 million, 6 hundred & 95thousand
       dollars).

       Upon receipt of a $50,000 deposit from the Developer for my services, along with
       $25,000 retainer fee for the attorney and $25,000 retainer fee for the architect, for a total
       of $100,000, I will begin the process of arranging for the acquisition. Per our
       understanding, I will also be receiving $20,000 per month and $1,000 per lot when the
       lots are deeded by the City to the Developer. The final deeding of the property by the
       City will take approximately 6 months. However, a letter from the City will be provided
       stating the Developer can begin development on those specific lots. If the Developer
       wishes to deposit $200,000, the City will provide a letter to guarantee the acquisition of
       the lots.

When the first 100 lots are completed the Developer will receive a letter from the City stating
that the Property is in process and ready to begin development The Developer must deliver funds
in the amount of $250,000 for the first 100 lots. If you have any questions feel free to contact
me. I look forward to working closely with you and the Developer.

Sincerely,

FLAWLESS FINANCIAL
Tracy Williams

Att: Vacant land listings

3040 W. 63RD ST CHICAGO, IL 60629  PHONE 773.434.7200  FAX 773.776.5110

# Exhibit D

# BROWN, UDELL & POMERANTZ, LTD.

ATTORNEYS AND COUNSELLORS AT LAW

1332 NORTH HALSTED STREET
SUITE 100
CHICAGO, ILLINOIS 60622

TELEPHONE 312-476-9900
FACSIMILE 312-476-1188
WWW.BUPLAW.COM

MICHAEL L BROWN
GLENN L UDELL
MICHAEL B. POMERANTZ
JAMES R. DONOVAL
KELLY CARTWRIGHT
PATRICK J. MACKEY
MICHAEL J. DRURAHM
JOEL E. REDNICK
FRANK M. ADAMS
MARY E. AMMERMANN
WILLIAM M. EIZAK
JOHN A. DANGELIS
TONY P. VALEVICIUS

OF COUNSEL
ROBERT J. PETERS
LARA M. KRTS
GRETCHEN R. VAUGHN

LEGAL ASSISTANT
KATHLEEN A. BURMEISTER

November 28, 2005

Blythe Holdings, Inc.
5348 Vegas Dr.
Las Vegas NV 89108
Attention: Ms. Stephanie Hill

Re:     Acquisition of Vacant Lots – Chicago, Ilinois

Dear Ms. Hill:

   The purpose of this letter is to provide Blythe Holdings, Inc. ("you") and our firm with a written memorandum of the terms and conditions under which we will undertake to represent you.  You have requested that we provide legal and consulting services to you in connection with your acquisition of approximately 400 vacant lots from the City of Chicago.  As we have discussed, we will provide (both directly and through sub-consultants retained by us) such services in connection with the preparation, assembly, review and completion of an Application for Purchase of the Property to the City of Chicago Department of Planning and Development, and Economic Disclosure statements and other attachments to that Application.  We shall also provide such consultation and advice to you, attend meetings and conference calls, and conduct other correspondence and communication with you, other members of the development team and City of Chicago officials as is necessary in connection with fostering the successful conclusion of the Application.  We will provide you with copies of all documents for your review prior to filing of same, and we will provide you with the PIN numbers regarding the lots you are acquiring.

   Our fees in representing you will be based upon a flat fee of fifty thousand dollars ($50,000).  Said fees shall be payable as follows: one half ($25,000) immediately upon the execution hereof, and the other half ($25,000) within thirty (30) days after the execution hereof.  As we discussed, we will retain Corvax Holdings LLC as our sub-consultant to provide certain consulting services in connection with the Application; Corvax Holdings LLC's fees will be paid from our fees, and the use of this company will not result in additional costs to you.

   We will commence work immediately upon receipt of the first half of the fee as set forth above.  We will work as expedeitiously as reasonably possible to complete the Application process, bearing in mind that there are substantial amounts of information that you will need to provide to us about you and the project, and in addition substantial portions of the Application (for example, architectural plans and specifications) for which we are dependent on third parties.

