**EXHIBIT 35**

-----Original Message-----
From: David M. M. Taffet [mailto:dmmt@platypus.bz]
Sent: Wednesday, February 05, 2014 4:51 PM
To: Dr. Jeffrey Russell; John M. Gerber; rosemary russell
Cc: beingthyself@yahoo.com
Subject: RE: Contract
Importance: High

Jeffrey,

You play too many games. Truly.

You also play way too loosely with the truth.  Truly.

If I were to choose one word to describe you and I opted to remain civil, it would be "Disingenuous".  If I were to to choose a few more (less civil) words, they would be Craven, Vapid, Lying, Sinister Man.

You represented that you communicated to Rosemary my generous offer to release you both from the membership and to leave the hard dollar portion of the capital account ($3,269,932.44) substantially undiminished except as necessary to cover fees and interest that the company might incur to secure debt to cover the shortfall of losing the two of you as a member.

In return for allowing you to resign from the membership (a possibility explicitly precluded contractually without my express approval) and from the associated unlimited, perpetual contractual obligations (e.g. capital calls), all I asked is that the two of you immediately pay all amounts owing and that you timely cover the calls through the end of the month.
Essentially, I am granting you something I am in no way obligated to even consider in exchange for you doing exactly what you are already contractually required to do.

Jeffrey, you represented that this deal was acceptable and I agreed to expend funds to have John Gerber memorialize our agreement.

Before John could put "pen to paper", you attempted an end-run by negotiating a private transaction with Tracy in which he offered to sell all of your shares for $2.5 million with half due in 6 months and the other half due in a year and a half following the first payment.

Attempting to negotiate this agreement reveals a number of things, all of which make it easier for me in good conscience to exercise the other rights available under the Default provisions of the Operating Agreement:

1

(1)     You believe that the Fair Market Value of your perceived 30%
ownership is $2,500,000, $769,932.44 less than the $3,269,932.44 I had offered on behalf of Platypus Holdings to repay;

(2)     You are comfortable accepting payment of the Fair Market Value of
your perceived 30% ownership over 2 years with half due in 6 months and the other half due in a year and a half following the first payment;

(3)     You cling to the self-serving delusion that you still own 30%, which
as the governing agreements make clear and as John Gerber and I explained in a number of prior communications, you do not;

(4)     You think you have a contractual ability to contract and to transfer
shares without my express approval when you have neither such contractual right nor such express approval; and

(5)     Despite the fact that I was allowing you to emerge substantially
whole despite the pain you caused by repeatedly and purposefully defaulting on your contractual obligations, you elected to pursue a path that would prove to my detriment by putting all of your ownership in Tracy's hands as opposed to allowing for the orderly distribution of the shares to the remaining members as the Operating Agreement provides.


I can assure you that negotiating a substantially intact capital account with satisfaction of past calls and a stay on future calls is off the table.
In the same vein, were I persuaded to engage once again in any discussion, the starting point would be your stated Fair Market Value of $2.5 million, not the $3,269,932.44 I had suggested, and such discussion, if any, would incorporate all of the penalties, rights and options available contractually in the Default provisions (delineated below) as offset, if at all, by your willingness to collateralize the $700,000 unsecured note at Penn Liberty, which given your meeting with the bank yesterday suspiciously became an issue for me again just moments ago despite my having reached agreement on how I will collateralize and cover my share. By the way, I assure you I will investigate and rectify whatever damage you did and, in the end, assuming my instincts are correct, sue you both for slander.

Now, with the day all but over and the Federal Wire facilities closed with no wire of the amounts you owe in the Platypus account, you are officially in default for the 4th time.

In his January 10, 2014, E-mail to both of you, John Gerber made plain that which you already knew from our previous conversations and from your independent reads of the executed Subscription Documents and Operating Agreement: The agreement provides for 50% reductions in your capital account AND a 50% reduction in your percentage ownership for EACH event of default.