   If, at any time, you have questions concerning this agreement or any of the above-referenced matters, please do not hesitate to contact me.  In order to protect the confidentiality of both your communications with us and our advice to you under the attorney-client privilege, please do not divulge them to, or discuss them with, anyone else.

**DEA 0016**

# BROWN, UDELL & POMERANTZ, LTD.

### ATTORNEYS AND COUNSELLORS AT LAW

  If the foregoing meets with your approval, please date and sign this letter where indicated and return it to me by facsimile.  For purposes of finalizing this letter agreement, any signed document, including this letter, transmitted by facsimile machine shall be treated in all manner and respects as an original document, and the signature of any party on such facsimiled document shall be considered an original document and have the same force and effect as an original document.  Please keep a signed copy of this letter for your files.

  We look forward to working with you.

Very truly yours,

Brown, Udell & Pomerantz, Ltd.

By: _____

      John A DeAngelis

ACCEPTED and AGREED
this _____ day of November, 2005

_____
Ms. Stephanie Hill, on behalf of
Blythe Holdings, Inc.

**DEA 0017**

JD16

# Exhibit E

1997 EDITION

# AIA DOCUMENT | B141-1997

## *Standard Form of Agreement Between Owner and Architect with Standard Form of Architect's Services*

**A G R E E M E N T** made as of the
in the year  Two  Thousand                                        day of
*(In words, indicate day, month and year)*

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

**B E T W E E N** the Architect's client identified as the Owner:

*(Name, address and other information)*

BLYTHE HOLDINGS, INC
2600 SO. TOWN CENTER DR #204)
LAS VEGAS, NV 89135

949 751.8527 CELL / 702 240 7808 PH & FX

and the Architect:
*(Name, address and other information)*

K2
329 W 18th
CHICAGO, IL

TABLE OF ARTICLES

1.1 INITIAL INFORMATION

1.2 RESPONSIBILITIES OF THE
    PARTIES

1.3 TERMS AND CONDITIONS

1.4 SCOPE OF SERVICES AND
    OTHER SPECIAL TERMS
    AND CONDITIONS

1.5 COMPENSATION

For the following Project:
*(Include detailed description of Project)*

100 LOTS IN CHICAGO, IL



© 1997  AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

The Owner and Architect agree as follows.

K2 00393

Copyright 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987, ©1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.


## ARTICLE 1.1 INITIAL INFORMATION

**1.1.1** This Agreement is based on the following information and assumptions.
*(Note the disposition for the following items by inserting the requested information or a statement such as "not applicable," "unknown at time of execution" or "to be determined later by mutual agreement.")*

**1.1.2** **PROJECT PARAMETERS.**

**1.1.2.1** The objective or use is: 3 BASIC DESIGN PLANS AND 3 ELEVATIONS
*(Identify or describe, if appropriate, proposed use or goals.)* FOR SINGLE FAMILY RESIDENCES AND 1 BASIC PLAN AND ELEVATION FOR A 2—

**1.1.2.2** The physical parameters are: FLAT AND 3 FLAT
*(Identify or describe, if appropriate, size, location, dimensions, or other pertinent information, such as geotechnical reports about the site.)* OWNER TO PROVIDE SURVEYS AND SOIL BORINGS FOR SITES

**1.1.2.3** The Owner's Program is: TO BUILD OR TO HAVE PERMITTED
*(Identify documentation or state the manner in which the program will be developed.)* A MINIMUM OF 10 LOTS AT A TIME

**1.1.2.4** The legal parameters are:
*(Identify pertinent legal information, including, if appropriate, land surveys and legal descriptions and restrictions of the site.)*

**1.1.2.5** The financial parameters are as follows.
  .1  Amount of the Owner's overall budget for the Project, including the Architect's compensation, is:

  .2  Amount of the Owner's budget for the Cost of the Work, excluding the Architect's compensation, is:

**3.1.2.6** The time parameters are:
*(Identify, if appropriate, milestone dates, durations or fast track scheduling.)*

**1.1.2.7** The proposed procurement or delivery method for the Project is:
*(Identify method such as competitive bid, negotiated contract, or construction management.)*

**1.1.2.8** Other parameters are:
*(Identify special characteristics or needs of the Project such as energy, environmental or historic preservation requirements.)*



© 1997   A I A ®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

K2 00394

1-2

KUP92

**1.1.3   PROJECT TEAM**
**1.1.3.1**   The Owner's Designated Representative is:
*(List name, address and other information.)*

**1.1.3.2**   The persons or entities, in addition to the Owner's Designated Representative, who are required to review the Architect's submittals to the Owner are:
*(List name, address and other information.)*

To be determined

**1.1.3.3**   The Owner's other consultants and contractors are:
*(List discipline and, if known, identify them by name and address.)*

To be determined

**1.1.3.4**   The Architect's Designated Representative is:
*(List name, address and other information.)*
Phillip Kupritz, K2 Architects, Inc.
Matthew Kupritz, K2 Architects, Inc.

**1.1.3.5**   The consultants retained at the Architect's expense are:
*(List discipline and, if known, identify them by name and address.)*
Structural: Moshe Calamaro & Associates
Mechanical: To be determined

**1.1.4**   Other important initial information is:

**1.1.5**   When the services under this Agreement include contract administration services, the General Conditions of the Contract for Construction shall be the edition of AIA Document A201 current as of the date of this Agreement.



© 1997   A I A ®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**1.1.6**   The information contained in this Article 1.1 may be reasonably relied upon by the Owner and Architect in determining the Architect's compensation. Both parties, however, recognize that such information may change and, in that event, the Owner and the Architect shall negotiate appropriate adjustments in schedule, compensation and Change in Services in accordance with Paragraph 1.3.3.

K2 00395

1-3

KUP93

## ARTICLE 1.2 RESPONSIBILITIES OF THE PARTIES

1.2.1 The Owner and the Architect shall cooperate with one another to fulfill their respective obligations under this Agreement. Both parties shall endeavor to maintain good working relationships among all members of the Project team.

### 1.2.2 OWNER

1.2.2.1 Unless otherwise provided under this Agreement, the Owner shall provide full information in a timely manner regarding requirements for and limitations on the Project. The Owner shall furnish to the Architect, within 15 days after receipt of a written request, information necessary and relevant for the Architect to evaluate, give notice of or enforce lien rights.

1.2.2.2 The Owner shall periodically update the budget for the Project, including that portion allocated for the Cost of the Work. The Owner shall not significantly increase or decrease the overall budget, the portion of the budget allocated for the Cost of the Work, or contingencies included in the overall budget or a portion of the budget, without the agreement of the Architect to a corresponding change in the Project scope and quality.

1.2.2.3 The Owner's Designated Representative identified in Paragraph 1.1.3 shall be authorized to act on the Owner's behalf with respect to the Project. The Owner or the Owner's Designated Representative shall render decisions in a timely manner pertaining to documents submitted by the Architect in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.

1.2.2.4 The Owner shall furnish the services of consultants other than those designated in Paragraph 1.1.3 or authorize the Architect to furnish them as a Change in Services when such services are requested by the Architect and are reasonably required by the scope of the Project.

1.2.2.5 Unless otherwise provided in this Agreement, the Owner shall furnish tests, inspections and reports required by law or the Contract Documents, such as structural, mechanical, and chemical tests, tests for air and water pollution, and tests for hazardous materials.

1.2.2.6 The Owner shall furnish all legal, insurance and accounting services, including auditing services, that may be reasonably necessary at any time for the Project to meet the Owner's needs and interests.