Thus, your repeated, purposeful decision to default has reduced your ownership in your own invested dollars from 100% to 50% with the first event of default, from 50% to 25% with your second event of default, from 25% to 12.5% with your third event of default and from 12.5% to 6.25% with this fourth (and most recent) event of default. To put this in perspective, every dollar you invested is now worth only $0.0625.  By way of example, his has the effect of making the portion of your capital account reflecting your initial $1.2 million investment worth only $75,000.

Were you to similarly default for a 5th time by failing to pay timely today's interim capital call for working capital, your current ownership in your capital account would be further reduced by 50% from its current 6.25% to 3.125%.

In the same vein, relying on the governing default provisions, your equity ownership has gone from 30% to 15% with the first event of default, from 15% to 7.5% with your second event of default, from 7.5% to 3.75% with your third event of default and from 3.75% to 1.875% with this fourth (and most

recent) event of default. Again, to put this in perspective, were the company to produce $1 million in profit, you would have enjoyed 30% or
$300,000 in profit participation. Now, you would benefit from only 1.875%, which is $18,750.

As stated above in the context of the percentage of your capital account that you own, were you to similarly default for a 5th time by failing to pay timely today's interim capital call for working capital, your current equity ownership would be further reduced by 50% from its current 1.875% to less than 1%, more specifically to .9375%.

Importantly, none of your defaults relieve you of your obligation to pay the capital calls in full. Accordingly, aside from today's interim capital call for $30,000, you presently owe $119,485.79.  Please wire the full amount owed immediately.

Moreover, so long as you are a member, which both of you still are, you are obligated to pay each and every capital call within 3 business days of the demand. Defaulting does not shield you against future capital calls.
Failure to pay subsequent capital calls timely and in full will constitute yet another default with the concomitant penalties.  Importantly, the company has an unlimited ability to make such calls even up to one year after dissolution and the dollar amount of such calls is not capped:


4(d) Unlimited Capital Calls. Manager may call for capital for new investments up until dissolution of the company and for expenses up to one year thereafter to fund Company Expenses and Working Capital. The Manager also determines when to dissolve the Company, in the absence of which the term of existence of the Company will be perpetual. Accordingly, the Subscriber's commitment to contribute capital when a capital call is made could be perpetual and unlimited in amount.


Although I have outlined above the immediate penalties for your repeated defaults, those courses of action are by no means the only available paths.
Failure to pay such Capital Calls will result in "Substantial Penalties" as stated in the Risk Factors of the Subscription Agreement:


4(e) Substantial Penalties for Default. Subscriber, as a Member, will be required to commit and fund additional capital proportionate to his Shares.
A Member who fails to make capital contributions in a timely manner may suffer substantial penalties with respect to his Shares, including a total forfeiture of such Shares. Upon an event of default, such defaulting Member may, in the sole discretion of the Manger, be assessed a reduction in his capital account up to 50% of the aggregate amount of his previous capital contributions (which reduction will be credited to the capital accounts of the other Members, including the Manager in his capacity as a Member), with appropriate adjustments made to the Shares held by such defaulting Member.
In addition, the Company may take any or all of the actions set forth in the Operating Agreement.


The Operating Agreement allows the company to take any of the following actions in the face of EACH default:


4.3 Default. Each Member agrees that time is of the essence in respect to the payment of such Person's Capital Contribution when due under this Section 4, that any failure of a Member to make all or a portion of any Capital Contribution on the applicable due date (a "Defaulting Member") would cause injury to the Company and to the other Members, and that the amount of damages caused by any such injury would be extremely difficult to calculate. Accordingly, each Member agrees that upon any such failure by a Defaulting Member (unless a cure opportunity is made available by the Company and such failure is cured in accordance with such opportunity), the Company, in its sole discretion, may take, without limitation, the following

actions:

(a) The Company may cause the Capital Account of such Defaulting Member to be reduced by an amount (the "Default Deduction") up to 50% of the aggregate amount of such Defaulting Member's Capital Contributions made on or prior to the date of such default and make appropriate adjustments to the Shares and Percentage Interest held by such Defaulting Member, and the amount of such reduction shall be credited to the Capital Accounts of all non-defaulting Members in proportion to their respective Capital Accounts after giving effect to the other adjustments under this Section 4.3.