1.2.2.7 The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including any errors, omissions or inconsistencies in the Architect's Instruments of Service.

### 1.2.3 ARCHITECT

1.2.3.1 The services performed by the Architect, Architect's employees and Architect's consultants shall be as enumerated in Article 1.4.

1.2.3.2 The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Project. The Architect shall submit for the Owner's approval a schedule for the performance of the Architect's services which initially shall be consistent with the time periods established in Subparagraph 1.1.2.6 and which shall be adjusted, if necessary, as the Project proceeds. This schedule shall include allowances for periods of time required for the Owner's review, for the performance of the Owner's consultants, and for approval of submissions by authorities having jurisdiction over the Project. Time limits established by this schedule approved by the Owner shall not, except for reasonable cause, be exceeded by the Architect or Owner.



© 1 9 9 7   A I A ®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

K2 00396



**1.2.3.3** The Architect's Designated Representative identified in Paragraph 1.1.3 shall be authorized to act on the Architect's behalf with respect to the Project.

**1.2.3.4** The Architect shall maintain the confidentiality of information specifically designated as confidential by the Owner, unless withholding such information would violate the law, create the risk of significant harm to the public or prevent the Architect from establishing a claim or defense in an adjudicatory proceeding. The Architect shall require of the Architect's consultants similar agreements to maintain the confidentiality of information specifically designated as confidential by the Owner.

**1.2.3.5** Except with the Owner's knowledge and consent, the Architect shall not engage in any activity, or accept any employment, interest or contribution that would reasonably appear to compromise the Architect's professional judgment with respect to this Project.

**1.2.3.6** The Architect shall review laws, codes, and regulations applicable to the Architect's services. The Architect shall respond in the design of the Project to requirements imposed by governmental authorities having jurisdiction over the Project.

**1.2.3.7** The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the Owner. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any errors, omissions or inconsistencies in such services or information.

## ARTICLE 1.3 TERMS AND CONDITIONS

### 1.3.1 COST OF THE WORK

**1.3.1.1** The Cost of the Work shall be the total cost or, to the extent the Project is not completed, the estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**1.3.1.2** The Cost of the Work shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, including the costs of management or supervision of construction or installation provided by a separate construction manager or contractor, plus a reasonable allowance for their overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work.

**1.3.1.3** The Cost of the Work does not include the compensation of the Architect and the Architect's consultants, the costs of the land, rights-of-way and financing or other costs that are the responsibility of the Owner.

### 1.3.2 INSTRUMENTS OF SERVICE

**1.3.2.1** Drawings, specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service for use solely with respect to this Project. The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights.

**1.3.2.2** Upon execution of this Agreement, the Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service solely for purposes of constructing, using and maintaining the Project, provided that the Owner shall comply with all obligations, including prompt payment of all sums when due, under this Agreement. The Architect shall



©1997 AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

T-5

**K2 00397**

obtain similar nonexclusive licenses from the Architect's consultants consistent with this Agreement. Any termination of this Agreement prior to completion of the Project shall terminate this license. Upon such termination, the Owner shall refrain from making further reproductions of Instruments of Service and shall return to the Architect within seven days of termination all originals and reproductions in the Owner's possession or control. If and upon the date the Architect is adjudged in default of this Agreement, the foregoing license shall be deemed terminated and replaced by a second, nonexclusive license permitting the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of completing, using and maintaining the Project.

1.3.2.3  Except for the licenses granted in Subparagraph 1.3.2.2, no other license or right shall be deemed granted or implied under this Agreement. The Owner shall not assign, delegate, sublicense, pledge or otherwise transfer any license granted herein to another party without the prior written agreement of the Architect. However, the Owner shall be permitted to authorize the Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers to reproduce applicable portions of the Instruments of Service appropriate to and for use in their execution of the Work by license granted in Subparagraph 1.3.2.2. Submission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of the Architect and the Architect's consultants. The Owner shall not use the Instruments of Service for future additions or alterations to this Project or for other projects, unless the Owner obtains the prior written agreement of the Architect and the Architect's consultants. Any unauthorized use of the Instruments of Service shall be at the Owner's sole risk and without liability to the Architect and the Architect's consultants.