(b) The Company may redeem any of all Shares of the Defaulting Member upon payment to such Defaulting Member of an amount (the "Default Redemption
Amount") equal to 50% of the fair market value of such Defaulting Member's Shares (calculated by the Company in its sole discretion) after taking into account the Default Deduction. In connection with any such redemption, the Company shall notify the Defaulting Member of the Default Redemption Amount and such notice shall be final absent of manifest error. The excess of the fair market value of any Shares redeemed under this Section 4.3(b) over the Default Redemption Amount shall be credited to the Capital Accounts of all non-defaulting Members in proportion to their respective Capital Accounts after giving effect to the other adjustments under this Section 4.3 (with a corresponding debit to the capital account of the Defaulting Member).

(c) The Company may, upon default, at its discretion, arrange for the sale of all or a portion of the Shares held by Defaulting Member, and such Defaulting Member hereby agrees to sell all or such portion of its Shares, to the Company, the other Members or another Person designated by the Company (including, without limitation, an existing Member or any affiliate of a Member) at such price and on such other terms as the Company deems appropriate. For any sale of the Defaulting Member's Shares pursuant to this Section 4.3(c), the purchase price paid for the Defaulting Member's Shares shall be applied in the following order: (i) To the payment of the expenses of the sale, including any selling commission, and the expenses of the Company resulting from the default, including reasonable attorneys' fees and costs (collectively, the "Default Expenses"); (ii) Thereafter, to the payment of all amounts then due and payable from the Defaulting Member to the Company as a Capital Contribution including any such unpaid amounts that contributed to the occurrence of the default; (iii) Thereafter, up to the amount of the purchase price remaining (if any), to the Defaulting Member, an amount not to exceed the amount of the Defaulting Member's Capital Account at the time of the default (prior to any reduction thereof pursuant to the forfeiture provisions of Section 4.3(a) above); and (iv) Thereafter, any remainder to the Company.

(d) The Company may seek or obtain commitments or investments of capital from additional investors in amounts and on such terms as the Company determines in its sole discretion.

(e) The rights and remedies referred to in this Section 4.3 shall be in addition to, and not in limitation of, any other rights available to the Members or the Company under this Agreement or at law or in equity. A Defaulting Member's default under this Section 4 shall not relieve any other Member of such Person's obligation to make its Capital Commitment. In addition, unless the Shares of any such Defaulting Member are redeemed pursuant to Section 4.3(b) or sold pursuant to Section 4.3(c), any such default shall not relieve such Defaulting Member of the obligation to make any required Capital Commitment subsequent to such default. The Company may proceed to collect from the Defaulting Member any amount due from such Member as and when due, as well as all costs and expenses of collection incurred by the Company (including reasonable fees and disbursements of counsel).

(f) Notwithstanding anything to the contrary herein, for purposes of identifying the Members from whom any approval must be obtained under this Agreement, the term "Members" shall not include any Defaulting Member (unless such default has been cured, if a cure opportunity is made available by the Company) under this Section 4.


I am deeply disappointed that such a long-standing and promising relationship has come to this. In truth, gloves off, I am disgusted.

David M. M. Taffet
(610) 529-9785

_____
From: Dr. Jeffrey Russell [jbrussell@ivf-success.com]
Sent: Wednesday, February 05, 2014 2:00 PM
To: David M. M. Taffet; John M. Gerber; rosemary russell
Subject: Contract

David, during our meeting on [date], we agreed that you would send me a new contract buying me and Rosemary out of Platypus and incorporating the terms that I provided, and upon which we agreed. You have not yet sent me that new contract and that failure causes me grave concerns. Once we finalize and fully-execute the buy-out contract, I happily will provide the capital calls Rosemary and I owe.

Please provide me with supporting documentation for the expenses outlined in your February 1, 2014 correspondence for the B & M, Labor and frozen pipe expenses on the 4009 S. Calumet and 4127 S. Michigan properties. What expenses do the Recurring Costs ($21,601) and A&M Costs ($19,574) cover?

Jeff