1.3.2.4  Prior to the Architect providing to the Owner any Instruments of Service in electronic form or the Owner providing to the Architect any electronic data for incorporation into the Instruments of Service, the Owner and the Architect shall by separate written agreement set forth the specific conditions governing the format of such Instruments of Service or electronic data, including any special limitations or licenses not otherwise provided in this Agreement.

**1.3.3   CHANGE IN SERVICES**

1.3.3.1  Change in Services of the Architect, including services required of the Architect's consultants, may be accomplished after execution of this Agreement, without invalidating the Agreement, if mutually agreed in writing, if required by circumstances beyond the Architect's control, or if the Architect's services are affected as described in Subparagraph 1.3.3.2. In the absence of mutual agreement in writing, the Architect shall notify the Owner prior to providing such services. If the Owner deems that all or a part of such Change in Services is not required, the Owner shall give prompt written notice to the Architect, and the Architect shall have no obligation to provide those services. Except for a change due to the fault of the Architect, Change in Services of the Architect shall entitle the Architect to an adjustment in compensation pursuant to Paragraph 1.5.2, and to any Reimbursable Expenses described in Subparagraph 1.3.9.2 and Paragraph 1.5.5.

1.3.3.2  If any of the following circumstances affect the Architect's services for the Project, the Architect shall be entitled to an appropriate adjustment in the Architect's schedule and compensation:

.1  change in the instructions or approvals given by the Owner that necessitate revisions in Instruments of Service;

.2  enactment or revision of codes, laws or regulations or official interpretations which necessitate changes to previously prepared Instruments of Service;



© 1997   A I A®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

.3   decisions of the Owner not rendered in a timely manner;

.4   significant change in the Project including, but not limited to, size, quality, complexity, the Owner's schedule or budget, or procurement method;

.5   failure of performance on the part of the Owner or the Owner's consultants or contractors;

.6   preparation for and attendance at a public hearing, a dispute resolution proceeding or a legal proceeding except where the Architect is party thereto;

.7   change in the information contained in Article 1.1.

**1.3.4   MEDIATION**

**1.3.4.1**   Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party. If such matter relates to or is the subject of a lien arising out of the Architect's services, the Architect may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by mediation or by arbitration.

**1.3.4.2**   The Owner and Architect shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

**1.3.4.3**   The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

**1.3.5   ARBITRATION**

**1.3.5.1**   Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with Paragraph 1.3.4.

**1.3.5.2**   Claims, disputes and other matters in question between the parties that are not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association.

**1.3.5.3**   A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

**1.3.5.4**   No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement and signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim,



©1997   AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



K2 00399

dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

1.3.5.5  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

### 1.3.6    CLAIMS FOR CONSEQUENTIAL DAMAGES

The Architect and the Owner waive consequential damages for claims, disputes or other matters in question arising out of or relating to this Agreement. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Paragraph 1.3.8.

### 1.3.7    MISCELLANEOUS PROVISIONS

1.3.7.1  This Agreement shall be governed by the law of the principal place of business of the Architect, unless otherwise provided in Paragraph 1.4.2.

1.3.7.2  Terms in this Agreement shall have the same meaning as those in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

1.3.7.3  Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion. In no event shall such statutes of limitations commence to run any later than the date when the Architect's services are substantially completed.

1.3.7.4  To the extent damages are covered by property insurance during construction, the Owner and the Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. The Owner or the Architect, as appropriate, shall require of the contractors, consultants, agents and employees of any of them similar waivers in favor of the other parties enumerated herein.

1.3.7.5  Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

1.3.7.6  Unless otherwise provided in this Agreement, the Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials or toxic substances in any form at the Project site.

1.3.7.7  The Architect shall have the right to include photographic or artistic representations of the design of the Project among the Architect's promotional and professional materials. The Architect shall be given reasonable access to the completed Project to make such representations. However, the Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect in the Owner's promotional materials for the Project.



© 1 9 9 7   A I A ®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

1-8

**K2 00400**

1.3.7.8  If the Owner requests the Architect to execute certificates, the proposed language of such certificates shall be submitted to the Architect for review at least 14 days prior to the requested dates of execution. The Architect shall not be required to execute certificates that would require knowledge, services or responsibilities beyond the scope of this Agreement.

1.3.7.9  The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Architect shall assign this Agreement without the written consent of the other, except that the Owner may assign this Agreement to an institutional lender providing financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under this Agreement. The Architect shall execute all consents reasonably required to facilitate such assignment.

**1.3.8   TERMINATION OR SUSPENSION**

1.3.8.1  If the Owner fails to make payments to the Architect in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect's option, cause for suspension of performance of services under this Agreement. If the Architect elects to suspend services, prior to suspension of services, the Architect shall give seven days' written notice to the Owner. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services. Before resuming services, the Architect shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

1.3.8.2  If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect shall be compensated for expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

1.3.8.3  If the Project is suspended or the Architect's services are suspended for more than 90 consecutive days, the Architect may terminate this Agreement by giving not less than seven days' written notice.

1.3.8.4  This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

1.3.8.5  This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect for the Owner's convenience and without cause.

1.3.8.6  In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses as defined in Subparagraph 1.3.8.7.

1.3.8.7  Termination Expenses are in addition to compensation for the services of the Agreement and include expenses directly attributable to termination for which the Architect is not otherwise compensated, plus an amount for the Architect's anticipated profit on the value of the services not performed by the Architect.

©1997  AIA®
**AIA DOCUMENT B141-1997**
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

1-9

K2 00401

KUP99

**1.3.9   PAYMENTS TO THE ARCHITECT**

1.3.9.1   Payments on account of services rendered and for Reimbursable Expenses incurred shall be made monthly upon presentation of the Architect's statement of services. No deductions shall be made from the Architect's compensation on account of penalty, liquidated damages or other sums withheld from payments to contractors, or on account of the cost of changes in the Work other than those for which the Architect has been adjudged to be liable.

1.3.9.2   Reimbursable Expenses are in addition to compensation for the Architect's services and include expenses incurred by the Architect and Architect's employees and consultants directly related to the Project, as identified in the following Clauses:

.1   transportation in connection with the Project, authorized out-of-town travel and subsistence, and electronic communications;

.2   fees paid for securing approval of authorities having jurisdiction over the Project;

.3   reproductions, plots, standard form documents, postage, handling and delivery of Instruments of Service;

.4   expense of overtime work requiring higher than regular rates if authorized in advance by the Owner;

.5   renderings, models and mock-ups requested by the Owner;

.6   expense of professional liability insurance dedicated exclusively to this Project or the expense of additional insurance coverage or limits requested by the Owner in excess of that normally carried by the Architect and the Architect's consultants;

.7   reimbursable expenses as designated in Paragraph 1.5.5;

.8   other similar direct Project-related expenditures.

1.3.9.3   Records of Reimbursable Expenses, of expenses pertaining to a Change in Services, and of services performed on the basis of hourly rates or a multiple of Direct Personnel Expense shall be available to the Owner or the Owner's authorized representative at mutually convenient times.

1.3.5.4   Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, employee retirement plans and similar contributions.

**ARTICLE 1.4 SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS**

1.4.1   Enumeration of Parts of the Agreement. This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect. This Agreement comprises the documents listed below.

1.4.1.1   Standard Form of Agreement Between Owner and Architect, AIA Document B141-1997.

1.4.1.2   Standard Form of Architect's Services: Design and Contract Administration, AIA Document B141-1997, or as follows:
*(List other documents, if any, delineating Architect's scope of services.)*
Basic services shall include all structural and mechanical engineering, all work pertaining to landscape,

1.   Other documents as follows:
*(List other documents, if any, forming part of the Agreement.)*

K2 00402



© 1997   A I A ®
**AIA DOCUMENT B141-1997**
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

1.4.2   Special Terms and Conditions. Special terms and conditions that modify this Agreement are as follows:

*K2 IS TO CONTRACT WITH RON GARDNER AND INCORPORATE THE ATTACHED DESIGN INTO THE PROJECT PACKAGE. THE COSTS FOR GARDNER'S WORK WILL BE INCLUDED IN THE K2 FEE OF $125,000.00*

## ARTICLE 1.5 COMPENSATION

1.5.1   For the Architect's services as described under Article 1.4, compensation shall be computed as follows:

The fee is *$125,000.00*   for all architectural work through acquisition of *PERMITS*           The fee is *TO BE TIME + MATERIAL*   for all field observation, *IF REQUIRED. TEN PERMIT SUBMITTALS ARE INCLUDED IN THE ABOVE FEE. EACH ADDITIONAL PERMIT SUBMITTAL WILL INVOICED FOR A $400/SITE.*

1.5.2   If the services of the Architect are changed as described in Subparagraph 1.3.3.1, the Architect's compensation shall be adjusted. Such adjustment shall be calculated as described below or, if no method of adjustment is indicated in this Paragraph 1.5.2, in an equitable manner.
(*Insert basis of compensation, including rates and multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply.*)

```
Principal Rate:          $120/hr.
Project Manager:         $80/hr.
Draftsman:               $60/hr.
```

1.5.3   For a Change in Services of the Architect's consultants, compensation shall be computed as a multiple of  one point one        (  1.1  ) times the amounts billed to the Architect for such services.

1.5.4   For Reimbursable Expenses as described in Subparagraph 1.3.9.2, and any other items included in Paragraph 1.5.5 as Reimbursable Expenses, the compensation shall be computed as a multiple of  one point one        (  1.1     ) times the expenses incurred by the Architect, and the Architect's employees and consultants.

1.5.5   Other Reimbursable Expenses, if any, are as follows:

*ALL PRINTING COSTS*



© 1997   AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

K2 00403

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

KUP101

.1.5.6   The rates and multiples for services of the Architect and the Architect's consultants as set forth in this Agreement shall be adjusted in accordance with their normal salary review practices.

1.5.7   An initial payment of ........................ Dollars ($............................) shall be made upon execution of this Agreement and is the minimum payment under this Agreement. It shall be credited to the Owner's account at final payment. Subsequent payments for services shall be made monthly, and where applicable, shall be in proportion to services performed on the basis set forth in this Agreement.

1.5.8   Payments are due and payable   **Thirty**   (  **30**  ) days from the date of the Architect's invoice. Amounts unpaid   **Sixty**   (  **60**  ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)*

    **1% per month**

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

1.5.9   If the services covered by this Agreement have not been completed within   **Thirty six**   (  **36**  ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Paragraph 1.5.2.

This Agreement entered into as of the day and year first written above.



_____          _____
**OWNER** *(Signature)*                               **ARCHITECT** *(Signature)*


_____          **Phillip Kupritz, Principal**
*(Printed name and title)*                        *(Printed name and title)*

**CAUTION:** *You should sign an original AIA document or a licensed reproduction. Originals contain the AIA logo printed in red; licensed reproductions are those produced in accordance with the Instructions to this document.*



© 1 9 9 7   A I A ®
**AIA DOCUMENT** B141-1997
STANDARD FORM
AGREEMENT

**K2 00404**

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

TP:jp 04/025/08  06-1718

In the United States District Court for the
Northern District of Illinois, Eastern Division

Blythe Holdings, Inc., a foreign corporation and
Chicago 100, Inc., an Illinois corporation,

                        Plaintiffs,

                 v.                            No.: 06 C 5262

Flawless Financial Corporation, an Illinois corporation,
Flawless Financial Mortgage Corporation, an Illinois corporation,    Judge Dow
Tracy Williams, individually,
Tracy Williams d/b/a Flawless Financial,
Tracy Williams d/b/a Flawless Financial Corporation,
Tracy Williams d/b/a/ Flawless Financial Mortgage Corporation,
Shirley Coleman, John A. DeAngelis, Michael Brown,
Glenn Udell, Michael Pomerantz, Brown, Udell and
Pomerantz, Ltd, an Illinois corporation, Phillip A. Kupritz,
Phillip A. Kupritz d/b/a K2, Phillip A. Kupritz d/b/a K2 Studio,
Phillip A. Kupritz d/b/a K2 Architects, Inc.,
Phillip A. Kupritz d/b/a Cion Companies. Inc.,
K2 Architects, Inc., an Illinois corporation and Cion
Companies Inc., an Illinois corporation,

                        Defendants

<u>Notice of Filing</u>

To:     See attached service list

       Please take notice that on April 25, 2008 we filed with the United States District Court

for the Northern District of Illinois, Plaintiffs' First Amended Complaint using the CM/ECF

system which will send notification of such filing to the attorneys of record.

April 25, 2008                 s/ Tomas Petkus
                               Tomas Petkus,
                               Attorney for Plaintiff

Craig D. Tobin
Tomas Petkus
Karl H. Schook
Tobin, Petkus & Muñoz, L.L.C.
Attorneys for Plaintiff
Three First National Plaza, Suite 1950
Chicago, Illinois 60602-4298
Office: (312) 641-1321
Fax: (312) 641-5220
Email: ctobin@barristers.com
        tomaspetkus@barristers.com
        khschook@barristers.com
Web:   www.barristers.com


## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2008 I filed the foregoing Notice of Filing and Plaintiffs' First Amended Complaint using the CM/ECF system which will send notification of such filing to the attorneys of record.


s/Tomas Petkus
Tomas Petkus


\\Ma01\Data - Client\Tobin, Craig\Blythe v. Williams\Pleadings\notice, filing, amended complaint.doc

*Blythe Holdings, Inc., et al. v. Flawless Financial Corporation, et al.*
Case No. 06 C 5262

<u>Service List</u>

Mr. James L. Kopecky
Mr. John J. Lynch
321 N. Clark , Suite 2200
Chicago, Illinois 60610
(312) 380-6552
(312) 527-3968 facsimile
Attorneys for John DeAngelis

Mr. Kyle D. Rettberg
Mr. Terry D. Weissman
Neal, Gerber & Eisenberg, LLP
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-8000
(312) 269-1747 facsimile
Attorneys for Michael Brown; Glenn Udell; Michael Pomerantz
and Brown, Udell &  Pomerantz, Ltd.

Mr. Edward P. Gibbons
Mr. Christopher A. Wadley
Mr. Peter G. Daniels
Walker, Wilcox, Matousek LLP
225 W. Washington Street, Suite 2400
Chicago, Illinois 60606
(312) 244-6700
(312) 244-6800 facsimile
Attorneys for Phillip Kupritz, *et al.*

Mr. Kenneth A. Michaels, Jr.                    Marty J. Schwartz
Mr. Paul M. Bauch                               Marty J. Schwartz & Associates, P.C.
Ms. Caroline Y. Sales                           70 W. Madison Street
Bauch & Michaels, LLC                           Suite 3700
53 W. Jackson Boulevard, Suite 1115             Chicago, Illinois 60602
Chicago, Illinois 60604                         (312) 558-4293
(312) 588-5000                                  (312) 558-7750
(312) 427-5709 facsimile                        Attorney for Tracy Williams, *et al.*
Attorneys for Shirley Coleman